No. 22-16859

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ANGELA WILLIAMS, JANE DOE #1, AND JANE DOE #2,

*Plaintiffs-Appellants*,

v.

JOSEPH LOMBARDO, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
NEVADA; AARON FORD, IN HIS OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF NEVADA, CITY OF LAS VEGAS, CLARK COUNTY, AND NYE
COUNTY

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Nevada
No. 2:21-CV-01676
Hon. Andrew P. Gordon

**APPELLANTS' OPENING BRIEF**

Jason D. Guinasso (SBN# 8478)
Hutchison & Steffen, PLLC
5371 Kietzke Lane
Reno, NV 89511
775.853.8746
*jguinasso@hutchlegal.com*

Benjamin W. Bull (SBN#388206)
Peter A. Gentala (SBN#021789)
Dani Bianculli Pinter (SBN#120441)
Christen M. Price (SBN#1016277)
National Center on Sexual
Exploitation
1201 F Street NW, Suite 200
Washington, DC 20004
202.393.7245
lawcenter@ncose.com

*Attorneys for Appellants Angela Williams,
Jane Doe #1, and Jane Doe #2*

## CORPORATE DISCLOSURE STATEMENT

This statement is provided pursuant to Fed. R. App. P. 26.1.  There are no nongovernmental corporation appellants in this case; all appellants are individuals.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS ....................................................................................... iii

TABLE OF AUTHORITIES ................................................................................. v

INTRODUCTION .................................................................................................. 1

JURISDICTIONAL STATEMENT ...................................................................... 2

STATEMENT OF THE ISSUES PRESENTED ................................................... 3

STATEMENT OF THE CASE .............................................................................. 4

   I.   Factual Background ..................................................................................... 4

     A.   Historical context ................................................................................. 4

     B.   Government Defendants' system .......................................................... 5

     C.   Plaintiffs' exploitation ......................................................................... 8

   II.   Procedural Background ............................................................................. 13

SUMMARY OF ARGUMENT ............................................................................ 16

STANDARD OF REVIEW ................................................................................. 21

ARGUMENT ...................................................................................................... 22

   I.   The district court erred by not considering most of Plaintiffs' allegations about how their injuries from being sex trafficked by legal, licensed businesses were fairly traceable to Government Defendants. ............................................. 22

   II.   The existence of independent third parties in the Nevada sex trade does not break the causal chain between Government Defendants' legalizing, incentivizing, licensing, controlling, and profiting from sex trade businesses and Plaintiffs' injuries from being trafficked by those same businesses. .................. 32

     A.   The district court misunderstood the relevant injuries in its causation analysis. ........................................................................................... 33

     B.   The district court overstated the role of independent parties in the causal chain. ....................................................................................................... 36

     C.   The district court ignored precedent finding causation based on the predictable effects of government action. ........................................................ 39

D.    The district court failed to consider causation analyses in other cases involving the same form of derivative liability:  benefiting from sex trafficking. ................................................................................. 46

III.    Article III standing's traceability prong should not be interpreted to nullify constitutional or statutory rights claims against sex trafficking enablers and profiteers. ........................................................................................ 50

A.    Article III standing's traceability prong should not be interpreted to undermine Thirteenth Amendment claims based on government enabling of slavery. ............................................................................................... 51

B.    Article III standing's traceability prong should not be interpreted to undermine Trafficking Victims Protection Act claims based on benefiting from slavery. ............................................................................................... 57

CONCLUSION ................................................................................. 60

ADDENDUM ............................................................................. ADD-1

# TABLE OF AUTHORITIES

**Cases**

*Ashford v. Raby*, No. 19-1677, 2020 WL 1057393, at *2 (6th Cir. Mar. 5, 2020). 23

*Bailey v. Alabama*, 219 U.S. 219 (1911) ................................................ 22, 59, 60, 61

*Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894 (9th Cir. 2011) ................. passim

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................ 46, 47, 48

*Brownback v. King*, 141 S. Ct. 740 (2021) ............................................................ 23

*C.R. Cases*, 109 U.S. 3 (1883) ......................................................................... 21, 58

*California v. Texas*, 141 S. Ct. 2104 (2021) ........................................................... 42

*Charleston v. Nevada*, 830 F. App'x 948 (9th Cir. 2020) ...................................... 62

*Coubaly v. Cargill, Inc.*, No. 21-CV-386 (DLF), 2022 WL 2315509 (D.D.C. June

28, 2022) ..................................................................................................... 54, 55

*Doe I v. Apple Inc.*, No. 1:19-CV-03737 (CJN), 2021 WL 5774224, at *1 (D.D.C.

Nov. 2, 2021) ..................................................................................................... 54

*Fla. Abolitionist v. Backpage.com LLC*, No. 617CV218ORL28TBS, 2018 WL

1587477, at *2 (M.D. Fla. Mar. 31, 2018) ............................................. 50, 51, 53

*Fleites v. MindGeek S.A.R.L.,* No. CV2104920CJCADSX, 2022 WL 4456077, at

*5 (C.D. Cal. July 29, 2022) ............................................................. 20, 38, 52, 53

*G & G Fire Sprinklers, Inc. v. Bradshaw*, No. 95-56639, 1997 WL 1106525, at *4

(9th Cir. Aug. 27, 1997) ......................................................................... 43, 48, 49

*Herring Networks, Inc. v. Maddow*, 8 F.4th 1148 (9th Cir. 2021) ......................... 34

*In re Tracht Gut, LLC*, 836 F.3d 1146 (9th Cir. 2016)............................................. 24

*Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020)............................. 42, 43, 44

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................................... passim

*M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019) 65

*Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011)......................... 22, 41, 44, 47

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,

    320 F.3d 920 (9th Cir. 2003) ................................................................. 25

*Smith v. Kentucky*, 520 S.W.3d 340 (Ky. 2017)...................................................... 23

*United States v. Reyes,* 866 F.3d 316 (5th Cir. 2017) ............................................. 23

*Warth v. Seldin,* 422 U.S. 490 (1975)...................................................................... 48

**Statutes**

18 U.S.C. § 1591 ........................................................................... 32, 49, 58, 59

18 U.S.C. § 1595 ............................................................................................ passim

28 U.S.C. § 1291(b)........................................................................................... 3

28 U.S.C. § 1331 ................................................................................................ 2

42 U.S.C. § 1983 ......................................................................................... 52, 53

NEV. REV. STAT. § 201.430 ................................................................................. 5

NEV. REV. STAT. § 244.345 ............................................................................. 5, 6

NEV. REV. STAT. § 368A.090 ............................................................................. 37

NEV. REV. STAT. § 368A.200 ............................................................. 37

NEV. REV. STAT. §201.440 ................................................................. 5

**Other Authorities**

Cir. R. 28.1 ........................................................................................ 62

Cir. R. 29 ........................................................................................... 62

Cir. R. 32 ..................................................................................... 62, 63

Circ. R. 28 ......................................................................................... 62

Cong. Globe, 42d Cong., 1st Sess. 697 (1871)................................. 53

Fed. R. App. P. 26.1 ........................................................................... ii

Fed. R. App. P. 29 .............................................................................. 62

Fed. R. App. P. 32 .............................................................................. 62

Fed. R. Civ. P. 15 .............................................................................. 32

Neal Kumar Katyal, *Men Who Own Women: A Thirteenth Amendment Critique of Forced Prostitution*, 103 Yale L.J. 791, 817 (1993).................................... passim

U.S. Const. amend. XIII ................................................................. passim

**Regulations**

CLARK, NEV., COUNTY CODE § 6.140.030-140........................................ 7

CLARK, NEV., COUNTY CODE § 8.32.010-150 (2021)............................... 7

LAS VEGAS, NEV., MUN. CODE § 6.36.010 (2020) ................................. 7

LAS VEGAS, NEV., MUN. CODE § 6.36.160 ............................................ 7

LAS VEGAS, NEV., MUN. CODE § 6.36.190 ................................................................ 7

LAS VEGAS, NEV., MUN. CODE § 6.57.010 ................................................................ 7

LAS VEGAS, NEV., MUN. CODE § 6.36.170 ................................................................ 7

NEV. ADMIN. CODE § 441A.800 ................................................................ 5

Nye Co. Code § 9.20.020 ................................................................ 6

Nye Co. Code § 9.20.120 ................................................................ 6

Nye Co. Code § 9.20.160 ................................................................ 6

**INTRODUCTION**

Rape for profit was a cornerstone of American chattel slavery. As a system, it was formally abolished with the Thirteenth Amendment. Yet it persists with legal cover in Nevada, where government entities collude with private actors to extend this age-old system of holding some women as public sexual property, in violation of the Thirteenth Amendment and federal anti-trafficking laws. ER-50–51, ER-57–59.

Angela Williams, Jane Doe #1, and Jane Doe #2 were sex trafficked due to this system by legal strip clubs, legal escort agencies, and a legal brothel, and seek to hold both the public officials and the private businesses accountable. ER-50–51.

They allege that sex trafficking increases in hospitable legal environments – that is, those that legalize or otherwise tolerate prostitution. ER-64–66. They allege that the government defendants in this case facilitated and profited from just such an environment, not least by licensing sex trade businesses, requiring women in prostitution to have corporate pimps, and failing to enforce laws against debt bondage and sex trafficking. *See, e.g.*, ER-67–75.

None of this, of course, is as open or explicit as it was in the antebellum South. But everyone knows how a company town works. You don't have to be terribly direct or excessively violent. You create a system of incentives that

exploits some people's vulnerability and enables other people's unscrupulousness, and eventually it becomes its own ecosystem.

Nevada officials imagine they can obscure their central role in this, pointing to illegal actors as though none of this was the predictable result of their own actions, and with the court below, they were successful, as the court ruled that Appellants' sex trafficking was not traceable to them.  ER-34–38.

But the Thirteenth Amendment and the Trafficking Victims Protection Act include not only direct perpetrators, but enablers and profiteers within their ambit; this should not be short-circuited when the enablers and profiteers are public officials.

If those charged with enforcing the laws against slavery are themselves the violators, and the plaintiffs cannot sue to enforce their own rights, this particular manifestation of slavery will be effectively decriminalized in Nevada.

## JURISDICTIONAL STATEMENT

The District Court has jurisdiction based on 28 U.S.C. § 1331, as well as 18 U.S.C. § 1595(a) and U.S. Const. amend. XIII.  On November 7, 2022, the District Court entered an order directing an entry of final judgment for Defendants Attorney General Aaron Ford, Governor Steve Sisolak, the City of Las Vegas, Clark County, and Nye County (collectively, "Government Defendants"). ER-5.

On December 1, 2022, Plaintiffs filed their notice of appeal. ER-107. This Court has jurisdiction based on 28 U.S.C. § 1291(b).

## STATEMENT OF THE ISSUES PRESENTED

1) At the motion to dismiss stage, courts must accept Plaintiffs' allegations as true and draw all reasonable inferences in the Plaintiffs' favor. The court below granted Government Defendants' motion to dismiss for lack of subject matter jurisdiction, reasoning that Plaintiffs had not sufficiently alleged traceability for Article III standing. But the court did not consider, let alone analyze, most of the facts Plaintiffs alleged against the Government Defendants. Did the Court err?

2) For Article III standing, an injury must be "fairly traceable" to a defendant, although the defendant need not exclusively, proximately, or even directly cause that injury. Plaintiffs alleged that Government Defendants legalized, incentivized, licensed, controlled, and profited from the Nevada businesses that sex trafficked them. Plaintiffs were also trafficked by third-party traffickers and sex buyers; does this mean that none of their injuries can be fairly traced to Government Defendants?

3) The Thirteenth Amendment and the Trafficking Victims Protection Act include liability for enabling and profiting from sex trafficking: derivative forms of liability premised on third-party violators. The district court's approach to traceability eliminates Article III standing where independent third parties play a

3

role in a plaintiff's injuries. Can Article III standing be interpreted to exclude

constitutional and statutory rights claims against sex trafficking enablers and

profiteers?

## STATEMENT OF THE CASE

### I.    Factual Background

### A. Historical context

Sex trafficking was a central feature of chattel slavery in the antebellum

South: "White men subjected enslaved women and girls to rape and sexual abuse

and harassment as a matter of course, and women and girls were also sold

specifically for prostitution in the euphemistically-named 'fancy' trade." ER-57.

"Enslaved women and girls were also forced to work in or manage brothels, and

give their owners the fees they got from sex buyers." ER-58. Some of the biggest,

wealthiest traders in the 1820s and 1830s were pimps. ER-58. The pervasive

sexual abuse and violence was a significant reason abolitionists opposed to slavery

condemned it. ER-58–59.

Women and girls continued to be exploited in prostitution after the

Thirteenth Amendment was ratified: "During the Jim Crow era, red light districts

were placed in black neighborhoods, and segregation did not stop white men from

frequenting them," and Chinese women were trafficked into the United States for

prostitution, even being openly auctioned off at San Francisco's wharf, which was recognized as slavery by the Ninth Circuit in one case.  ER-60–62.

### B. Government Defendants' system

Plaintiffs have alleged specific facts implicating Government Defendants in Plaintiffs' sex trafficking.  The Governor and Attorney General (State Defendants or Nevada) permit prostitution in rural counties, but do not enforce their own regulations limiting prostitution advertising to counties where prostitution is legal, which drives up demand for sex-buying.  ER-67–68, 72–73 (citing NEV. REV. STAT. § 244.345(8) and NEV. REV. STAT. §§ 201.430; 201.440).  The State forces prostituted people to submit to weekly STI testing, but does not require sex buyers to undergo any testing.  ER-67 (citing NEV. ADMIN. CODE § 441A.800).

Nevada allows counties to regulate themselves, even with a brothel owner sitting on the county commission that regulates the brothels.  ER-68.  Nevada also permits escorting and "entertainment by referral service" throughout the state, which are euphemisms for prostitution.  ER-68.[1]  Nevada defines "entertainment by referral service" to anticipate, if not outright compel, that persons engaging in this practice be managed by an agency.  *See* NEV. REV. STAT. § 244.345(8)(a)

---

[1] *See also* https://en.wikipedia.org/wiki/Prostitution_in_Nevada (internal citation omitted) ("Escort services offering sexual services euphemistically as 'entertainment' or 'companionship' are ubiquitous, with a reported 104 pages of a Las Vegas yellow pages directory devoted to 'entertainers'.").

(defining "Entertainer for an entertainment by referral service" as "a natural person who is sent or referred for a fee to a hotel or motel room, home or other accommodation by an entertainment by referral service for the purpose of entertaining the person located in the hotel or motel room, home or other accommodation.").

Nye County not only permits brothel prostitution but does not ban compelling someone to engage in prostitution, as long as it occurs in a brothel. ER-69–70 (citing Nye Co. Code §§ 9.20.160, 9.20.020). Nye County prevents prostituted people from operating independently, that is, they must work in a particular brothel to be licensed. ER-69–70 (citing Nye Co. Code § 9.20.160). Nye County also permits itself discretion about licensing felons to operate brothels. ER-70 (citing Nye Co. Code § 9.20.120). Nye County does not screen for trafficking when it issues brothel work cards, and did not even ask Jane Doe #1 for a government ID when it issued hers. ER-88.

Both Nye County and Nevada allow legal, licensed brothels to engage in debt bondage. They permit the brothels to lock women inside for weeks at a time. ER-69. They let the brothels prevent women from having their own transportation, despite many brothels being rural, without meaningful access to public transit. ER-69–70. They also allow brothels to require women to surrender 50% of their earnings to the brothel and follow the brothel's rules or face fines. ER-69. Nye

County and Nevada let the brothels force women to live on the premises and pay the brothels for room and board to do so. ER-69.

Las Vegas licenses escort agencies and strip clubs, despite acknowledging that prostitution occurs in both. ER-70–72 (citing LAS VEGAS, NEV., MUN. CODE § 6.36.010 (2020); LAS VEGAS, NEV., MUN. CODE § 6.57.010). Las Vegas also forces escorts to work for an escort agency and undergo STI testing for licensure. ER-70–71 (citing LAS VEGAS, NEV., MUN. CODE §§ 6.36.170, 6.36.190, 6.36.160).

Clark County also licenses escorting, outcall entertainment and strip clubs, despite acknowledging that prostitution occurs in these. ER-70–72 (citing CLARK, NEV., COUNTY CODE § 6.140.030-140; CLARK, NEV., COUNTY CODE § 8.32.010-150 (2021)). Clark County requires women working in strip clubs to be licensed, and to work for a particular club to obtain a license. ER-72.

Plaintiffs also alleged that the legal climate Government Defendants have created has predictably led to high demand for sex buying, ER-72, a disproportionately large sex trade, ER-74, and therefore increased sex trafficking, ER-74–75. Yet Defendants do not vigorously prosecute sex trafficking, ER-74, and are plagued by outright corruption in their legal system: Angela William's known trafficker, Defendant Jamal Rashid, was a paid informant for the Las Vegas police, ER-74, 79–80.

And Plaintiffs alleged that this prostitution system is profitable for Government Defendants, due to the tourism it motivates, particularly as the economy depends on casinos, ER-74–75, as well as the taxes and licensing fees that the brothels, escort agencies, and strip clubs generate. ER-75.

### C. Plaintiffs' exploitation

*Angela Williams*

Plaintiff Angela Williams was sex trafficked in Nevada for over a decade, from 2006-2017. ER-75. She was groomed by a trafficker in Houston when she was 17, and then trafficked by him after she turned 18, in his illegal brothels. ER-75–78. She ended up in a Houston strip club after she escaped, and was trafficked by the club and an additional, violent trafficker. ER-78–79. Attempting to escape again, she responded to an advertisement posted by Defendant Jamal Rashid's employee. ER-79. Rashid was a trafficker who owned several escort businesses and shell corporations to disguise his escort services. ER-79.

Angela was hired by Defendant V.I.P. Entertainment, LLC, which was a legal, licensed escort business in Las Vegas. ER-79. Angela was required to get a work card from the Clark County Sheriff's office. ER-80. Rashid employed coercion and control, including controlling how much the women were allowed to sleep, whether they could eat, and what they were allowed to wear. ER-80–81. He

demanded that Angela give him 70% of her earnings, eventually increasing this to 100%. ER-80.

Rashid "used the money from sex trafficking the women to pay for his music production," and "has worked for Grammy award-winning artists," ER-82. Las Vegas police knew he was a pimp because they were using him as an informant, and he also paid them considerable money. ER-79–80. Rashid was convicted of federal prostitution offenses in 2021 and is currently serving a prison sentence. ER-76.

After she escaped Rashid, Angela's final trafficker also owned an escort agency and trafficked her in Las Vegas strip clubs, including Sapphire. ER-83. Although Angela was forced to travel, sometimes across state lines, on outcall "dates," most of the trafficking occurred in Nevada. *See* ER-83–85.

*Jane Doe #1*

Plaintiff Jane Doe #1 was trafficked in Nevada between 2013 and 2018, in street prostitution, by multiple escort agencies and in a legal brothel. ER-85–88. Jane Doe #1 experienced homelessness, being in the foster care system, and sexual abuse while she was a child. ER-85. While fighting her abuser for custody of their children, Jane Doe #1 was induced to travel to Las Vegas to engage in prostitution, having been promised it would be easy money to help pay for housing and a family law lawyer. ER-85.

Jane Doe #1 was trafficked by multiple violent pimps within one day of arriving in Nevada. ER-86. She was trafficked by an extremely violent guerilla pimp who employed torture. ER-86. After escaping him, she was trafficked by a Romeo pimp who relied more on psychological manipulation, and used Nevada as a hub while also sending her to other states on outcalls. ER-86. Jane Doe #1 was trafficked in casinos, executive offices, truck stops, brothels, hotels, underground business pubs, restaurants, and massage parlors. ER-87. When the Romeo pimp went to prison for sex trafficking a minor, Jane Doe #1, still under his control, continued to give him money, and also was controlled by various escort agencies. ER-87.

It was at this point that Plaintiff Jane Doe #1 was trafficked in brothel prostitution at Defendant Chicken Ranch, a legal brothel in Nye County, while she was being trafficked by two external pimps/traffickers. ER-88. When she went to the Nye County Sheriff's Office for her brothel work card, the office did not screen her for trafficking or exploitation. ER-88. They did not even ask her for a government ID, ER-88, and at that time Jane Doe #1 did not possess one, ER-88.

Chicken Ranch ran on debt bondage, a form of slavery expressly forbidden by federal law. ER-89–90. The brothel controlled all arrivals and departures for the prostituted women. ER-89. The brothel also required massive fees from the prostituted women, including, but not limited to, 50% of what Jane Doe #1 earned,

$250 per week for room and board, $50 each way for transportation, and $120 monthly for the weekly STI tests. ER-89.

During her two-week shifts, Jane Doe #1 was not permitted to leave the brothel, even to run errands. ER-89. All the women who are prostituted at Chicken Ranch are locked inside with no keys or way to leave until their two-week shift is over and they are signed out. ER-89. Jane Doe #1 was not permitted to leave the brothel if she owed the brothel money, which happened at least once. ER-89–90. The brothel never attempted to verify Jane Doe #1's age or consent, nor whether she was under an external pimp/trafficker's control. ER-88. Jane Doe #1 witnessed pimps/traffickers prostituting women and girls at the brothel, including girls who were visibly underage, having not yet reached their teens. ER-89.

*Jane Doe #2*

Plaintiff Jane Doe #2 experienced bullying, grooming, and sexual abuse as a child. ER-90. She was also trafficked by a series of "Romeo" pimps/traffickers in Houston, who employed psychological manipulation. ER-90. In 2017, she was induced to travel to Las Vegas on the pretext of taking vacation, and sex trafficked in legal strip clubs, especially in Defendants Sapphire and Larry Flynt's Hustler, by the clubs themselves, as well as by an external pimp/trafficker. ER-90–97. She was required to get a work card for the strip clubs, but was not asked if she was

being trafficked or otherwise screened for exploitation by the Clark County
Sheriff's Office. ER-91–92.

Plaintiffs have alleged that Sapphire and Hustler ran their strip clubs through
debt bondage and other coercion. ER-92–96. Plaintiff Jane Doe #2 had to pay
substantial monies to Sapphire and Hustler from any money she made:
house/entry fees; tips to various staff including bouncers, DJs, floor hosts, bottle
service, and restroom attendants; fines; certain percentages of VIP/private room
fees; fees imposed on her when customers used credit cards; and around $25 to use
the club's ATM. ER-92–96. Sapphire failed to put these fees in writing. ER-94.
These practices ensured that Jane Doe #2 was often in debt to Sapphire and
Hustler. ER-94.

Although prostitution is illegal in Las Vegas and Clark County, the clubs
contained private/VIP rooms, with bed-like furniture inside, and it was impossible
to make enough money to cover Sapphire and Hustler's fees without selling sex
acts. ER-95–97. As Jane Doe #2 was under the control of external traffickers, she
could not refuse to return to the clubs, but was forced to pay or avoid debts to
Sapphire and Hustler by engaging in commercial sex acts with club patrons, ER-
91–97.

Sapphire and Hustler's percentages for private rooms were usually between
20-28%, augmented by an additional 40% tip if Jane Doe #2 engaged in sex for

money on Sapphire's premises, and some private rooms cost sex buyers thousands of dollars per hour. ER-93–95. Sometimes, on busy nights, Sapphire or Hustler would take half or more of what Jane Doe #2 made. ER-96.

Sapphire and Hustler had video and audio in the private rooms, but failed to intervene when sex buyers turned violent, including when they raped Jane Doe #2. ER-96–97. Sapphire and Hustler would insist on collecting tips from sex buyers' rapes of Jane Doe #2 at the club. ER-96–97. Sapphire and Hustler also expected payment when Jane Doe #2 would do outcalls to nearby casinos or hotels. ER-96.

Any money that Sapphire or Hustler did not take from Jane Doe #2 went to the external pimps/traffickers. ER-96. Sapphire and Hustler witnessed Jane Doe #2 in a condition that suggested she was under coercion, such as being often intoxicated and incapacitated, and being "visibly underweight, malnourished, bruised, and scarred," ER-97, yet continued to exploit her.

## II. Procedural Background

This case was originally filed in September 2021, against Government Defendants and Defendants Western Best, Inc. d/b/a Chicken Ranch; Western Best LLC; Jamal Rashid; Mally Mall Music, LLC; Future Music, LLC; PF Social Media Management, LLC; E.P. Sanctuary; Blu Magic Music, LLC; Exclusive Beauty Lounge, LLC; First Investment Property LLC; V.I.P. Entertainment, LLC; MP3 Productions, Inc.; MMM Productions, Inc.; SHAC, LLC d/b/a Sapphire

Gentlemen's Club and/or Sapphire; SHAC MT, LLC; and Las Vegas Bistro, LLC d/b/a Larry Flynt's Hustler Club (Sex Industry Defendants) for violating the Thirteenth Amendment and the Trafficking Victims Protection Act (TVPRA) by engaging in, enabling, and profiting from sex trafficking. ER-126. An amended complaint was filed on November 10, 2021. ER-130.

Thereafter the Defendants filed various motions to dismiss and strike. ER-130–135. Jamal Rashid and his businesses[2] (Escort Agency Defendants) defaulted, and an entry of default was entered on April 28, 2022. ER-137. Hustler has not yet responded to the Complaint. *See* ER-133.

The district court ruled on the pending motions on July 18, 2022. ER-138. The court dismissed the government defendants, finding that because Plaintiffs had different entry paths into sex trafficking, and were trafficked within and outside Nevada by individual pimps/traffickers and sex buyers in addition to the Sex Industry Defendants, that numerous independent third parties' "independent decisions collectively had a significant effect on the plaintiffs' injuries." ER-36 (cleaned up).

---

[2] These include Mally Mall Music, LLC; Future Music, LLC; PF Social Media Management, LLC; E.P. Sanctuary; Blu Magic Music, LLC; Exclusive Beauty Lounge, LLC; First Investment Property LLC; V.I.P. Entertainment, LLC; MP3 Productions, Inc.; and MMM Productions, Inc.

The court found Plaintiffs' allegations that Nevada's legal prostitution system leads to an increased illegal sex trade and that Nevada failed to "enforce its limited regulation" insufficient to "plausibly allege that the injuries they suffered are fairly traceable" to Government Defendants and granted their motions to dismiss on standing grounds. ER-36 (quoting ER-66, 75). The court dismissed the claims with prejudice, because Plaintiffs had exercised their amendment as of right, and further amendment was futile. ER-37.[3]

The court also denied Sapphire and Chicken Ranch's motions to dismiss the direct and beneficiary sex trafficking claims, finding that Plaintiffs had stated claims for TVPRA violations. ER-41–45. The Court said Sapphire knew its patrons were sexually abusing Jane Doe #2, yet chose to "provide" her and benefit anyway by demanding tips from her. ER-44–45.

The court said allegations that Chicken Ranch employed debt and physical restraint were sufficient to allege force, fraud, or coercion leading to commercial sex acts. ER-41–43. The Order dismissed the Thirteenth Amendment claims against Sapphire and Chicken Ranch. ER-38–41. The Court also denied a sex buyer's motion to intervene. ER-45–47.

---

[3] Plaintiffs' amendment as of right was to add another plaintiff (Jane Doe #2) and the strip clubs that had trafficked her. *See* ER- 90–97.

Plaintiffs filed a motion for interlocutory appeal on July 28, 2022. ER-138. Defendants opposed the motion and filed a motion for final judgment. ER-138–139. The district court held a hearing on November 4, 2022, granted the Defendants' motion, and stayed the case on its own motion. ER-139. Final judgment was entered on November 7, 2022. ER-140. Plaintiffs filed a notice of appeal on December 1, 2022. ER-107.

## SUMMARY OF ARGUMENT

This case is about an ecosystem where slavery thrives: private and public actors have cultivated and enabled an environment hospitable to sexual abuse for profit, in which Plaintiffs were sex trafficked by legal, licensed businesses.

The court below ruled that particularly because Plaintiffs entered the sex trade in different ways and were trafficked by various third parties, including sex buyers, in multiple locations within and outside Nevada, numerous independent third parties' "independent decisions collectively had a significant effect" on their injuries, preventing causation as to the Government Defendants. *See* ER-34–37 (cleaned up). The Plaintiffs offer three main arguments for why this determination should be reversed.

First, the court failed to accept Plaintiffs' allegations as true and draw all reasonable inferences in the Plaintiffs' favor. *See* ER-34–37. Plaintiffs alleged numerous facts relevant to Government Defendants' causal role in their abuse.

16

*See, e.g.*, ER-67–68, 72–74 (detailing how State Defendants allow prostitution in rural counties, force STI testing on prostituted people but not sex buyers, do not enforce their own regulations limiting prostitution advertising, and permit escorting and "entertainment by referral service" throughout Nevada); ER-68 (detailing how State Defendants allow counties to self-regulate and do not bar brothel debt bondage practices); ER-69–70 (detailing how Nye County not only permits brothel prostitution but implicitly permits compelling someone into prostitution (as long as it occurs in a brothel), prevents persons in prostitution from operating independently, and has discretion about licensing felons to operate brothels); ER-70–72 (detailing how Las Vegas permits escorting and strip clubs, and forces escorts to work for an escort agency and to undergo STI testing for licensure); ER-70–71 (detailing how Clark County permits escorting, outcall entertainment, and strip clubs).

Plaintiffs also alleged that the legal climate Government Defendants created has led to high demand for sex buying, ER-72, and a disproportionately large sex trade, ER-74, yet Defendants have a sparse record of sex trafficking prosecutions, ER-74, and even outright corruption in their law enforcement, ER-74, 79. And Plaintiffs alleged that this prostitution system is profitable for Government Defendants, due to the sex tourism it motivates, as well as the taxes and licensing fees that brothels, escort agencies, and strip clubs generate. ER-74–75.

17

But aside from a reference to legalized prostitution and failure to enforce limited regulations, and a mistaken claim that Plaintiffs were not challenging the testing regime, the court below did not even consider these allegations. *See* ER-34–37.

Second, for Article III standing, an injury must be "fairly traceable" to a defendant, although the defendant need not exclusively, proximately, or even directly cause that injury. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (requiring that an injury be traceable to the defendant's conduct); *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011) (finding that it is not necessary to eliminate other contributing causes to establish traceability). The court below mistakenly assumed that Plaintiffs had to tie Government Defendants to all the injuries they suffered from being sex trafficked, instead of to injuries from being sex trafficked by the Sex Industry Defendants.

Plaintiffs alleged that Government Defendants legalized, incentivized, licensed, controlled, and profited from the Nevada businesses that sex trafficked them. *See* ER-65–75. This is not a negligence theory; Plaintiffs are not alleging that Government Defendants are bystanders, but that they are at the beginning and end of the causal chain.

The Government Defendants are the architects of the legal system that enabled Plaintiffs to be enslaved. And because they are government officials, they

have the power to regulate, tax, license, investigate, prosecute, and even abolish the legal businesses that sex trafficked Plaintiffs, yet did not hold them accountable. *See* ER-53–57, 67-75. Finally, the State Defendants complete the causal chain by taking a cut of the profits from escort agencies and strip clubs, including the ones that trafficked Plaintiffs Angela Williams and Jane Doe #2. *See* ER-74–75, 100–101.

Accordingly, the presence of independent third party traffickers, including sex buyers, does not break the causal chain between the Government and Sex Industry Defendants and Plaintiffs' violation. In finding otherwise, the court ignored precedent finding traceability based on the predictable effects of government action, *see Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011), nor other case law finding traceability based on facilitating and benefiting from TVPRA sex trafficking violation, *see Fleites v. MindGeek S.A.R.L.,* No. CV2104920CJCADSX, 2022 WL 4456077, at *5 (C.D. Cal. July 29, 2022).

Third, the district court's interpretation of Article III standing's traceability prong undermines plaintiffs' ability to bring derivative claims – that is, claims where there are primary and derivative wrongdoers. But these are exactly the types of claims that the Thirteenth Amendment and the TVPRA civil beneficiary liability provision are intended to vindicate.

Under the Thirteenth Amendment, government actors have affirmative duties. *See, e.g.*, Neal Kumar Katyal, *Men Who Own Women: A Thirteenth Amendment Critique of Forced Prostitution*, 103 Yale L.J. 791, 817 (1993). The Thirteenth Amendment is not like other constitutional rights, which primarily prevent the government from engaging in certain practices. *Id.* The Thirteenth Amendment categorically abolishes slavery, *C.R. Cases*, 109 U.S. 3, 20 (1883), and so government complicity in slavery has been interpreted as a violation, *see Bailey v. Alabama*, 219 U.S. 219, 227–28 (1911).

And the TVPRA specifically has a provision granting survivors the right to sue anyone who profited from their sex trafficking, regardless of whether that person was a perpetrator under the criminal provision. *See* 18 U.S.C. § 1595(a). Accordingly, Article III standing's traceability prong should not be interpreted to nullify core constitutional or statutory rights to hold sex trafficking enablers and profiteers accountable.

This appeal is ultimately about whether federal courts have jurisdiction to hear a case about government actors violating constitutional rights, specifically the right to be free from slavery. Because the court below failed to consider Plaintiffs' alleged facts in its standing analysis, misapplied the rule for whether independent third parties break the causal chain, and undermined trafficking survivors' ability to vindicate constitutional and statutory rights to be free from slavery, its

traceability analysis should be rejected, and its dismissal of the Government

Defendants for lack of standing should be reversed, and the case remanded.

## STANDARD OF REVIEW

Article III standing determinations are reviewed *de novo*. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (internal citation omitted) ("We review *de novo* a district court's determination that plaintiffs lack constitutional standing."). To establish constitutional standing, Plaintiffs must show three elements: 1) an injury in fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; which is 2) "fairly traceable" to the defendant's "challenged action," and "not the result of the independent action of some third party not before the court"; and is 3) redressable "by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).[4]

Establishing standing is the plaintiff's burden, which depends on the litigation's stage; "at the motion to dismiss stage, general factual allegations of injury resulting from the defendant's conduct may suffice," as a court will "presume that general allegations embrace those specific facts that are necessary to

---

[4] This brief uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See, e.g., Brownback v. King*, 141 S. Ct. 740, 748 (2021); *Ashford v. Raby*, No.19-1677, 2020 WL 1057393, at *2 (6th Cir. Mar. 5, 2020); *United States v. Reyes,* 866 F.3d 316, 321 (5th Cir. 2017); *Smith v. Kentucky*, 520 S.W.3d 340, 354 (Ky. 2017).

support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)
(cleaned up).

## ARGUMENT

Plaintiffs argue that I) the district court erred by not considering most of
Plaintiffs' allegations about how their injuries from being sex trafficked by legal,
licensed businesses were fairly traceable to Government Defendants; II) the
existence of independent third parties in the Nevada sex trade does not break the
causal chain between Government Defendants' legalizing, incentivizing, licensing,
controlling, and profiting from sex trade businesses and Plaintiffs' injuries from
being trafficked by those same businesses; and III) Article III standing's
traceability prong should not be interpreted to nullify constitutional or statutory
rights claims against sex trafficking enablers and profiteers.

I. **The district court erred by not considering most of Plaintiffs'
allegations about how their injuries from being sex trafficked by legal,
licensed businesses were fairly traceable to Government Defendants.**

On a motion to dismiss, allegations must be taken as true and construed
favorably. A court "must accept as true all facts alleged in the complaint and draw
all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d
1146, 1150 (9th Cir. 2016) (internal citations omitted).

This Court has reversed for the failure to do this. *See No. 84 Emp.-Teamster
Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th

Cir. 2003) (internal citations omitted) ("[I]n reaching this finding, the District Court failed to accept Plaintiffs' allegations as true and construe them in the light most favorable to Plaintiffs.").

Yet the court below did not consider, let alone analyze or accept as true, most of what Plaintiffs alleged about the Government Defendants' causal role in their exploitation. The following chart sets out the allegations implicating Government Defendants; the italicized entries are the facts the court acknowledged:

| Allegation | Cite | Defendant | Considered by court |
|---|---|---|---|
| *Legalizing prostitution* | ER-67 | State Defendants; Nye County | Yes, ER-36 |
| Legalizing entertainment by referral service | ER-68 | State Defendants; Clark County | No |
| *Forcing prostituted people to get weekly STI testing* | ER-67 | State Defendants; Nye County | Yes, but mistakenly characterized as not being challenged in the |

| Allegation | Cite | Defendant | Considered by court |
|---|---|---|---|
|  |  |  | lawsuit, ER-40 |
| Forcing people in escorting to get STI tests | ER-70 | City of Las Vegas | No |
| Licensing strip clubs while acknowledging prostitution occurs in them | ER-71 | Clark County; City of Las Vegas | No |
| Licensing escort agencies | ER-70–71 | Clark County; City of Las Vegas | No |
| Requiring strip club dancers to be licensed, and making employment by a specific strip club be a condition of the license | ER-72 | Clark County | No |
| Requiring escorts to be managed by an escort agency | ER-70 | City of Las Vegas | No |

| Allegation | Cite | Defendant | Considered by court |
|---|---|---|---|
| Requiring women in brothel prostitution to be attached to a brothel | ER-69 | Nye County | No |
| Allowing brothels to lock women inside for weeks at a time | ER-68 | State Defendants; Nye County | No |
| Allowing brothels to prevent women from having their own transportation | ER-68–69 | State Defendants; Nye County | No |
| Allowing brothels to employ coercion through debt | ER-68 | State Defendants; Nye County | No |
| Allowing strip clubs to employ coercion through debt | ER-92–97 | State Defendants; Clark County; City of Las Vegas | No |
| Not requiring sex buyers to get any STI testing | ER-67 | State Defendants; Nye County; City of Las Vegas | No |

25

| Allegation | Cite | Defendant | Considered by court |
|---|---|---|---|
| Allowing compelled prostitution (trafficking) in brothels | ER-69–70 | Nye County | No |
| Allowing a known trafficker to continue exploiting women while a paid police informant | ER-79 | State Defendants; City of Las Vegas; Clark County | No |
| Allowing counties to self-regulate, even to the point of permitting a pimp/brothel owner/trafficker to sit on local regulatory board | ER-68 | State Defendants | No |
| *Failure to enforce frequent advertising regulation violations* | ER-72–73 | State Defendants | Somewhat; generalized reference to failure to regulate, ER-36 |

| Allegation | Cite | Defendant | Considered by court |
|---|---|---|---|
| *Failure to vigorously prosecute sex trafficking* | ER-74 | State Defendants; Clark County; City of Las Vegas; Nye County | Somewhat; generalized reference to failure to regulate, ER-36 |
| Failure to publish state sex trafficking investigation, prosecution, and conviction data | ER-74 | State Defendants | No |
| Significant government corruption | ER-74 | State Defendants; Clark County; City of Las Vegas; Nye County | No |
| Knowing that Nevada is a particular destination for sex trafficking | ER-72–73 | State Defendants | No |

| Allegation | Cite | Defendant | Considered by court |
|---|---|---|---|
| Failure to check ID or otherwise screen for sex trafficking | ER-88 | Nye County | No |
| Profiting from sex trafficking through collecting escort agency and strip club taxes | ER-75 | State Defendants | No |
| Profiting from sex trafficking through brothel license fees | ER-75 | Nye County | No |
| Profiting from sex trafficking from collecting property taxes | ER-75 | Nye County, Clark County, City of Las Vegas | No |
| Profiting from sex trafficking by collecting escort agency and strip club license fees | ER-75 | Clark County; City of Las Vegas | No |
| Depending significantly on tourism and casino revenue, which is motivated at least in part by sex buying/sex tourism | ER-74, 100–101 | State Defendants; Clark County; City of Las Vegas; Nye County | No |

28

| Allegation | Cite | Defendant | Considered by court |
|---|---|---|---|
| Correlation of legalized prostitution with sex trafficking | ER-66 | State Defendants; Clark County; City of Las Vegas; Nye County | No |
| *Demand fueled by perception of legalized prostitution* | ER-72 | State Defendants; Clark County; City of Las Vegas; Nye County | Yes, ER-36 |

The court's analysis lumped the Government Defendants together, even though Plaintiffs allege some facts specific to each one. The court also mistakenly asserted that the testing regime is irrelevant because Plaintiffs are not challenging it, ER-40, but Plaintiffs are challenging the testing regulation, ER-102 (requesting a declaration that testing regulation is unconstitutional and an injunction against its enforcement).

Not only did the court not accept Plaintiffs' alleged facts, but it also failed to draw reasonable inferences on Plaintiffs' behalf. There are at least two such inferences that are material to causation.

First, because Government Defendants legalized euphemistic sex trade activity like escorting and entertainment by referral service, it is reasonable to infer

Government Defendants have created a legalized prostitution system extending beyond the rural counties that prostitution is ostensibly limited to.[5]  Similarly, the City of Las Vegas even compels escorts to get STI testing, which further supports the inference.  *See* ER-70.

Second, each local licensing scheme (and arguably Nevada's entertainment by referral rule) essentially requires pimping, as they do not allow persons to engage in prostitution, escorting, or stripping independently.  ER-68–72.  That is, prostitution is not always illegal in Nevada, but independent prostitution is always illegal in Nevada.

It is reasonable to infer, then, that the Government Defendants are not simply tolerating prostitution; they are encouraging it to take a particular, exploitative form:  where women are under the control of someone else.  This inference is further supported by the regulations' one-sided nature.  Plaintiffs alleged that the Government Defendants consistently enforce rules designed to keep men from getting sick from the women they are buying, but not rules designed to limit prostitution advertising, prevent debt bondage, or hold sex traffickers accountable; nor do they seem to mind a pimp sitting on a brothel regulatory board.  ER-67–70, 72–74.

---

[5] It seems reasonable to infer that given the "hotel or motel room, home or other accommodation" locations specified, "entertainment" does not refer to clowns, chamber music, or puppets.

Sex trafficking occurs when a commercial sex act involves a person under 18 or a person induced by force, fraud, or coercion. 18 U.S.C. § 1591. By extension, then, Government Defendants have effectively built sex trafficking into their system, unless a court could reasonably infer, given Plaintiffs' allegations, that pimps never or rarely employ, force, fraud, or coercion when inducing people to engage in commercial sex acts.

To the extent the court failed to consider, assume the truth of, and draw reasonable favorable inferences from the facts Plaintiffs pled tracing the Government Defendants' conduct to their sex trafficking injuries in legal Nevada businesses, its determination should be reversed.

The district court also abused its discretion in not giving Plaintiffs leave to amend, particularly as the complaint had only been amended once, and not as to causation factors, *see* ER- 90–97, as the federal rules provide that "the district court should freely give leave when justice so requires," which the Ninth Circuit mandates is a "policy…to be applied with extreme liberality." *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1160–61 (9th Cir. 2021) (cleaned up) (citing Fed. R. Civ. P. 15(a)(2).

A court must consider "any of four factors" in determining whether to grant leave to amend: "bad faith, undue delay, prejudice to the opposing party, and/or futility." *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1160–61 (9th Cir.

2021).  At most the court considered only futility, and simply asserted without explaining that the independent third parties problem could not be cured by amendment.  ER-37 (internal citation omitted) ("I deny amendment because the plaintiffs previously amended their complaint, and the standing deficiency cannot be cured by further amendment.").  Particularly given that Plaintiffs had only amended the complaint once, and that the court disregarded most facts Plaintiffs pled regarding causation, denying Plaintiffs leave to amend was an abuse of discretion.

## II. The existence of independent third parties in the Nevada sex trade does not break the causal chain between Government Defendants' legalizing, incentivizing, licensing, controlling, and profiting from sex trade businesses and Plaintiffs' injuries from being trafficked by those same businesses.

The court below ruled that because Plaintiffs entered the sex trade in different ways and were trafficked by various third parties, including sex buyers, in multiple locations within and outside Nevada, numerous independent third parties' "independent decisions collectively had a significant effect" on their injuries, preventing causation as to the Government Defendants.  *See* ER-36 (cleaned up).

But this A) misunderstands the relevant injuries, which flow from trafficking committed by the Sex Industry Defendants; B) overstates the role of independent third parties in the causal chain; C) ignores precedent finding causation based on the predictable effects of government action; and D) fails to consider causation

analyses in other cases involving the same form of derivative liability: benefiting from sex trafficking.

**A. The district court misunderstood the relevant injuries in its causation analysis.**

For standing, Plaintiffs need not allege that all their injuries were traceable to all defendants' conduct, but that a legally redressable injury – even just one – can be fairly traced to what defendants did. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)) (for standing, a plaintiff must show she has: "(1) suffered an injury in fact; (2) her injury is fairly traceable to the challenged conduct of the defendant; and (3) her injury is likely to be redressed by a favorable decision.").

The court below concluded:

> Because numerous third parties and their independent actions collectively impacted the plaintiffs in a significant way, and because the out-of-state origins and continuations of the plaintiffs' trafficking further attenuate Nevada's role in their respective ordeals, the plaintiffs' alleged causal chain is too weak to support standing against the City and State Defendants.

ER-36–37.

This presumes that Plaintiffs must allege traceability as to Government Defendants for all their injuries spanning years of being sex trafficked by various third parties. But Plaintiffs need only trace the Government Defendants' conduct

to one injury to sufficiently allege standing, and the court's analysis misunderstood which injuries are relevant.

Plaintiffs did not sue Defendants for every instance of rape or other injury they suffered during their sex trafficking, or for grooming or other exploitation that happened to them before they ever came to Nevada. They sued for what was done to them in entities ultimately under the Government Defendants' control, that is, for enabling and profiting from the Sex Industry Defendants' trafficking of Plaintiffs. Thus, the relevant injuries for assessing causation are those resulting from Plaintiffs' being trafficked in legal, licensed Nevada businesses.

To take Defendant Nye County as an example, Plaintiff Jane Doe #1's injuries from being sex trafficked in a legal brothel are "fairly traceable," to Nye County's failure to do due diligence when they gave her a prostitution license. ER-88. Plaintiffs alleged that Nye County did not even ask her for identification. ER-88.

Given that Plaintiffs also alleged that Plaintiff Jane Doe #1 did not have a government ID at that time, it is reasonable to infer that either Plaintiff Jane Doe #1's traffickers knew Nye County would not check her ID or ask questions, or they knew Nye County might check and would not care that she could not produce one. Either way, Nye County's conduct is squarely in the causal chain of the rights abuses committed against Jane Doe #1, regardless of whether third parties might

also be implicated, and the District Court did not even acknowledge, let alone analyze, these specific allegations in its standing assessment.

Not only do Plaintiffs allege that Government Defendants play a causal role in the injuries Plaintiffs suffered while being trafficked by the Sex Industry Defendants, Government Defendants have directly injured Plaintiffs with their own conduct too. The coercion, violence, and fraud inherent in sex trafficking are part of the injuries, but so is the fact that people have chosen to monetize it. There is a particular injury in someone profiting from another person's violation. Cf. *Fleites v. MindGeek S.A.R.L.*, No. CV2104920CJCADSX, 2022 WL 4456077, at *5-6 (C.D. Cal. July 29, 2022) (treating monetization as a unique injury in the context of sex trafficking in pornography).

To the extent profiting from a person's abuse is a unique injury, it is directly traceable to the Government Defendants. Sex Industry Defendants do not set the tax laws. State Defendants are the ones who chose to take a cut every time someone pays an escorting agency or a strip club. ER-75. And they do not levy a generalized tax, but an entertainment tax that specifically lists escort agencies and strip clubs, ER-75, NEV. REV. STAT. §§ 368A.090, 368A.200, which means they are directly profiting from the specific injuries Plaintiffs suffered from being sex trafficked. Las Vegas, Clark County, and Nye County chose to profit from sex traffickers as well, through licensing fees and property taxes. ER-75.

35

Ultimately, causation depends on whether, on the face of the complaint, Plaintiffs have alleged enough, plausibly enough, to trace any aspect of their injuries as sex trafficking victims back to any conduct of the Government Defendants. Plaintiffs have met this standard through the allegations summarized above, about how Government Defendants have legalized, incentivized, licensed, controlled, and profited from sex trade businesses that trafficked them.

Accordingly, this Court should reverse the district court's causation ruling, which mistakenly assumed that Plaintiffs had to trace Government Defendants' conduct to all their injuries, instead of just some of them.

### B. The district court overstated the role of independent parties in the causal chain.

Regarding the "causal connection between the injury and the conduct complained of," the Supreme Court said the injury at issue must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up) holding at summary judgment that wildlife conservation groups challenging federal regulation failed to demonstrate an imminent, redressable injury).

While the court below took that phrase as an absolute ban on finding standing if any independent third parties contributed to any Plaintiff's injury in any material way, the Supreme Court's explanation is more qualified; if causation

depends on "the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," then it is the plaintiff's burden "to adduce facts showing that those choices have been or will be made in such manner as to produce causation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (cleaned up).

When government action or inaction as to a third party is at issue, standing is thus more difficult, but not impossible to establish. 504 U.S. at 562. Importantly, the Sex Industry Defendants, who directly injured Plaintiffs by sex trafficking them, are not independent, are before this court, did not make unfettered choices as they were licensed and regulated entities, and did not exercise "legitimate discretion" in the course of violating federal law. ER-75–97.

The district court's analysis assumes that the causal chain is linear, unidirectional, and that each person in that chain plays a distinct, non-overlapping role with respect to everyone else. But this understanding of causation is not supported by Ninth Circuit precedent. First, fairly traceable doesn't mean exclusively caused: defendants' conduct need not be the sole cause of a plaintiff's injury, nor the last act in the causation chain. *See Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011) ("Barnum has alleged that at least EPA's

listing of Redwood Creek has affected the value of its property. It need not eliminate any other contributing causes to establish its standing.").

Fairly traceable does not mean proximately caused, either – a causation chain can have many links, as long as they are not hypothetical. Plaintiffs need only allege "a line of causation between defendants' action and their alleged harm that is more than attenuated. A causation chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (cleaned up).

Plaintiffs have alleged that Sex Industry Defendants' conduct was the predictable result of the system the Government Defendants have established. ER-75–97. Plaintiffs also alleged that Government Defendants and Sex Industry Defendants acted in concert, *see* ER-75, and, as in *Barnum*, they need not eliminate other contributing causes to their injuries, such as those from other, unregulated third parties outside this case.

Because Plaintiffs alleged that the Government Defendants licensed and regulated the Sex Industry Defendants that directly sex trafficked them, the causal chain between those actors and Plaintiffs' injuries does not depend on "the unfettered choices made by independent actors not before the courts and whose

exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

### C. The district court ignored precedent finding causation based on the predictable effects of government action.

In cases "where a causal relation between injury and challenged action depends upon the decision of an independent third party," to "satisfy that burden, the plaintiff must show at the least that third parties will likely react in predictable ways." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (cleaned up).

The Ninth Circuit has also found traceability where a defendant's conduct has a predictable effect on third-party conduct, leading to the plaintiff's injury. In *Juliana*, Plaintiffs alleged injuries caused by climate change. At summary judgment, the court found causation where plaintiffs alleged injuries from carbon emissions "from fossil fuel production, extraction, and transportation," 15% of which came from the United States at that time, and which was increased by federal subsidies and leases. *Juliana v. United States*, 947 F.3d 1159, 1169 (9th Cir. 2020).

Thus, causation can be established when government licensing is at issue, even when the licensees' own (presumably independent) choices cause the environmental harms at issue. The court rejected the idea that causation was too indirect, noting that the federal government's longstanding policies had shaped the situation: "[T]he plaintiffs here do not contend that their injuries were caused by a

39

few isolated agency decisions. Rather, they blame a host of federal policies, from subsidies to drilling permits, spanning 'over 50 years,' and direct actions by the government." *Juliana v. United States*, 947 F.3d 1159, 1169 (9th Cir. 2020) (cleaned up).

Causation also may be established where government fails to properly regulate someone else. *See G & G Fire Sprinklers, Inc. v. Bradshaw*, No. 95-56639, 1997 WL 1106525, at *4 (9th Cir. Aug. 27, 1997) (cleaned up) (" When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction . . . it becomes the burden of the plaintiff to adduce facts showing that those choices [of the third party] have been or will be made in such manner as to produce causation and permit redressability of injury."); *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 898–99 (9th Cir. 2011) (Creek watershed landowner sued EPA for categorizing creek as impaired water body under the Clean Water Act, alleging this reduced his timberlands' value. Court found standing, agreeing that the listing itself caused injury due to public perception, regardless of whether the perception was accurate).

This principle has also been applied to private companies' actions. For example, in *Maya* itself, on which the court's decision relied, independent third parties did not break the causal chain. *See Maya v. Centex* (9th Cir. 2011) (finding traceability sufficiently alleged as to lenders' actions during widespread housing crisis; plaintiffs' overpayment on houses was fairly traceable to defendants marketing and lending to high-risk buyers, despite the ongoing housing bubble problem being nationwide).

The Ninth Circuit thus allows that government inaction as to a regulated third party can be the basis for standing. As in *Juliana*, Plaintiffs have alleged constitutional rights violations based partly on government action and inaction in their regulation of both third parties and the Sex Industry Defendants, who had government licenses. *See, e.g.*, ER-67–68, 72–74 (detailing how State Defendants permit prostitution in rural counties, force STI testing on prostituted people but not sex buyers, do not enforce their own regulations limiting prostitution advertising, and permit escorting and "entertainment by referral service" throughout Nevada); ER-68 (detailing how State Defendants permit counties to self-regulate and do not bar brothel debt bondage practices); ER-69–70 (describing how Nye County not only permits brothel prostitution but does not ban compelled prostitution, as long as it occurs in a brothel, prevents persons in prostitution from operating independently, and has discretion about licensing felons to operate brothels); ER-

41

70–72 (detailing how Las Vegas permits escorting and strip clubs, and forces escorts to work for an escort agency and to undergo STI testing for licensure); ER-70–71 (explaining how Clark County permits escorting, outcall entertainment, and strip clubs).

Plaintiffs also alleged that the legal climate Government Defendants have created led to high demand for sex buying, ER-72, and a disproportionately large sex trade, ER-74, yet Defendants have a sparse record of sex trafficking prosecutions, ER-74–75, and even outright corruption in their law enforcement, ER-74.  And Plaintiffs alleged that this prostitution system is profitable for Government Defendants, due to the tourism it motivates, as well as the taxes and licensing fees that brothels, escort agencies, and strip clubs generate.  ER-74–75.

As in *Barnum*, traceability may be based on a government regulation's influence on public perception and the resulting behavior.  Here, Plaintiffs alleged that public perception about prostitution's legality in Nevada led to an increased, outsized demand that has resulted in increased sex trafficking.  ER-72.

That said, some cases have required that defendants do more than influence third parties toward a predictable outcome.  *See Bennett v. Spear*, 520 U.S. 154, 169 (1997) (emphasis in original) (cleaned up) ("While, as we have said, it does not suffice if the injury complained of is the result of the *independent* action of some third party not before the court, that does not exclude injury produced by

42

determinative or coercive effect upon the action of someone else."); *DSE Grp., LLC v. Richardson*, 381 F. App'x 749, 750-51 (9th Cir. 2010) (declining at summary judgment stage to exercise jurisdiction over county because plaintiffs had not proved that the county decision at issue was coerced by the state officials).

    *DSE Grp* is distinguishable, as it concerned a case at the summary judgment stage, where discovery had occurred, and evidence was being evaluated. This case is at the motion to dismiss stage, where Plaintiffs have not had the benefit of discovery, particularly regarding Government Defendants and Sex Industry Defendants' interactions with each other. *See* ER-128–140.

    The Ninth Circuit has noted that the standard for causation is different on a motion to dismiss. *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 n.6 (9th Cir. 2011) (internal citations omitted) ("Defendants' reliance on *Duke Power Co. v. Carolina Envtl. Study Group Inc.* and *Simon v. E. Ky. Welfare Rights Org.* is misplaced. *Duke Power* involved a final judgment on the merits. *Simon* was an appeal from the grant of summary judgment. Neither case establishes the burden for surviving a motion to dismiss.").

    Third parties are always present in the sex trafficking context. Perhaps, the Government Defendants can explain or produce evidence rebutting their alleged conduct, but Plaintiffs are entitled to evaluate that evidence, which should go to the merits, not jurisdiction.

And *Bennett* found that the plaintiff's allegations sufficed for the motion

dismiss stage, because while the defendant government entity's formal opinion was

theoretically advisory, the potential consequences for disregarding it ultimately had

a coercive effect on other agencies. *Bennett v. Spear*, 520 U.S. 154, 168-169.

However, the Court did not say that where third parties contributed to the injuries

at issue, traceability could *only* be found if the defendants coerced the third parties'

conduct. *See* 520 U.S. 154, 168-170.

Also, as will be argued in more detail in the next section, to the extent the

court has discretion about which rule to adopt, given precedent that goes both

ways, it should consider the significance of the rights at issue. *See, e.g., G & G

Fire Sprinklers, Inc. v. Bradshaw*, No. 95-56639, 1997 WL 1106525, at *5 (9th

Cir. Aug. 27, 1997) (internal quotation marks omitted) (quoting *Warth v. Seldin,

422* U.S. 490 at 505 (1975) ) ("When a governmental prohibition or restriction

imposed on one party causes specific harm to a third party, harm that a

constitutional provision or statute was intended to prevent, the indirectness of the

injury does not necessarily deprive the person harmed of standing to vindicate his

rights.").

Here, Plaintiffs have alleged that Government Defendants prohibitions and

restrictions imposed on the Sex Industry Defendants and Plaintiffs themselves

resulted in harm to them due to sex trafficking, which both the Thirteenth

Amendment and the TVPRA were intended to prevent.  ER-98–101.  Under *G & G Fire Sprinklers*, that some of these injuries were indirect should not "deprive [Plaintiffs] of standing to vindicate [their] rights."  *See* 1997 WL 1106525, at *5.

Accordingly, Plaintiffs have alleged a non-speculative causal chain implicating Government Defendants because they alleged facts showing how the Government Defendants' actions led to predictable behavior on the part of both third parties and Sex Industry Defendants, and that they were sex trafficked as a result.

Consider the following analogy:  Debt bondage is officially illegal after Reconstruction, in Mississippi.  Mississippi decides to make sharecropping legal in rural areas, and plantations, licensed locally, are allowed to establish company stores, require workers to live onsite, and use debt to coerce their labor.

In larger counties and cities, sharecropping is still officially illegal, but is also known by the euphemism "collective farming."  Collective farming is legal, and licensed collective farm owners engage in sharecropping and debt coercion as well.  As a result, the state becomes a destination for labor trafficking disproportionate to its population size, yet does not prosecute labor trafficking.

This attracts more unscrupulous businesses to the state, who use goods made through the exploitation, which boosts Mississippi's economy.  The only regulation consistently enforced is background and physical fitness checks on the

45

workers.  State officials collect an agriculture tax specific to and local officials collect property taxes and licensing fees from both sharecropper and collective farm businesses.

Labor trafficked workers sue farms that exploited them along with the government officials in the jurisdictions which licensed the farms.  Some were migrant workers in other states, induced to come to Mississippi.  They experienced violence and coercion from illegal, unlicensed farms, in addition to being trafficked by the licensed businesses.  Does their abusive experience elsewhere or at the hands of unlicensed businesses destroy causation for the government's role in abuse committed by the licensed businesses?  By the court's logic, the answer would be yes.  But that conclusion would run contrary to the Thirteenth Amendment's purpose and function as discussed in Section III below.

> **D. The district court failed to consider causation analyses in other cases involving the same form of derivative liability:  benefiting from sex trafficking.**

In the TVPRA context, courts in two different districts have upheld causation for facilitator-beneficiaries and standing.  In *Fla. Abolitionist*, the court noted that an injury indirectly caused by a defendant "satisfies the fairly traceable requirement," which was met by the plaintiff as to Backpage by alleging that she was "raped and sold at least five times in a period of twelve hours," after an advertisement of her was posted on Backpage.  *Fla. Abolitionist v. Backpage.com*

*LLC*, No. 617CV218ORL28TBS, 2018 WL 1587477, at *2 (M.D. Fla. Mar. 31, 2018). Despite the third-party traffickers who bought and sold Jane Doe, the court stated that "a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement." *Fla. Abolitionist v. Backpage.com LLC*, No. 617CV218ORL28TBS, 2018 WL 1587477, at *2 (M.D. Fla. Mar. 31, 2018).

More recently, a district court in this circuit held that traceability was sufficiently alleged as to Visa for profiting from sex trafficking by processing Pornhub payments knowing that Pornhub hosted trafficking content. *Fleites v. MindGeek S.A.R.L.*, No. CV2104920CJCADSX, 2022 WL 4456077, at *4 (C.D. Cal. July 29, 2022). Visa tried to argue that independent third parties broke the causal chain, as third parties created and uploaded the criminal content at issue, but the court reasoned that plaintiff was specifically injured by the monetization of her abuse, which was something that MindGeek did, and Visa (which had significant influence over MindGeek) enabled, knowing that MindGeek was a bad actor. *Fleites v. MindGeek S.A.R.L.*, No. CV2104920CJCADSX, 2022 WL 4456077, at *5-6 (C.D. Cal. July 29, 2022). The court wrote:

> If Visa was aware that there was a substantial amount of child porn on MindGeek's sites, which the Court must accept as true at this stage of the proceedings, then it was aware that it was processing the monetization of child porn, moving money from advertisers to MindGeek for advertisements playing alongside child porn like Plaintiff's videos. And so, after opening the door, Visa was there at

47

the end of the line, too, performing the final act necessary to establish Plaintiff's section 1591(a)(2) claim against MindGeek: the movement of money.

*Fleites v. MindGeek S.A.R.L.,* No. CV2104920CJCADSX, 2022 WL 4456077, at *5 (C.D. Cal. July 29, 2022) (internal citation omitted).

Similarly, as to *Florida Abolitionist*, Plaintiffs in this case have alleged Government Defendants' causal role as facilitators, despite third parties acting as direct traffickers. Backpage allowed traffickers to use its platform to advertise, instead of banning or reporting them. Government Defendants allow traffickers, including Sex Industry Defendants, to recruit, exploit, and advertise, and not only does not ban them, but licenses them, and forces women in prostitution to associate with them. *See* ER-68–97.

And similarly, as to *Fleites*, Plaintiffs are uniquely injured by the monetization of their sexual abuse, and Government Defendants also both opened the door by creating and preserving a legal regime that incentivizes sex trafficking, and was "there at the end of line" as well, taking a cut of the profits. *See* ER-74–75. Also, like Visa, the Government Defendants were playing a facilitator-profiteer role with respect to known exploiters over which they had significant influence and control. *See* ER-75. Government Defendants, collectively, can do more than cut off payment processing for Sex Industry Defendants. They have the authority to deny licenses, increase taxes, investigate, prosecute, and fine or

otherwise punish these businesses, or to abolish them altogether . *See* ER-53–57, 67–75.

Two District of Columbia district court cases have come out differently, however. *Coubaly v. Cargill, Inc.*, No. 21-CV-386 (DLF), 2022 WL 2315509 (D.D.C. June 28, 2022) (finding child labor trafficking victims failed to allege traceability against cocoa companies who had buyer/seller relationships with Ivorian farms that engaged in abuses); *Doe I v. Apple Inc.*, No. 1:19-CV-03737 (CJN), 2021 WL 5774224, at *1 (D.D.C. Nov. 2, 2021) (finding child labor trafficking victims failed to allege traceability against technology companies who were end-users of cobalt mined, often illegally, in the DRC).

These cases are distinguishable in at least two ways. First, they analyze causation in the context of labor trafficking within a global supply chain. Plaintiffs' case concerns sex trafficking within a focused jurisdiction. Second, the court in both cases found causal chain gaps that necessitated speculation; it was not the presence of third parties in the chain that automatically destroyed standing. *See Coubaly*, 2022 WL 2315509 at *7. Because the Sex Industry Defendants in this case are themselves traffickers and are the referents for the Government Defendants' facilitating and profiting from trafficking, there is no causal gap requiring analogous speculation. Additionally, *Coubaly* is on appeal, so its validity is unsettled.

49

Accordingly, Plaintiffs ask this Court to analyze traceability in this case consistently with the cases – concerning sex trafficking facilitation and benefiting claims – that are most analogous to their own.

In conclusion, independent third parties existing in the Nevada sex trade do not break the causal chain between Government Defendants' legalizing, incentivizing, licensing, controlling, and profiting from sex trade businesses and Plaintiffs' injuries from being trafficked by those same businesses. But the court's independent third parties analysis mistakenly broadens the range of injuries for which Plaintiffs must show causation, overstates the role of third parties as to the relevant injuries, and does not consider cases where causation was found despite third parties contributing to the injury at issue. Accordingly, that traceability ruling should be reversed.

## III. Article III standing's traceability prong should not be interpreted to nullify constitutional or statutory rights claims against sex trafficking enablers and profiteers.

The district court's traceability interpretation frustrates Plaintiffs' ability to bring claims where there are primary and derivative wrongdoers. But Article III standing's traceability prong should not be interpreted to undermine A) Thirteenth Amendment claims based on government enabling of slavery; or B) Trafficking Victims Protection Act claims based on benefiting from slavery.

### A. Article III standing's traceability prong should not be interpreted to undermine Thirteenth Amendment claims based on government enabling of slavery.

The Thirteenth Amendment is intended to be broad and abolitionist in character, and provides, in relevant part: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1.

Plaintiffs have alleged Thirteenth Amendment violations under Section 1983, which reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

42 U.S.C. § 1983.

The Thirteenth Amendment, unlike other constitutional rights, is not just a restriction on government behavior; it requires affirmative action from government entities. *See, e.g.*, Neal Kumar Katyal, *Men Who Own Women: A Thirteenth Amendment Critique of Forced Prostitution*, 103 Yale L.J. 791, 817 (1993) (emphasis in original) (characterizing Section 1983 as "creating a cause of action against *state inaction*"). After the Thirteenth Amendment was ratified, the federal government "repeatedly intervened in the domestic affairs of Southern states to

51

ensure that slavery would not continue. And in a host of measures enacted after the Civil War, Congress forced officials to investigate and eliminate instances of slavery." Katyal, *Men Who Own Women*, 103 Yale L.J. 791, 820–22 (1993).[6]

An early civil rights case characterized the Amendment as being self-executing, nullifying any laws supporting slavery, but also affirmatively establishing freedom: "an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *C.R. Cases*, 109 U.S. 3, 20 (1883). This was recognized by public officials at that time; for example, in 1871, Senator George Edmunds noted that the Thirteenth Amendment meant that slavery was no longer "tolerated or upheld or winked at" by government officials, who had a duty to prevent state or local authorities from denying the newly freed people their rights. Cong. Globe, 42d Cong., 1st Sess. 697 (1871).

Slavery is an essentially private enterprise, so it would be would functionally decriminalized if a government refused to enforce laws against it, and the Amendment would be a dead letter if private third party involvement destroyed standing for plaintiffs seeking to hold the government accountable for that responsibility.

---

[6] *See also* Neal Kumar Katyal, *Men Who Own Women: A Thirteenth Amendment Critique of Forced Prostitution*, 103 Yale L.J. 791, 826 n.175 (1993) (noting that "The Civil Rights Act of 1866 imposed several affirmative duties on government," including a private cause of action similar to Section 1983 and a provision that criminalized any US marshal for disregarding "a warrant issued under the Act.").

And the form of slavery at issue here is well within the Amendment's purpose as it was central to chattel slavery. Had the South agreed to abolish slavery but refused to alter the prostitution system, that would have been effectively a refusal to comply with the Thirteenth Amendment where Black women and girls were concerned. *See* ER-57–60.

That independent third parties are necessary for a completed Thirteenth Amendment violation does not prevent government defendants from being implicated. *See Bailey v. Alabama*, 219 U.S. 219, 227–28 (1911). This is particularly true given that the Thirteenth Amendment's context was that independent, private actors were a constant threat to the newly freed people, and states could be held responsible for not controlling them. *See, e.g.*, Neal Kumar Katyal, *Men Who Own Women: A Thirteenth Amendment Critique of Forced Prostitution*, 103 Yale L.J. 791, 820–22 n.171-175 (1993) (internal citations omitted).

In *Bailey,* the Supreme Court found that a facially neutral criminal fraud statute violated the Amendment because it gave legal cover to coerced labor. If a person entered into a written contract for services in Alabama in the early 1900s, got paid, and then did not do the work or return the money, they could be charged with fraud. *Bailey v. State of Alabama*, 219 U.S. 219, 227-28 (1911). One had to intend to injure or defraud the employer, but simply failing to provide the services

53

– for whatever reason – was considered evidence of intent to commit fraud. 219 U.S. at 227-28. This put people at risk of prison if they failed to work off an outstanding debt. *Id.* at 236.

The Supreme Court held that Alabama's law violated the Thirteenth Amendment, because it was enabling people to coerce labor through debt bondage under threat of criminal prosecution. *Bailey v. State of Alabama*, 219 U.S. 219, 227-28 (1911). Alabama argued it was just a neutral fraud statute, but the Court found that a state could not use neutral statutes to give legal cover to slavery, and it was irrelevant that private third parties had to first make the contracts and break them before anyone was coerced to work, having the law on the books signaled to those third parties that they could get away with debt bondage, and that violated the Amendment. *See Bailey v. State of Alabama*, 219 U.S. 219, 227-28, 236-237, 241-245 (1911).

*Bailey* means that laws can be facially neutral, but functionally unconstitutional – and that the law against slavery applies both to direct conduct and government complicity. This means that a state creating an environment hospitable to any form of slavery can be held accountable, even if the state itself does not own or sell enslaved people, or explicitly permit others to do so under the law.

That is, a legal system that makes it easy for traffickers to enslave people is itself a Thirteenth Amendment violation. A corollary of these interpretive principles is that injuries that result are thus traceable to government defendants because it's their system. Given this jurisprudence, Section 1983 causes of action based on the Amendment should be able to include government enabling and indirect violations, without standing being interpreted to nullify them.

The Amendment does not give the government the option of being a bystander if others are enacting a system of slavery in their jurisdiction. While *Bailey* involved a state prosecution, that was just the method of coercion: "judging its purpose by its effect…it seeks in this way to provide the means of compulsion through which performance of such service may be secured." *Bailey v. State of Alabama*, 219 U.S. 219, 238 (1911). In this case, much of the coercion is committed by private parties, ER-75–97, but the Government Defendants' effectively requiring women in prostitution to have pimps is coercive as well, ER-69–72.

While not precedential, the Ninth Circuit's *Charleston* ruling offers important context for this case. The ruling was about whether plaintiffs alleged an injury that could be remedied by injunctive relief if they were no longer being actively sex trafficked, because, unlike this case, the *Charleston* survivors only sued the state, so damages were unavailable. The court suggested that the

redressability problem might be overcome by asserting third-party standing, and cited a law review article arguing that governments violate the Thirteenth Amendment when they fail to adequately respond to sex trafficking. *Charleston v. Nevada*, 830 F. App'x 948, 949 (9th Cir. 2020) (citing Neal Kumar Katyal, Note, *Men Who Own Women: A Thirteenth Amendment Critique of Forced Prostitution*, 103 Yale L.J. 791, 815, 819 (1993)) ("Third-party standing may be the only practical way to assert the rights of enslaved human beings."). The court did not question causation, and its suggestion would be inconsistent with causation being impossible to sufficiently allege.

Because the Thirteenth Amendment anticipates and includes derivative liability, particularly when a government's indirect action or nonaction perpetuates a slavery system, it would defeat the Amendment's purpose to require Plaintiffs to allege that Government Defendants violated it through direct conduct, like selling them itself. And as discussed above, controlling precedent does not compel the standing rule the court below reached. Given that the court's traceability interpretation would significantly undermine a federal constitutional right, it should be rejected.

56

### B. Article III standing's traceability prong should not be interpreted to undermine Trafficking Victims Protection Act claims based on benefiting from slavery.

Section 1595(a) includes derivative liability by definition. *Compare* 18 U.S.C. § 1591 with 18 U.S.C. § 1595(a). Section 1595(a) allows sex trafficking victims to sue the perpetrator or anyone who "knowingly benefits, financially or by receiving anything of value" from participating in what that person knew or should have known was sex trafficking. 18 U.S.C. § 1595(a).

A perpetrator is anyone who knowingly "benefits, financially or by receiving anything of value," or "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person," while "knowing, or . . . in reckless disregard of the fact" that a person was induced into a commercial sex act through force, fraud, or coercion. 18 U.S.C. § 1591(a).[7]

Read together with Section 1591, Section 1595(a) presumes that an entity can be liable for standing by and profiting, even if the entity was not directly causing the injury. As the hundreds if not thousands of rapes perpetrated by sex buyers are the primary source of the sexual assault and other violence in prostitution, *see* ER-75–97, numerous third parties' independent decisions (to buy sex) are always present in the sex trafficking context.

---

[7]Advertising claims must allege actual knowledge. 18 U.S.C. § 1591(a).

A causation standard requiring no third parties to have significantly intervened to cause any of the harm would mean that beneficiaries cannot actually be held liable under the TVPRA, because victims would have no standing to sue them. To follow the court's logic to its end would thus make benefitting from sex trafficking almost non-actionable.

Many cases, including this one, have found that plaintiffs state a claim for a 1595 (a) beneficiary liability for sex trafficking, without determining that the independent third parties necessarily involved destroy traceability. *See, e.g.*, *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 974 (S.D. Ohio 2019) (finding plaintiff stated a claim against hotel franchisors for sex trafficking beneficiary liability where franchisors knowingly profited from what they should have known was sex trafficking).

The court in this case made a similar finding about Sapphire, finding Plaintiff Jane Doe #2 had stated a claim against Sapphire for benefiting from sex trafficking, because Sapphire knew that club patrons were paying for commercial sex and committing rape against the dancers, including Jane Doe #2, yet continued to profit from tips and fees. *See* ER-39.

As the court held that Plaintiffs stated a claim against Sapphire and Chicken Ranch for direct and beneficiary liability, *see* ER-41–45, and Plaintiffs have alleged that Government Defendants benefited financially from both perpetrators'

activities, *see* ER-74–75, 100–101, Plaintiffs necessarily have stated a cause of action against Government Defendants for beneficiary liability under 18 U.S.C. § 1595(a), yet the Order maintains Plaintiffs have no standing to sue them.

As discussed above, controlling precedent does not compel the standing rule the court below reached. Given that the court's traceability interpretation would effectively gut a federal cause of action, and contradict other sex trafficking beneficiary jurisprudence (including the court's own), it should be rejected.

The district court's interpretation of Article III standing's traceability prong frustrates plaintiffs' ability to bring derivative claims – that is, claims where there are both primary and derivative wrongdoers. But these are exactly the types of claims that the Thirteenth Amendment and the TVPRA civil beneficiary liability provision are intended to vindicate, and standing should not be interpreted to undercut them.

Because the court failed to apply Plaintiffs' alleged facts in its standing analysis, imposed an incorrectly rigorous standard for establishing causation, and reached a conclusion regarding standing that undermines constitutional and statutory rights to be free from slavery, its traceability analysis should be rejected.

## CONCLUSION

For the foregoing reasons, the District Court's dismissal of the Government Defendants for lack of standing should be reversed, and the case remanded for consideration of Plaintiffs' claims on the merits.

DATED this 13th day of April, 2023

*s/ Christen M. Price*
Jason D. Guinasso (SBN# 8478)
HUTCHISON & STEFFEN, PLLC
5371 Kietzke Lane
Reno, NV 89511
775.853.8746
*jguinasso@hutchlegal.com*

Benjamin W. Bull (SBN#388206)
Peter A. Gentala (SBN#021789)
Dani Bianculli Pinter (SBN#120441)
Christen M. Price (SBN#1016277)
NATIONAL CENTER ON SEXUAL
EXPLOITATION
1201 F Street NW, Suite 200
Washington, DC 20004
202.393.7245
*lawcenter@ncose.com*

*Attorneys for Appellants*

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**Form 17. Statement of Related Cases Pursuant to Circ. R. 28-2.6**

**9th Cir. Case Number(s)**

No. 22-16859

The undersigned attorney or self-represented party states the following:

[x]     I am unaware of any related cases currently pending in this court.

[ ]     I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]     I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature:**   s/ Christen M. Price          **Date:**   April 13, 2023

61

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**

No. 22-16859

I am the attorney or self-represented party.

**This brief contains 12,381 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ Christen M. Price          **Date:** April 13, 2023

**ADDENDUM**

ADDENDUM ..................................................................................... 1

STATUTES

I.      18 U.S.C.A. § 1591 (2018) ................................................... 7

        §     1591. Sex trafficking of children or by force, fraud, or coercion .......... 7

II.     18 U.S.C.A. § 1595 (2018) § 1595. Civil remedy ...................................... 10

III.    28 U.S. Code § 1291 - Final decisions of district courts............................. 11

IV.     28 U.S. Code § 1331 - Federal question ..................................... 12

V.      42 U.S.C.A. § 1983 (1996) ................................................... 12

VI.     NEV. REV. STAT. 201.430. Unlawful advertising of prostitution; penalties. 13

VII.    NEV. REV. STAT. 201.440 ....................................... 15

VIII.   NEV. REV. STAT. 244.345 ....................................... 16

IX.     NEV. REV. STAT. 368A.090 ..................................... 20

X.      NEV. REV. STAT. 368A.200 ..................................... 23

OTHER AUTHORITIES

XI.     U.S.C.A. Const. Amend. XIII ..................................... 29

REGULATIONS

XII.    Clark, Nev., County Code 6.10.020 Work identification card required....... 30

XIII.   Clark, Nev., County Code Chapter 6.140 OUTCALL PROMOTERS AND
        ENTERTAINERS ...................................................... 32

        6.140.010 Findings...................................................... 32

        6.140.020 Definitions................................................... 34

        6.140.030 Exemptions................................................... 37

        6.140.040 Outcall promoter license required.............................. 37

        6.140.050 Entertainer work permit required............................... 37

6.140.060 Employment of entertainers. ...................................................... 38

6.140.070 Outcall entertainment manager. ................................................. 38

6.140.080 Application for license. ............................................................. 41

6.140.085 Investigation—Issuance of outcall promoter's license. ............... 43

6.140.090 License issuance or denial. ........................................................ 45

6.140.095 Work permit required. ................................................................ 47

6.140.100 License fee. ............................................................................... 49

6.140.110 Semiannual reports. .................................................................. 50

6.140.120 Term of licenses. ...................................................................... 51

6.140.130 Records required—Maintenance—Inspection. ........................... 52

6.140.140 Outcall regulations. .................................................................. 53

6.140.150 Prostitution unlawful. ............................................................... 55

6.140.160 Revocation of license or permit. ............................................... 55

6.140.170 Compliance by present licensees. ............................................. 58

XIV. Clark, Nev., County Code Chapter 6.160. ...................................... 59

6.160.010 Findings. ................................................................................... 59

6.160.020 Purpose. .................................................................................... 60

6.160.030 Definitions. ............................................................................... 60

6.160.080 Work identification card. .......................................................... 62

XV. Clark, Nev., County Code Chapter 8.32 ESCORT SERVICES ................... 62

8.32.010 Findings. .................................................................................... 62

8.32.040 Unlawful to conduct an escort bureau business without license... 66

8.32.050 Unlawful to work as an escort—Exceptions. ............................... 66

8.32.060 Definitions. ................................................................................ 66

8.32.070 Work identification cards required ............................................. 74

8.32.080 Applications, investigation and license issuance. ........................ 76

8.32.090 Investigation fees. ...................................................................... 85

8.32.095 License fees. ............................................................................... 85

ADD-3

8.32.100 License renewal....................................................................... 86

8.32.110 Escort bureau duties. .......................................................... 86

8.32.120 Advertising—Implying services other than service oriented escorts. ......................................................................................................... 88

8.32.130 Cease and desist orders. .................................................... 89

8.32.140 Suspension or revocation of license. .............................. 90

8.32.150 Exemptions............................................................................ 93

XVI.  Las Vegas, Nev., Mun. Code § 6.35. ......................................... 94

6.35.010 Findings................................................................................. 94

6.35.020 Purpose. ................................................................................ 95

6.35.030 Definitions............................................................................ 95

6.35.060 Erotic dance establishment license—Application....................... 97

XVII. Las Vegas, Nev., Mun. Code § 6.36 ESCORT BUREAUS AND PERSONNEL........................................................................................ 101

Article I. General Provisions ........................................................... 101

6.36.010 Privileged business finding—Chapter 6.06 compliance. ............ 101

6.36.020 Definitions........................................................................... 101

Article II. Bureau Licenses ............................................................. 102

6.36.030 Required. ............................................................................. 102

6.36.040 Fee....................................................................................... 102

6.36.050 Denial or discipline grounds. ......................................... 103

6.36.055 Business location............................................................... 103

6.36.060 Contract with patrons....................................................... 104

6.36.070 Employee permits and cards. ......................................... 105

6.36.080 Referral of employees—Notice of termination......................... 105

6.36.090 Employment records. ....................................................... 105

6.36.100 Age of employees............................................................... 106

Article III. Escort and Runner Permits and Identification ...................... 106

6.36.110 Required. ............................................................................. 106

6.36.120 Permit—Application. ................................................................. 106

6.36.130 Permit—Approval, denial, revocation, suspension..................... 108

6.36.140 Permit—Fee. ............................................................................ 110

6.36.150 Permit—Content. ...................................................................... 110

6.36.160 Permit—Renewal. ..................................................................... 110

6.36.170 Permit—Limitation to named bureau........................................ 111

6.36.180 Permit—Transfer....................................................................... 111

6.36.190 Permit—Surrender. ................................................................... 111

6.36.200 Permit—Loss reporting.............................................................. 112

6.36.210 Identification card. ..................................................................... 112

6.36.220 Exhibition on request. ................................................................ 113

XVIII. Las Vegas, Nev., Mun. Code § 6.57 OUTCALL ENTERTAINMENT
REFERRAL SERVICE BUSINESSES ..................................................... 113

6.57.010 Intent of chapter. ....................................................................... 113

6.57.020 Findings—General compliance................................................... 114

6.57.030 Definitions................................................................................... 114

6.57.040 License—Required. .................................................................... 116

6.57.050 License—Application—Investigation......................................... 116

6.57.060 License—Fee............................................................................. 117

6.57.065 License—Business location. ....................................................... 117

6.57.070 Licensee—Discipline. ................................................................ 118

6.57.080 Licensee—Hiring restrictions. ................................................... 118

6.57.090 Licensee—Work cards—Application. ....................................... 119

6.57.100 Licensee—Work cards—Employee discipline. .......................... 119

6.57.110 Employees—Hiring restrictions................................................. 120

6.57.120 Employees—Record keeping...................................................... 120

6.57.130 Managers—Hiring restrictions................................................... 121

6.57.140 Managers—Application—Investigation. ................................... 122

ADD-5

6.57.150 Managers—Presence on premises required. .............................. 123

6.57.160 Managers—Termination. ........................................... 123

6.57.170 Managers—Record keeping. ...................................... 123

6.57.180 Advertising. ............................................................. 124

6.57.190 Violation—Penalty ................................................... 126

XIX. Nev. Admin. Code § 441A.800 - Testing of sex workers; prohibition of certain persons from employment as sex worker ...................................... 127

XX. Nye Co. Code § 9.20.020 ......................................................... 131

9.20.010: Adoption ..................................................................... 131

9.20.020: Definitions .................................................................. 131

9.20.030: License Required ......................................................... 135

9.20.120: License Denial ............................................................. 135

9.20.125: Restriction On Number Of Licensed Operations Located In Amargosa Valley ........................................................................ 138

9.20.130: License Restrictions ..................................................... 138

9.20.140: Requirement And Application For Work Card ......................... 142

9.20.145: Display Of Registration Card ........................................... 146

9.20.150: Health Examinations Of Courtesans And Tests ....................... 147

9.20.160: General Prohibitions .................................................... 150

9.20.230: Fees ......................................................................... 151

## I.    18 U.S.C.A. § 1591 (2018)

### § 1591. Sex trafficking of children or by force, fraud, or coercion

**A.** Whoever knowingly--

**(1)**    in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

**(2)**    benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

**B.** The punishment for an offense under subsection (a) is--

**(1)**    if the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2), or by any combination of such means, or if the person recruited, enticed, harbored, transported,

ADD-7

provided, obtained, advertised, patronized, or solicited had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or

**(2)** if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had attained the age of 14 years but had not attained the age of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.

**C.** In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.

**D.** Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 25 years, or both.

**E.** In this section:

ADD-8

**(1)** The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

**(2)** The term "coercion" means--

    **(A)** threats of serious harm to or physical restraint against any person;

    **(B)** any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

    **(C)** the abuse or threatened abuse of law or the legal process.

**(3)** The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

**(4)** The term "participation in a venture" means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1).

**(5)** The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

**(6)** The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

## II. 18 U.S.C.A. § 1595 (2018) § 1595. Civil remedy

**(a)** An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

**(b)(1)** Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

**(2)** In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

**(c)** No action may be maintained under subsection (a) unless it is commenced not later than the later of--

    **(1)**     10 years after the cause of action arose; or

    **(2)**     10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.

**(d)** In any case in which the attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591, the attorney general of the State, as parens patriae, may bring a civil action against such person on behalf of the residents of the State in an appropriate district court of the United States to obtain appropriate relief.

## III.   28 U.S. Code § 1291 - Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be

limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## IV.    28 U.S. Code § 1331 - Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## V.    42 U.S.C.A. § 1983 (1996)

### § 1983. Civil action for deprivation of rights
### [Statutory Text & Notes of Decisions subdivisions I to IX]

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

ADD-12

## VI.  NEV. REV. STAT. 201.430. Unlawful advertising of prostitution; penalties

1.  It is unlawful for any person engaged in conduct which is unlawful pursuant to paragraph (b) of subsection 1 of NRS 207.030, or any owner, operator, agent or employee of a house of prostitution, or anyone acting on behalf of any such person, to advertise the unlawful conduct or any house of prostitution:

   (a)     In any public theater, on the public streets of any city or town, or on any public highway; or

   (b)     In any county, city or town where prostitution is prohibited by local ordinance or where the licensing of a house of prostitution is prohibited by state statute.

2.  It is unlawful for any person knowingly to prepare or print an advertisement concerning a house of prostitution not licensed for that purpose pursuant to NRS 244.345, or conduct which is unlawful pursuant to paragraph (b) of subsection 1 of NRS 207.030, in any county, city or town where prostitution is prohibited by local ordinance or where the licensing of a house of prostitution is prohibited by state statute.

3.  Inclusion in any display, handbill or publication of the address, location or telephone number of a house of prostitution or of identification of a means

of transportation to such a house, or of directions telling how to obtain any such information, constitutes prima facie evidence of advertising for the purposes of this section.

**4.** Any person, company, association or corporation violating the provisions of this section shall be punished:

**(a)** For the first violation within a 3-year period, by imprisonment in the county jail for not more than 6 months, or by a fine of not more than $1,000, or by both fine and imprisonment.

**(b)** For a second violation within a 3-year period, by imprisonment in the county jail for not less than 30 days nor more than 6 months, and by a fine of not less than $250 nor more than $1,000.

**(c)** For a third or subsequent violation within a 3-year period, by imprisonment in the county jail for 6 months and by a fine of not less than $250 nor more than $1,000.

## VII. NEV. REV. STAT. 201.440

**201.440. Unlawful to permit illegal advertising of houses of prostitution; penalties**

**1.** In any county, city or town where prostitution is prohibited by local ordinance or where the licensing of a house of prostitution is prohibited by state statute, it is unlawful for any person, company, association or corporation knowingly to allow any person engaged in conduct which is unlawful pursuant to paragraph (b) of subsection 1 of NRS 207.030, or any owner, operator, agent or employee of a house of prostitution, or anyone acting on behalf of any such person, to advertise a house of prostitution in his or her place of business.

**2.** Any person, company, association or corporation that violates the provisions of this section shall be punished:

**(a)** For the first violation within a 3-year period, by imprisonment in the county jail for not more than 6 months, or by a fine of not more than $1,000, or by both fine and imprisonment.

**(b)** For a second violation within a 3-year period, by imprisonment in the county jail for not less than 30 days nor more than 6 months, and by a fine of not less than $250 nor more than $1,000.

**(c)** For a third or subsequent violation within a 3-year period, by imprisonment in the county jail for 6 months and by a fine of not less than $250 nor more than $1,000.

## VIII. NEV. REV. STAT. 244.345

**244.345. Dancing halls, escort services, entertainment by referral services and gambling games or devices; limitation on licensing of houses of prostitution**

**Effective: July 1, 2011**

**1.** Every natural person wishing to be employed as an entertainer for an entertainment by referral service and every natural person, firm, association of persons or corporation wishing to engage in the business of conducting a dancing hall, escort service, entertainment by referral service or gambling game or device permitted by law, outside of an incorporated city, must:

**(a)** Make application to the license board of the county in which the employment or business is to be engaged in, for a county license of the kind desired. The application must be in a form prescribed by the regulations of the license board.

**(b)** File the application with the required license fee with the county license collector, as provided in chapter 364 of NRS, who shall present the application to the license board at its next regular meeting.

The board, in counties whose population is less than 700,000, may refer the petition to the sheriff, who shall report upon it at the following regular meeting of the board. In counties whose population is 700,000 or more, the board shall refer the petition to the metropolitan police department. The department shall conduct an investigation relating to the petition and report its findings to the board at the next regular meeting of the board. The board shall at that meeting grant or refuse the license prayed for or enter any other order consistent with its regulations. Except in the case of an application for a license to conduct a gambling game or device, the county license collector may grant a temporary permit to an applicant, valid only until the next regular meeting of the board. In unincorporated towns and cities governed pursuant to the provisions of chapter 269 of NRS, the license board has the exclusive power to license and regulate the employment and businesses mentioned in this subsection.

2. The board of county commissioners, and in a county whose population is less than 700,000, the sheriff of that county constitute the license board, and the county clerk or other person designated by the license board is the clerk thereof, in the respective counties of this state.

3. The license board may, without further compensation to the board or its clerk:

**(a)** Fix, impose and collect license fees upon the employment and businesses mentioned in this section.

**(b)** Grant or deny applications for licenses and impose conditions, limitations and restrictions upon the licensee.

**(c)** Adopt, amend and repeal regulations relating to licenses and licensees.

**(d)** Restrict, revoke or suspend licenses for cause after hearing. In an emergency the board may issue an order for immediate suspension or limitation of a license, but the order must state the reason for suspension or limitation and afford the licensee a hearing.

**4.** The license board shall hold a hearing before adopting proposed regulations, before adopting amendments to regulations, and before repealing regulations relating to the control or the licensing of the employment or businesses mentioned in this section. Notice of the hearing must be published in a newspaper published and having general circulation in the county at least once a week for 2 weeks before the hearing.

**5.** Upon adoption of new regulations the board shall designate their effective date, which may not be earlier than 15 days after their adoption. Immediately after adoption a copy of any new regulations must be available

for public inspection during regular business hours at the office of the county clerk.

**6.** Except as otherwise provided in NRS 241.0355, a majority of the members constitutes a quorum for the transaction of business.

**7.** Any natural person, firm, association of persons or corporation who engages in the employment of any of the businesses mentioned in this section without first having obtained the license and paid the license fee as provided in this section is guilty of a misdemeanor.

**8.** In a county whose population is 700,000 or more, the license board shall not grant any license to a petitioner for the purpose of operating a house of ill fame or repute or any other business employing any person for the purpose of prostitution.

**9.** As used in this section:

**(a)** "Entertainer for an entertainment by referral service" means a natural person who is sent or referred for a fee to a hotel or motel room, home or other accommodation by an entertainment by referral service for the purpose of entertaining the person located in the hotel or motel room, home or other accommodation.

**(b)** "Entertainment by referral service" means a person or group of persons who send or refer another person to a hotel or motel room, home

or other accommodation for a fee in response to a telephone or other request for the purpose of entertaining the person located in the hotel or motel room, home or other accommodation.

## IX. NEV. REV. STAT. 368A.090

### 368A.090. "Live entertainment" defined

1. "Live entertainment" means any activity provided for pleasure, enjoyment, recreation, relaxation, diversion or other similar purpose by a person or persons who are physically present when providing that activity to a patron or group of patrons who are physically present.

2. The term:

(a)     Includes, without limitation, any one or more of the following activities:

(1)     Music or vocals provided by one or more professional or amateur musicians or vocalists;

(2)     Dancing performed by one or more professional or amateur dancers or performers, including, without limitation, dancing performed by one or more persons who are nude or partially nude;

(3)     Acting or drama provided by one or more professional or amateur actors or players;

**(4)** Acrobatics or stunts provided by one or more professional or amateur acrobats, performers or stunt persons;

**(5)** Animal stunts or performances induced by one or more animal handlers or trainers, except as otherwise provided in subparagraph (3) of paragraph (b);

**(6)** Athletic or sporting contests, events or exhibitions provided by one or more professional or amateur athletes, sportsmen or sportswomen;

**(7)** Comedy or magic provided by one or more professional or amateur comedians, magicians, illusionists, entertainers or performers;

**(8)** A show or production involving any combination of the activities described in subparagraphs (1) to (7), inclusive;

**(9)** A performance by a disc jockey who presents recorded music; and

**(10)** An escort who is escorting one or more persons at a location or locations in this State.

**(b)** Except as otherwise provided in subsection 3, excludes, without limitation, any one or more of the following activities:

**(1)** Television, radio, closed circuit or Internet broadcasts of live entertainment;

**(2)** Entertainment provided by a patron or patrons, including, without limitation, singing by patrons or dancing by or between patrons;

**(3)** Animal behaviors induced by animal trainers or caretakers primarily for the purpose of education and scientific research;

**(4)** An activity that is an uncompensated, spontaneous performance that is not longer than 20 minutes during a 60-minute period;

**(5)** An activity described in subparagraphs (1) to (8), inclusive, of paragraph (a) that does not constitute a performance, including, without limitation, go-go dancing; or

**(6)** Marketing or promotional activities, including, without limitation, dancing or singing that is for a period that does not exceed 20 minutes during a 60-minute period and that is associated with the serving of food and beverages.

**3.** The exclusions set forth in paragraph (b) of subsection 2 do not apply to an activity provided by a nonprofit religious, charitable, fraternal or other

organization that qualifies as a tax-exempt organization pursuant to 26 U.S.C. § 501(c), or by a nonprofit corporation organized or existing under the provisions of chapter 82 of NRS, when the number of tickets to the activity offered for sale or other distribution is 15,000 or more.

4. As used in this section, "person who is nude or partially nude" means a natural person with any of the following less than completely or opaquely covered:

   (a)     His or her genitals;

   (b)     The pubic region; or

   (c)     A female breast below a point immediately above the top of the areola.

## X.    NEV. REV. STAT. 368A.200

**Imposition and amount of tax; tax collected from purchaser; exemptions from tax**

**Effective: July 1, 2021**

1. Except as otherwise provided in this section, there is hereby imposed an excise tax on admission to any facility in this State where live entertainment is provided and on the charge for live entertainment provided by an escort at one or more locations in this State. The rate of the tax is:

**(a)** Except as otherwise provided in paragraph (b), for admission to a facility in this State where live entertainment is provided, 9 percent of the admission charge to the facility.

**(b)** For live entertainment provided by an escort who is escorting one or more persons at a location or locations in this State, 9 percent of the total amount, expressed in terms of money, of consideration paid for the live entertainment provided by the escort.

**2.** Amounts paid for:

**(a)** Admission charges collected and retained by a nonprofit religious, charitable, fraternal or other organization that qualifies as a tax-exempt organization pursuant to 26 U.S.C. § 501(c), or by a nonprofit corporation organized or existing under the provisions of chapter 82 of NRS, are not taxable pursuant to this section, only if the number of tickets to the live entertainment which are offered for sale or other distribution to patrons, either directly or indirectly through a partner, subsidiary, client, affiliate or other collaborator, is less than 7,500.

**(b)** Gratuities directly or indirectly remitted to persons employed at a facility where live entertainment is provided are not taxable pursuant to this section.

**(c)** Fees imposed, collected and retained by an independent financial institution in connection with the use of credit cards or debit cards to pay the admission charge to a facility where live entertainment is provided are not taxable pursuant to this section. As used in this paragraph, "independent financial institution" means a financial institution that is not the taxpayer or an owner or operator of the facility where the live entertainment is provided or an affiliate of any of those persons.

**3.** The tax imposed by this section must be added to and collected from the purchaser at the time of purchase, whether or not the admission for live entertainment is purchased for resale.

**4.** The tax imposed by subsection 1 does not apply to:

**(a)** Live entertainment that this State is prohibited from taxing under the Constitution, laws or treaties of the United States or the Nevada Constitution.

**(b)** Live entertainment that is governed by the Nevada Interscholastic Activities Association pursuant to chapter 385B of NRS or is provided or sponsored by an elementary school, junior high school, middle school or high school, if only pupils or faculty provide the live entertainment.

**(c)**     An athletic contest, event, tournament or exhibition provided by an institution of the Nevada System of Higher Education, if students of such an institution are contestants in the contest, event, tournament or exhibition.

**(d)**     Live entertainment that is provided by or entirely for the benefit of a nonprofit religious, charitable, fraternal or other organization that qualifies as a tax-exempt organization pursuant to 26 U.S.C. § 501(c), or a nonprofit corporation organized or existing under the provisions of chapter 82 of NRS, only if the number of tickets to the live entertainment which are offered for sale or other distribution to patrons, either directly or indirectly through a partner, subsidiary, client, affiliate or other collaborator, is less than 7,500.

**(e)**     Any boxing contest or exhibition governed by the provisions of chapter 467 of NRS.

**(f)**     Live entertainment that is not provided at a licensed gaming establishment if the facility in which the live entertainment is provided has a maximum occupancy of less than 200 persons.

**(g)**     Live entertainment that is provided at a licensed gaming establishment that is licensed for less than 51 slot machines, less than 6 games, or any combination of slot machines and games within those

respective limits, if the facility in which the live entertainment is provided has a maximum occupancy of less than 200 persons.

**(h)** Live entertainment that is provided at a trade show.

**(i)** Music performed by musicians who move constantly through the audience if no other form of live entertainment is afforded to the patrons.

**(j)** Live entertainment that is provided at a licensed gaming establishment at private meetings or dinners attended by members of a particular organization or by a casual assemblage if the purpose of the event is not primarily for entertainment.

**(k)** Live entertainment that is provided in the common area of a shopping mall, unless the entertainment is provided in a facility located within the mall.

**(l)** Food and product demonstrations provided at a shopping mall, a craft show or an establishment that sells grocery products,
housewares, hardware or other supplies for the home.

**(m)** Live entertainment that is incidental to an amusement ride, a motion simulator or a similar digital, electronic, mechanical or electromechanical attraction. For the purposes of this paragraph, live entertainment shall be deemed to be incidental to an amusement ride,

a motion simulator or a similar digital, electronic, mechanical or electromechanical attraction if the live entertainment is:

> **(1)** Not the predominant element of the attraction; and

> **(2)** Not the primary purpose for which the public rides, attends or otherwise participates in the attraction.

**(n)** A race scheduled at a race track in this State and sanctioned by the National Association for Stock Car Auto Racing, if two or more such races are held at that race track during the same calendar year.

**(o)** An athletic contest, event or exhibition conducted by a professional team based in this State if the professional team based in this State is a participant in the contest, event or exhibition.

**(p)** Live entertainment that is provided by or entirely for the benefit of a governmental entity.

**5.** As used in this section:

**(a)** "Affiliate" has the meaning ascribed to it in NRS 463.0133.

**(b)** "Maximum occupancy" means, in the following order of priority:

> **(1)** The maximum occupancy of the facility in which live entertainment is provided, as determined by the State Fire

Marshal or the local governmental agency that has the authority to determine the maximum occupancy of the facility;

**(2)** If such a maximum occupancy has not been determined, the maximum occupancy of the facility designated in any permit required to be obtained in order to provide the live entertainment; or

**(3)** If such a permit does not designate the maximum occupancy of the facility, the actual seating capacity of the facility in which the live entertainment is provided.

**(4)** "Operator" includes, without limitation, a person who operates a facility where live entertainment is provided or who presents, produces or otherwise provides live entertainment.

## XI.   U.S.C.A. Const. Amend. XIII

**Amendment XIII. Slavery Abolished; Enforcement**

**Section 1.** Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

**Section 2.** Congress shall have power to enforce this article by appropriate legislation.

**XII.    Clark, Nev., County Code 6.10.020 Work identification card required.**

(a) It shall be unlawful for any licensee engaging in any business for which the code requires work identification cards for the licensee or employees thereof to employ any person unless such person is the holder of a valid work identification card issued in conformity with the provisions of this chapter. It shall be unlawful for any person to be employed as a non-gaming employee without a valid work identification card. A licensee who violates this provision shall be subject to the penalties provided in Section 6.04.140.

(b) Each hiring authority shall determine if an employee or prospective employee has a valid work identification card for such business pursuant to this code. If the employer determines that the employee or prospective employee does not have a valid work identification card then the hiring authority shall provide the employee or prospective employee with a referral form to obtain a work identification card.

(c) Notwithstanding any other provision of this code to the contrary, or subsequent repeal thereof, a work identification card is required for employees, owners, and managers of the following non-gaming categories:

    (1)    Family home care providers;

    (2)    Security guards;

**(3)**      Adult entertainment cabarets;

**(4)**      Erotic dance establishments pursuant to the provisions in Clark County Code Section 6.160.090;

**(5)**      Escort bureaus;

**(6)**      Dancehalls;

**(7)**      Teenage dancehalls;

**(8)**      Adult nightclub establishments pursuant to the provisions of Clark County Code Section 6.170.080;

**(9)**      Martial arts; and

**(10)**      As required pursuant to Nevada Revised Statutes.

(Ord. 1234 § 2, 1990: Ord. 634 § 1 (part), 1979)

(Ord. No. 3892, § 3, 8-18-2010; Ord. No. 4938, § 1, 5-3-2022)

**XIII.    Clark, Nev., County Code Chapter 6.140 OUTCALL PROMOTERS AND ENTERTAINERS**

 **Sections:**

**6.140.010 Findings.**

The Clark County liquor and gaming licensing board and the board of county commissioners of Clark County find that:

For several years preceding 1986, escort bureaus had been operating as modified brothels in Clark County, engaging in the business of sending "escorts" to hotel and motel rooms for the purposes of prostitution. Disciplinary action was brought against each of the escort services resulting in a surrender or revocation of their business license. The escort business, then instituted a new business method, by obtaining promoter's licenses and offering in response to a telephone call, what they purported to be "entertainment." Police undercover activities have established that these promoters are actually operating as modified brothels, sending individuals to hotel and motel guestrooms for the purpose of prostitution under the subterfuge of "entertainment." The cover of the First Amendment has materially increased the burden of policing this business to decrease the incidence of prostitution and drug sales.

The purpose of the ordinance codified in this chapter is to regulate the outcall entertainment business to the end that many types of criminal activities will be

curtailed, without de facto prohibiting or curtailing protected expression. This chapter represents a balancing of the legitimate ends of the community by imposing an incidental, content neutral place, time and manner regulation on the outcall promoter business, without limiting alternative avenues of communication, and at the same time, requiring the business to carry its share of financing law enforcement activities.

Note: The use of the words "entertainment" or "entertainer" does not mean or imply that the conduct offered by outcall promoters or the conduct in which persons referred by said promoters engage is the type or form of entertainment which involves expression protected by the First Amendment to the Constitution of the United States or that there has been a finding by the board of county commissioners that such entertainment is provided. The term "entertainment" is used because it is by that term the promoters refer to themselves in advertisement and it is convenient to use so as to distinguish, for indexing purposes, between the businesses defined herein, and other businesses which legitimately deliver goods or services off their business premises.

(Ord. 1340 § 1, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.020 Definitions.**

As used in this chapter, unless the context otherwise requires or the words are otherwise defined below, the words and terms used in this chapter have the definitions set out in Chapters 12.08, 12.14, 12.20, 8.24 and 8.32 of the Clark County Code, and as ascribed to them in this section as follows:

(a) "Applicant" means the person or business entity applying for a license, permit or work identification card and includes all officers, directors, stockholders, partners and all persons or business entities which share in profits.

(b) "Entertainment" means something affording pleasure, diversion, or amusement (i.e., a performance of some kind) in a hotel or motel guest room by one or more entertainers for a fee.

(c) "Outcall" or "entertainment by referral" service means a person or group of persons who send or refer another person to a hotel or motel guest room for a fee in response to a telephone call or other request for the purpose of entertaining the person located in the hotel or motel guest room.

(d) "Business entity" means a group of persons, partnership, corporation, joint venture or other business association.

(e) "Person" means a singular individual.

**(f)** "Entertainer" means the person referred by the outcall entertainment business entity (entertainment by referral service), to visit the hotel or motel guest room of a patron for a fee for the purpose of providing entertainment to the person or persons in the hotel or motel guest room.

**(g)** "Patron" means a person who requests an entertainer visit a hotel or motel guest room and either pays or agrees to pay the fee for such visit.

**(h)** "Manager" means the responsible person employed by the outcall entertainment promoter (entertainment by referral service) to manage, supervise or oversee the day-to-day business operations of the outcall entertainment business (entertainment by referral service), and act as licensee's agent.

**(i)** "Outcall promoter" means a person or business entity holding him, her or itself out as a source of outcall entertainers (entertainers by referral service) or one who engages in the business of providing outcall entertainment (entertainment by referral service) for a fee. For the purposes of this chapter, self-employed outcall entertainers are also considered "outcall promoters."

**(j)** "Gross revenue" means gross earnings or gross receipts received by the outcall promoter (entertainment by referral service) from all business-related sources.

**(k)** "Basic licensee's fee" means the fee announced, advertised or told by telephone communication or any other means, by an outcall entertainment business (entertainment by referral service) to a patron as the fee for providing outcall entertainment.

**(l)** "Prostitution" means engaging in sexual intercourse, oral-genital contact, anal-genital contact or any touching of the sexual organs, pubic region or female breast of a person with the intent of arousing or gratifying the sexual desire of either person for monetary consideration, whether by credit, cash, check or other consideration.

(Ord. 1421 § 1, 1992: Ord. 1340 § 2, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.030 Exemptions.**

The following entertainment services are exempt from the provisions of this chapter so long as the location is licensed for the activity provided or arranged for:

**(1)** Entertainment services provided or arranged by a hotel or motel to a patron of that hotel or motel for a fee paid to that hotel or motel in response to a telephone call or other request;

**(2)** Entertainment services to a hotel or motel room for a group event (room capacity in excess of twenty persons) that is authorized by the hotel or motel in which the event is to take place.

(Ord. 1421 § 2, 1992)

**6.140.040 Outcall promoter license required.**

It is unlawful for any person or business entity to engage in business as an outcall promoter within the unincorporated areas of Clark County without first obtaining an outcall promoter license therefor as provided in this chapter.

(Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.050 Entertainer work permit required.**

It is unlawful for an entertainer to work as an entertainer or perform an entertainer function in the unincorporated areas of Clark County without first obtaining an outcall entertainer work permit.

(Ord. 1421 § 3, 1992: Ord. 1340 § 3, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.060 Employment of entertainers.**

It is unlawful for an outcall promoter to employ, contract with or refer an entertainer to a hotel or motel guest room unless the entertainer has a work permit as an outcall entertainer issued to work for that promoter.

(Ord. 1421 § 4, 1992: Ord. 1340 § 4, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.070 Outcall entertainment manager.**

**(a)** All businesses which are required to be licensed under this chapter shall have at least one responsible employee to conduct the affairs of the business on the premises and act as manager and licensee's agent at all times the business is open. If the licensee is a sole proprietor he may obtain a manager's permit if he otherwise qualifies.

**(b)** All managers shall file an application for a manager's permit with the director.

**(c)** The director shall issue or deny the outcall entertainment manager's permit within twenty working days from receipt of the application provided:

**(1)**     His/her outcall entertainment manager permit has not been previously revoked;

**(2)**     The applicant has not been convicted of prostitution, soliciting prostitution, living off the earnings of a prostitute, pandering, keeping of a disorderly house, unlawful advertising of a house of prostitution, exhibition or sale of obscene material to minors, crime against nature, rape, lewdness with a child under fourteen, use of a minor in pornographic performances, sexual intercourse while afflicted with an infectious or contagious disease, forgery or fraudulent use or billing of credit cards, manufacturing, distribution or sale of controlled substances within five years of the date of application; or

**(3)**     The applicant has not been the sole proprietor, partner, officer, director, or manager of an escort service, brothel, or outcall promoter business which has had a license revoked, suspended or sanctioned within three years of the date of application; or

**(4)**     The applicant has not violated any of the provisions of this chapter within two years of the date of application; or

**(5)**     The applicant has not included any untrue, false or misleading information in the application.

**(d)** In addition to the grounds set forth in Section 6.140.160, the permit of the manager may be revoked or suspended upon written notice and hearing before the Clark County liquor and gaming licensing board or hearing officer upon findings that the manager or business entity licensed as an outcall promoter while the manager was on duty did not fully comply with all laws, rules and regulations set forth in Sections 6.140.130 and 6.140.140, or that the manager:

   **(1)** Employed, contracted with or referred an entertainer who did not possess a valid work permit or who the manager knew or should have known had been convicted of prostitution or soliciting prostitution; or

   **(2)** Referred an entertainer under the age of eighteen years when such referral violated curfew, liquor or gaming laws, or when the referral violated the Contributory Delinquency Statutes (NRS 201.090 et seq.); or

   **(3)** Referred an entertainer who committed an act of prostitution or solicited prostitution from a patron or patron's companion; or

   **(4)** Referred an entertainer for purposes of prostitution.

**(e)** If the applicant for a permit is denied by the director, the applicant may within thirty days of said denial file a written appeal to the director stating

upon oath the grounds for such appeal. The liquor and gaming licensing board shall hear the appeal at the next regularly scheduled meeting after the filing of the appeal with the director subject to the open meeting law requirements.

(Ord. 1421 § 5, 1992: Ord. 1340 § 5, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.080 Application for license.**

(a) All applications for outcall promoter licenses required by this chapter shall be filed with the director on forms furnished by the director. The applications for outcall entertainment licensure shall include the following information, stated under oath:

(1)      Whether the business or proposed business is the undertaking of a sole proprietorship, partnership, or corporation. If a sole proprietorship, the application shall set forth the name, address, telephone number and principal occupation of the sole proprietor and any criminal convictions, except traffic misdemeanors, and dates. If a partnership, the application shall set forth the names, aliases, criminal convictions and dates, addresses, telephone numbers, principal occupations, and respective ownership shares of each partner, whether general, limited or silent. If a corporation, the application shall set forth

the corporate name, a copy of the articles of incorporation, and the names, aliases, criminal convictions and dates, addresses and telephone numbers and principal occupations of every officer, director and shareholder (having more than ten percent of the outstanding shares) and the number of shares held by each. In addition to the above, each sole proprietor, partner, officer, director and shareholder mentioned in this subsection shall set forth the trade name of each business with which he has been associated as a sole proprietor, partner, officer, director, stockholder, or manager which has been denied a business license, been the subject of disciplinary action, or had a business license revoked or surrendered and the dates of such license action (denial, discipline or revocation).

**(2)** The name, aliases, criminal convictions and dates, and principal occupation of the manager or managers and the trade name of each business with which the manager has been associated as a sole proprietor, partner, officer, director, stockholder, or manager which has been denied a business license, been the subject of disciplinary action, or had a business license revoked or surrendered and the dates of such license action (denial, discipline or revocation);

**(3)** The business name, business address, and business telephone number of the establishment or proposed establishment together with a description of the nature of the business;

**(4)** Applicant's financial statement and current and previous business activities and associates, covering at least a five-year period immediately preceding the date of filing of the application.

**(5)** Source and amount of any funds, loans, or investments to be used by the business for its startup or operation.

(Ord. 1421 § 6, 1992: Ord. 1352 § 1, 1992: Ord. 1340 § 6, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.085 Investigation—Issuance of outcall promoter's license.**

**(a)** Upon receipt of the completed application, and investigation fees pursuant to Section 6.08.115 and business license fees for outcall promoter, the director shall refer the outcall promoter to the metropolitan police department for fingerprinting, investigation and verification of the application and reporting back to the board.

The director shall place the application on the agenda for the next regularly scheduled meeting of the liquor and gaming licensing board which occurs subsequent to receipt of the report from the metropolitan police department pursuant to state open meeting law requirements.

**(b)** The liquor and gaming licensing board shall not grant the outcall promoter license unless it is satisfied that the applicant is suitable to be licensed or found suitable consistently with the declared policy of this chapter.

**(c)** The liquor and gaming license board has full power to deny any application:

**(1)** If the proposed financing of the entire operation is not from a suitable source, any lender or other source of money or credit which the licensing board finds does not meet the standards set forth in subsection (3), (4) or (8) of this section, the applicant may be deemed unsuitable;

**(2)** If the license application is incomplete so as to not contain all information required by this chapter;

**(3)** If all license and investigation fees as required in Section 6.08.115 and license fees are not paid;

**(4)** If the applicant has been convicted of prostitution, soliciting prostitution, living off the earnings of a prostitute, pandering, keeping of a disorderly house, unlawful advertising of a house of prostitution, exhibition or sale of obscene material to minors, crime against nature, rape, lewdness with a child under fourteen, use of a minor in pornographic performances, unlawful sexual intercourse while afflicted with an infectious or contagious disease, forgery, or fraudulent use or

billing of credit cards, manufacture, distribution or sale of controlled substances within five years of the date of the application;

**(5)** If the applicant has been the sole proprietor, partner, officer, director, stockholder or manager of an escort service, brothel or outcall promoter business which has had a license revoked, suspended or sanctioned for any act listed in subsection (4) above, whether convicted or not within three years of the date of the application;

**(6)** If the applicant has violated any of the provisions of this chapter within two years of the date of application; or

**(7)** If the applicant has included any untrue, false or misleading information in the application;

**(8)** If the applicant has failed to disclose, misstated or attempted to mislead the sheriff or the board with respect to any material fact contained within any required application.

(Ord. 1421 § 7, 1992: Ord. 1340 § 7, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.090 License issuance or denial.**

The licensing board shall issue or deny the outcall promoter license to the applicant therefor within forty-five days from receipt of the application (day 45) upon compliance with the conditions required by this chapter.

**(a)** Upon the expiration of the forty-five days from receipt of application, the applicant may demand a license and begin operating the outcall entertainment business for which a license is sought, unless and until the director of business license notifies the applicant of a denial of the license application and states the reason for the denial. (This provision shall not create a reliance or estoppel situation as to this license or any other provision of this code.)

**(b)** If the application is denied, the director of business license shall notify the applicant with the reason(s) stated for denial. Notification shall be hand delivered or sent certified, United States Mail, return receipt requested, to the address provided on the license application which shall be considered the correct address. Each applicant has the burden to furnish any change of address to the director of business license, by United States certified mail, return receipt requested.

**(c)** In the event that an application is denied, the applicant may file or cause to be filed in the state court a petition for writ of review of the denial of the license as provided by NRS 34.010 through 34.140.

(Ord. 1421 § 8, 1992)

**6.140.095 Work permit required.**

(a) All outcall entertainers, outcall promoters, managers, officers, directors and employees of outcall promoters are required to obtain a work permit that shall be issued or denied within twenty days from the date of application unless a temporary work permit is issued.

(b) Application for work permit shall be made to the director.

(c) An application for work permit shall be verified by the applicant and shall contain or set forth the following information:

    (1) The applicant's name, home address (current and former), home telephone number, date of birth, and aliases (past or present), and social security number;

    (2) The business name and address where the applicant intends to work;

    (3) Criminal history.

(d) Applicants shall be accompanied by a fee pursuant to Section 16.12.562 and shall be referred to the metropolitan police department for fingerprinting and investigation pursuant to Section 6.08.115.

(e) The director shall deny a work permit for any of the conditions set out in subsection (c)(2), (3), (4), (5), (6), (7) or (8) of Section 6.140.085 as reported by the metropolitan police department after investigation.

**(f)** The conviction or plea of nolo contendere of any crime listed in subsection (c)(4) of Section 6.140.085 or failure to comply with all conditions of Sections 6.140.130 and 6.140.140 by the holder of a work permit may be grounds for suspension or revocation of an outcall promoter's license or work permit by the licensing board or director pursuant to procedures set out in Section 8.08.170 or 8.24.060.

**(g)** The outcall promoter shall keep a current list of all outcall entertainers whom it refers at the licensed business location. The list shall contain the legal name and any aliases and work permit number of each entertainer and shall be available during all business hours for inspection by licensing officials, and agents of the Las Vegas metropolitan police department.

**(h)** Director may issue a ninety-day temporary work permit pending complete investigation, if available evidence does not support the immediate granting or denial of a permanent card. No person required to obtain a work permit pursuant to this chapter shall be licensed or work as an outcall promoter without either a temporary or permanent work permit. The temporary work permit may be extended only once without the consent of the licensing board.

**(i)** An applicant whose permit has been denied by the director may appeal the decision within ten days of the denial to the liquor and gaming licensing

board by written notification to the director who shall place it before the liquor and gaming licensing board at its next regularly scheduled meeting subject to the state open meeting law. The liquor and gaming licensing board shall hear the appeal by examination of:

  **(1)**　　The verified application submitted by applicant;

  **(2)**　　The applicant's criminal history and conditions set forth above in subsections (d) and (e) of this section.

**(j)** The board shall sustain the director's denial or grant the permit based on the evidence presented. The board shall grant a restricted or conditional permit if in its discretion the facts presented merit such permit. In the event that the permit is denied, the applicant may file or cause to be filed in the State Court a petition for writ of review of the denial of the license as provided by NRS 34.010 through 34.140.

(Ord. 1421 § 9, 1992: Ord. 1340 § 8, 1991)

**6.140.100 License fee.**

The license fee for an outcall promoter license is one percent of the gross revenue received, to be paid on or before the fifteenth day succeeding the end of the semiannual license period.

(Ord. 1340 § 9, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.110 Semiannual reports.**

**(a)** Every person or business entity licensed pursuant to this chapter shall file with the department, in conjunction with the license fees, a report signed by the licensee or its manager under oath that the report is true to his own knowledge, showing the amount of total gross receipts for the preceding six-month period;

**(b)** Each report must be accompanied by the amount of license fee which is due for the next license period;

**(c)** The provisions of Section 6.08.090 apply to licenses issued pursuant to this chapter including the "records of gross sales," "sales invoices and credit slips" referred to in subsection (d) of Section 6.08.090 in addition to those records required to be kept in Section 6.140.130;

**(d)** All reports required by this chapter to be filed with the director shall be sworn under oath by the manager or licensee of an outcall promoter's license, that the information contained therein is true to his personal knowledge. A bookkeeper or accountant may file the report for a licensee if the licensee appoints the bookkeeper or accountant as his agent for such purpose through written notice filed with the report. The document submitted shall contain the following statement and shall be sworn before an officer empowered to administer oaths:

I do hereby swear that the report of gross revenues attached hereto, is of

my personal knowledge, complete, true and accurate.

_____

Signed, position

SUBSCRIBED and SWORN to before

me this \_\_\_\_\_ day of _____, 19\_\_\_.

_____

NOTARY PUBLIC in and for said

County and State.


(Ord. 1421 § 10, 1992: Ord. 1340 § 11, 1991: Ord. 1069 § 1 (part), 1988: Ord.

1056 § 1 (part), 1987)

**6.140.120 Term of licenses.**

All licenses provided for in this chapter shall be issued for semiannual periods

which shall be as follows:

     **(a)** The first half-year shall begin on June 1st;

     **(b)** The second half-year shall begin on December 1st.

(Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.130 Records required—Maintenance—Inspection.**

(a) Every outcall promoter and outcall entertainer shall keep accurate and detailed records of all entertainment visits in a ledger which states in consecutive order:

   (1)     The date of the visit;

   (2)     The name of the hotel or motel, address, of each visit, and the promoter's name if patron was referred by promoter;

   (3)     The name, aliases and work permit number of the entertainer;

   (4)     The total sum of money or other consideration paid by the patron to either the entertainer and/or the promoter for the entertainment visit or note of cancellation and reason; and

        (i)   The amount of said sum kept by or given to the entertainer,

        (ii)  The amount of said sum kept by or given to the promoter;

   (5)     Whether the entertainer received monetary consideration in addition to the fee charged by the promoter and if so, how much.

(b) All records required to be maintained by subsections (a) and (b) of this section must be made available to the department of business license and the metropolitan police department for the purpose of audit and investigation. The promoter's records may be examined at the licensed

place of business, the entertainer must produce the records upon forty-eight-hour notice to the address stated in the notice. The forty-eight-hour notice shall be in writing, mailed or delivered to the address stated in the license application.

**(c)** All records required to be maintained by subsections (a) and (b) above must be kept for not less than three years from the date of the entertainment visit.

(Ord. 1421 § 11, 1992: Ord. 1340 § 12, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**6.140.140 Outcall regulations.**

**(a)** No person or business entity shall advertise, or cause to be advertised, an outcall entertainment business without a valid outcall promoter's license issued pursuant to this chapter.

**(b)** No outcall entertainment promoter licensee shall contract with, employ or refer a person as an entertainer unless such entertainer holds a work identification card pursuant to this chapter.

**(c)** No entertainer shall provide entertainment which contributes to the delinquency of a minor if the patron is under the age of eighteen years.

**(d)** No entertainer shall commit an act of prostitution.

**(e)** No entertainer shall solicit any fee, pay, tip or gratuity from any patron in addition to the licensee's basic fee.

**(f)** No outcall promoter licensee shall maintain business or refer entertainers to patrons unless one or more managers are overseeing the operation of the business at all times the business is open to ensure compliance with all regulations.

**(g)** No outcall promoter, entertainer, manager or employee thereof shall advertise through any publication, dissemination or display whether by hire, contract or otherwise directly or indirectly in any newspaper, magazine or other publication, by any radio, television, telephone or pictorial display, publication, handbill or other advertising media which depicts any person or object or which contains any statement which suggests to a reasonable, prudent person that prostitution or any other illegal act, service or product is offered or provided.

**(h)** No outcall promoter, entertainer, manager or employee thereof shall use or permit to be used any word, phrase or combination of words used in any advertisement or conversation which implies that prostitution is provided, or which give the public a basis to believe that prostitution is provided.

**(i)** No outcall promoter, entertainer, manager or employee thereof shall advertise through any medium any statement that states or implies that outcall entertainers have been medically examined and are free of contagious disease.

(Ord. 1340 § 13, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

## 6.140.150 Prostitution unlawful.

It is unlawful for any person to commit an act of prostitution.

(Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

## 6.140.160 Revocation of license or permit.

**(a)** The liquor and gaming licensing board shall revoke or suspend an outcall promoter's license, an outcall entertainer's work permit and a manager's permit after:

**(1)** The licensee or permittee is given at least ten days' written notice of the specific charges against him or her;

**(2)** A hearing is held before the liquor and gaming licensing board or a hearing officer pursuant to regulations codified in Chapter 8.08 of this code and the findings of the hearing officer are submitted with recommendation only as to dismissal of complaint, or suspension or revocation of the license or permit. All other provisions of Chapter 8.08

of the Clark County Code which are applicable to escorts or escort

services are applicable to entertainers, outcall promoters and managers.

**(b)** The outcall promoter's license shall be revoked or suspended if the

licensee maintains or conducts business in any building or structure which

is structurally unsafe, or does not provide adequate egress, or which

constitutes a fire hazard, or which is otherwise dangerous to human life or

safety, or which in relation to existing use constitutes a hazard to safety or

health, or public welfare, by reasons of inadequate maintenance,

dilapidation, or obsolescence.

**(c)** The outcall promoter's license, outcall entertainer's work permit and

manager's permit shall be revoked or suspended if the licensee, his, her or

its employee, agent or manager has knowingly made any false, misleading

or fraudulent statement of material fact in the application for a license or

permit, or in any report required to be filed with the department or record

required to be kept for no less than three years or knowingly caused or

suffered another to furnish such false, misleading or fraudulent

information or withhold such required information on his, her or its

behalf.

**(d)** The license of an outcall promoter shall be revoked or suspended if the

licensee, manager, partner, stockholder, officer or director knew or should

have known it referred an outcall entertainer for the purpose of
prostitution or if it violates subsection (a), (b), (f), (g), (h) or (i) of Section
6.140.140 or Section 6.140.060.

**(e)** The license of an outcall promoter, permit of an outcall entertainment
manager, and work permit of an outcall entertainer shall be revoked upon
conviction of any crime listed in subsection (c)(4) of Section 6.140.085. If
the license is held by a partnership or corporation, conviction of a partner,
stockholder holding ten percent or more stock, officer or director of any
such listed crime shall also result in revocation.

(Ord. 1421 § 12, 1992: Ord. 1340 § 14, 1991: Ord. 1069 § 1 (part), 1988: Ord.
1056 § 1 (part), 1987)

**6.140.170 Compliance by present licensees.**

Inasmuch as the 1991 Session of the Nevada State Legislature enacted Assembly Bill 116, which transferred license jurisdiction from the board of county commissioners to the county license board, and the county license board has, through regulation, adopted the ordinance codified in this chapter as its licensing regulation of this business, any person, firm or corporation which was licensed pursuant to this chapter as of June 18, 1992 and which held any business license from the county which lawfully permits the activities regulated hereby or was doing business on September 10, 1992, shall have 60 days from passage of this amendment (September 1, 1992) to submit the application required in this chapter for the next required semiannual license or be deemed as operating as an outcall promoter without a license. Additionally, employees of businesses designated by this section who are required to obtain work permit shall have sixty days from passage of this amendment to submit application for permit or be deemed as operating without a permit.

(Ord. 1421 § 13, 1992: Ord. 1340 § 15, 1991: Ord. 1069 § 1 (part), 1988: Ord. 1056 § 1 (part), 1987)

**XIV.    Clark, Nev., County Code Chapter 6.160.**

**6.160.010 Findings.**

The Clark County board of commissioners finds that erotic dance establishments, if unregulated, will likely lead to an increase in prostitution, venereal disease, drug and alcohol offenses, fraud and other criminal activity; and

Erotic dance establishments sometimes are fronts for or operated by persons associated with organized criminal activities, and the need to scrutinize such dance establishments is thereby enhanced; and

The law enforcement resources available for responding to problems associated with or created by erotic dance establishments are limited and are best conserved by regulating and licensing erotic dance establishments and those associated with them; and

The public health, safety, welfare and convenience require that erotic dance establishments and their employees be regulated and licensed in order to reduce the potential for harm.

(Ord. 1642 § 1, 1994: Ord. 1140 § 1 (part), 1989)

**6.160.020 Purpose.**

The purpose of this chapter is to regulate erotic dance establishments to the end that the many types of criminal activities frequently engendered by such establishments will be curtailed. However, it is recognized that such regulation cannot de facto approach prohibition. Otherwise a protected form of expression would vanish. This chapter represents a balancing of competing interests: reduced criminal activity through the regulation of erotic dance establishments versus the protected rights of erotic dancers and patrons.

(Ord. 1140 § 1 (part), 1989)

**6.160.030 Definitions.**

In this chapter the following definitions and those in Sections 6.04.005, 6.170.030, 8.04.010 and 8.20.020 shall apply unless the context clearly requires otherwise:

    **(a)** "Board" means the Clark County board of county commissioners.

    **(b)** "Dancer" means a person who dances, models, personally solicits drinks or otherwise performs for an erotic dance establishment and who seeks to arouse or excite the patrons' sexual desires.

    This definition includes persons who receive any monetary consideration from an erotic dance establishment for soliciting the sale or purchase of any product by arousing, exciting or appealing to a patron's sexual desires

or implying sexual gratification as defined in Chapter 8.32. (c)

"Department" means the licensing department of Clark County.

**(d)** "Erotic dance establishment" means a fixed place of business which emphasizes and seeks, through one or more dancers, to arouse or excite the patrons' sexual desires. Erotic dance establishments are deemed to be places of public accommodation.

**(e)** "LVMPD" means the Las Vegas metropolitan police department.

**(f)** "Security guard" means a person who acts as a doorman or bouncer or who performs a function described in Section 6.50.060.

(Ord. 1483 § 1, 1993: Ord. 1140 § 1 (part), 1989)

**6.160.080 Work identification card.**

No person shall work at an erotic dance establishment as a dancer, bar personnel, waiter/waitress, manager or security guard without a valid work identification card.

(Ord. 1747 § 2, 1995: Ord. 1642 § 6, 1994: Ord. 1483 § 4, 1993: Ord. 1349 § 1, 1992: Ord. 1140 § 1 (part), 1989)

**XV.    Clark, Nev., County Code Chapter 8.32 ESCORT SERVICES**

**Sections:**

**8.32.010 Findings.**

The Clark County liquor and gaming license board finds:

**(A)**    The 1979 Nevada Legislature (S.B. 396) granted the exclusive power to control and/or license and/or regulate escort services to the county license board (merged with liquor board now known as Clark County liquor and gaming licensing board) which board licenses businesses which tend to be injurious and deleterious.

**(B)**    The Clark County board of commissioners on November 7, 1978, held a public hearing, which board consisted of the present members of the Clark County liquor and gaming licensing board, which board of county commissioners enacted Ordinance 595 which made certain findings which

are found by this board to be accurate, and true and in accordance with the conduct of escort services operating in Clark County. This board adopts the record, minutes, and findings of the board of county commissioners of said date as the basis upon which to enact this regulation, in addition to facts of which it takes legislative notice.

**(C)** Based upon the above, the Clark County liquor and gaming licensing board determines that the operation of a business of providing escorts (as herein defined) is detrimental to the health and safety of the public, community, and tourists, that such a business is offensive to the public morals and decency; that such a business is detrimental to the continued economic development of the county and tends to degrade the county as a provider of good entertainment, and is harmful to the cause of attracting tourists, visitors, and conventions to the county; it having been established that the escorts and escort bureaus have:

**(a)** Engaged in fraudulent, misleading and deceptive advertising which is designed to make the prospective client believe that acts of prostitution (as defined in Section 12.08.010 of this code) will be provided;

**(b)**      Collected money in advance for the promise of acts of prostitution and refused to provide same unless additional money is paid to the escort as a tip, token or gratuity;

**(c)**      Forced other escort services out of business by threats and by intimidation have taken over other escort bureaus;

**(d)**      Failed, neglected and refused to comply with legitimate ordinances requiring weekly health examinations for infectious disease, resulting in a higher incidence of infectious contagious disease than that of licensed Nevada brothels;

**(e)**      Used as escorts, persons known to have violated the law regarding prostitution, and refuse to cease their use;

**(f)**      Required escorts to pay the escort bureau as much as five hundred fifty dollars per week for introductions to patrons;

**(g)**      Operated primarily as an employment agency without acquiring a state license therefor or complying with state law, as required in NRS Chapter 611;

**(h)**      Employed "escorts" without providing Nevada Industrial Insurance or employment security benefits therefor;

**(i)**Defrauded patrons by sending escorts other than those for which contract was made;

**(j)**     Refused to refund fees paid by patrons upon a patron's complaint of failure to satisfy contractual agreement;

**(k)**     Submitted fraudulent and incomplete financial records for the purpose of computing license tax;

**(l)** Operated unlicensed escort bureaus and violated valid court orders;

**(m)**     Refused to protect escorts sent out by them resulting in the rape, assault and robbery thereof;

**(n)**     Given Las Vegas and Clark County the reputation of the "Prostitution Capitol of the World";

**(o)**     Operated escort bureaus as a "call girl" prostitution operation;

**(p)**     Operated only on an "out call" basis;

**(q)**     Admitted in judicial proceedings they are unable to control the acts of the escort to prevent acts of prostitution while with a patron;

**(r)**     Admitted in judicial proceedings that the business relationship between an escort and an escort patron was the "private sex life of an individual";

**(s)**     Admitted in judicial proceedings their business is of the nature of a dancehall and within the jurisdiction of the license board rather than the board of county commissioners. Thus, admitting the escort bureaus to be a privileged business;

**(t)**　　Defined "escort bureau" in judicial proceedings as "a business which furnished persons who make a business or profession of being a date or companion to another."

(Reg. G-50-79 § 17 (part), 1979)


**8.32.040 Unlawful to conduct an escort bureau business without license.**

It is unlawful for any person to conduct, manage, operate, or maintain an escort bureau business within the county unless licensed pursuant to this chapter.

(Reg. G-59-81 § 2, 1981: Reg. G-50-79 § 17 (part), 1979)


**8.32.050 Unlawful to work as an escort—Exceptions.**

It is unlawful for any person to work or perform services as an escort in the county unless employed by a licensed escort bureau or licensed as an escort bureau.

(Reg. G-59-81 § 3, 1981: Reg. G-50-79 § 17 (part), 1979)


**8.32.060 Definitions.**

**(A)** An "escort" is a person who is held out to the public to be available for hire and who for monetary consideration in the form of a fee, commission, salary, to consort with, or accompanies or who offers, for monetary consideration, to consort, or accompany, another or others to or about

social affairs, entertainments or places of amusement or within any place of public resort or within any private quarters.

**(1)** A "service oriented escort" is an escort which:

    **(a)** Operates from an open office; and

    **(b)** Does not employ or use an escort runner; and

    **(c)** Does not advertise that sexual conduct will be provided to the patron or work for an escort bureau which so advertises; and

    **(d)** Does not offer or provide sexual conduct.

**(2)** A "sexually oriented escort" is an escort which:

    **(a)** Employs as an employee, agent or independent contractor an escort bureau runner; or

    **(b)** Works for, as an agent, employee, contractor, or is referred to a patron by a sexually oriented escort bureau; or

    **(c)** Advertises, that sexual conduct will be provided, or works for, as an employee, agent or independent contractor or is referred to a patron by an escort bureau which so advertises; or

    **(d)** Solicits, offers to provide or does provide acts of sexual conduct to an escort patron, or accepts an offer or solicitation

to provide acts of sexual conduct for a fee in addition to the fee charged by the escort bureau; or

**(e)** Works as an escort without having a current work identification card issued for the referring escort bureau in his or her possession at all times while working as an escort; or

**(f)** Accepts a fee from a patron who has not first been delivered a contract.

**(B)** An "escort bureau" is a person, as defined herein, which for a fee, commission, profit, payment or other monetary consideration, furnishes, refers or offers to furnish or refer escorts, or provides or offers to introduce patrons to escorts.

**(1)** A "service oriented escort bureau" is an escort bureau which:

**(a)** Maintains an open office at an established place of business; and

**(b)** Employs or provides only escorts which possess work identification cards; and

**(c)** Does not use an escort bureau runner; and

**(d)** Does not advertise that sexual conduct will be provided to a patron.

**(2)** A "sexually oriented escort bureau" is an escort bureau which:

**(a)** Operates in any of the manners described in Section 8.32.010(C)(a), (b), (e), (k), (o); or

**(b)** Does not maintain an open office; or

**(c)** Employs as an employee, agent or independent contractor, uses an escort bureau runner; or

**(d)** Advertises, that sexual conduct will be provided, or that escorts which provide such sexual conduct will be provided, referred, or introduced to a patron; or

**(e)** Solicits, offers to provide or does provide acts of sexual conduct to an escort patron; or

**(f)** Employs, contracts with or provides or refers escorts who do not possess work identification cards as required herein and in Chapter 8.24 of the Clark County Code; or

**(g)** Does not deliver contracts to every patron or customer; or

**(h)** Employs, contracts with a sexually oriented escort or refers or provides to a patron, a sexually oriented escort.

**(C)** "An escort bureau runner" is any third person, not an escort, who for a salary, fee, hire, reward, or profit, as the agent for an escort bureau or a patron by contacting or meeting with escort patrons or escort bureaus at any location other than the established open office whether or not said

person is employed by such escort bureau or by another business or is self-employed.

**(D)**    An "escort patron" is a customer or any person who contracts with, or employs, or for monetary consideration hires an escort bureau or escort for purposes of hiring an escort.

**(E)**    "Licensing board" is the Clark County liquor and gaming licensing board as defined in Chapter 3.40 of the Clark County Code.

**(F)** "Person" is any individual, partnership, limited partnership, firm, corporation or association in fact.

**(G)**    An "offer to provide acts of sexual conduct" means to offer, propose or to solicit to provide sexual conduct to a patron. Such definition includes all conversations, advertisements and acts which would lead a reasonably prudent person to conclude that such acts were to be provided.

**(H)**    An "open office" is an office at the licensed escort bureau address from which escort business is transacted; to qualify as an open office it is required that:

**(1)**    The office be open to the public and patrons or prospective patrons from nine a.m. and seven p.m. and that the office be accessible to business invitees, business license officials and law enforcement

officers through a security system during all other hours that escorts are working;

**(2)** The office be managed by the owner or a management employee of the owner having authority to bind the bureau to escort and patron contracts and adjust patron and consumer complaints;

**(3)** All telephone lines and numbers listed to the escort bureau, or advertised as escort bureau numbers terminate at the open office and at no other location;

**(4)** An index of all employees and escorts and their work card numbers be kept in the open office;

**(5)** All business records required to be kept by Section 6.08.090 shall be kept in the open office. "Records of gross sales" which are required to be kept include records of escort calls and referrals, stating the name and address, including hotel or motel room, of the patron, the date and time of referral, name of escort sent and whether or not the referral resulted in an escort service and the total fee received from the patron, if any.

**(I)** A "licensee" is a person who is the holder of a valid license under this title. Licensee includes an agent, servant, employee or other person while

acting on behalf of that licensee whenever such licensee is prohibited from doing a certain act under this title.

**(J)** "Sexual conduct" means the engaging in or the commission of an act of sexual intercourse, oral-genital contact, or the touching of the sexual organs, pubic region, buttock or female breast of a person for the purpose of arousing or gratifying the sexual desire of another person.

**(L)** "County" means, unless otherwise indicated, that portion of Clark County outside the incorporated cities and towns, both within and without the unincorporated cities and towns.

**(M)** "Director" means the director of the department of business license of Clark County.

**(N)** "Suitable" means a finding by the licensing board that a person qualifies for licensure within this chapter and has not been convicted of a felony within ten years prior to application and does not have associates with such convictions or who are associated with organized crime.

**(O)** "Police department" means the Las Vegas metropolitan police department.

**(P)** "Associate" means any person who controls, is controlled by, or is under common control with a licensee, including a person who, whether disclosed or not:

    **(1)** Is a general partner, limited partner, officer, director or employer of the applicant or licensee; or

    **(2)** Directly or indirectly or acting in concert with one or more other persons, or through one or more subsidiaries, owns, controls, holds with power to vote, or holds proxies of the voting interest in the licensee or applicant; or

    **(3)** Controls the election of a majority of the directors of the licensee or general partner of the licensee; or

    **(4)** Has contributed any capital to the licensee or applicant unless the contribution secured by collateral, the value of which is equal to the amount of the contribution, and unless there is a promise to repay the contribution on a strict schedule regardless of the earnings, profits or receipts, and said promise is kept within the limits of commercial banking practices;

    **(5)** Sponsors, procures or pays for advertisements, pays for or is contractually liable for telephone services, or promises or advances,

loans or expends any money to pay license fees, office or start-up expenses without collateral and a promise to repay as is required in subdivision (4) of this subsection.

**(Q)**    "Sexual stimulation" means to excite or arouse the prurient interest or to offer or solicit acts of sexual conduct as defined under "offer to provide acts of sexual conduct" in subsection (g) of this section.

**(R)**    "Sexual gratification" means sexual conduct as defined in subsection (d) of this section.

**(S)**    "Sexually oriented acts" means sexual conduct as defined in subsection (J) of this section.

(Reg. G-73-85 § 2, 1985: Reg. G-59-81 § 4, 1981: Reg. G-50-79 § 17 (part), 1979)

## 8.32.070 Work identification cards required.

**(A)**    All escorts, owners, managers, officers, directors and employees of escort bureaus are required to obtain work identification cards pursuant to the regulation codified as Chapter 8.24 of the Clark County Code.

**(B)**    In addition to grounds for denial of work identification cards, set out in Section 8.24.050(B) the Las Vegas metropolitan police department may deny a work card if the applicant has been convicted of prostitution,

pandering, soliciting or any crime listed in NRS 201.300 through NRS 201.440, inclusive, or of owning, managing or operating an illegal or unlicensed brothel or received payment or portion of profits therefrom, or been convicted of conspiracy, fraud or obtaining money under false pretenses, or has worked as a sexually oriented escort or operated a sexually oriented escort bureau. The conviction of any of the above crimes or an act of sexual conduct or solicitation for such act by a holder of a work card may be grounds for suspension or revocation of an escort license or work card by the licensing board.

**(C)**     The escort bureau shall keep a current list of all escorts at the licensed business location. Said list shall contain the name and work identification card number of each escort and shall be available during all business hours for inspection by licensing officials, and agents of the Las Vegas metropolitan police department.

**(D)**     Las Vegas metropolitan police department may issue a ninety-day temporary work identification card pending complete investigation, if available evidence does not support the immediate granting or denial of a permanent card. No person required to obtain a work identification card pursuant to this chapter shall be licensed or work as an escort without

either a temporary or permanent work card. The temporary work card may

be extended only once without the consent of the licensing board.

(Reg. G-73-85 § 3, 1985: Reg. G-59-81 § 5, 1981: Reg. G-50-79 § 17(part), 1979)

**8.32.080 Applications, investigation and license issuance.**

An escort bureau license is a privilege. A license shall not be issued for the

operation of an escort bureau unless the applicant proves by clear and convincing

evidence the good character, honesty and integrity of the applicant and its officers,

directors, owners and management staff. A separate license is required for each

fictitious name under which a person conducts business. Only one license shall be

issued for each person for whom a finding of suitability is required under the terms

of this code. All business expenses are made at the applicant's risk, as the license

may terminate prior to amortization thereof.

  **(A)**     All persons desiring to obtain a business license to engage in an escort

bureau business within the county shall first file an application with the

director on a form provided by his office. All persons who furnish

property or services to a licensee under any arrangement pursuant to

which the person receives payments based on earnings, profits or receipts

from the escort bureau must file an application pursuant to this section

and be found suitable by the licensing board.

**(B)** All applicants shall provide the following information under oath:

**(1)** Whether the applicant has ever been convicted by any state or federal court within the past ten years of any misdemeanor or felony other than minor traffic offenses;

**(2)** A list of convictions for all pandering, prostitution, soliciting, thefts, fraud, obtaining money under false pretenses, embezzlement or any criminal convictions involving the use of force or violence upon the person of another; or adverse civil action judgments involving allegations pertaining to fraudulent advertising, sales or trade practices, and a detailed explanation of the circumstances;

**(3)** The complete address (including suite number) of the proposed business location in the county, with a copy of the deed, lease or other document pursuant to which applicant occupies such premises;

**(4)** The person or persons who will have custody of the business records at the business location;

**(5)** Agent for service of process;

**(6)** Applicant's family, residential, education, military and criminal history background, covering at least a ten-year period immediately preceding the date of filing of the application;

**(7)** A complete description of the exact nature of the business to be conducted, including office organization, advertising theme and method, employee qualifications and copies of contracts to be used with escorts and patrons;

**(8)** Applicant's business and employment history, stating whether or not the applicant, or applicant's manager, director, officer, partner or stockholder(s) have had any business license revoked or suspended and stating the details thereof, including the reasons therefor;

**(9)** The names, current addresses and written statements of at least five bona fide permanent residents of the United States that the applicant is of good moral character. If the applicant is able, the statement must first be furnished from residents of Clark County, then the state of Nevada, and lastly from the United States;

**(10)** Applicant's financial statement and current and previous business activities and associates, covering at least a ten-year period immediately preceding the date of filing of the application.

**(C) (1)** If an applicant is a partnership or limited partnership, all application information listed in subsection (B) of this section shall be provided for all of the partners, including, if applicable, limited partners, the same as if each were a sole proprietor and applicant;

**(2)**　　If an applicant is a corporation, all application information listed in subsection (B) of this section shall be provided for each of the directors, officers and shareholders holding ten percent or more of the stock of the corporation, the same as if each were a sole proprietor and applicant;

**(3)**　　If applicant is a partnership or limited partnership, it shall provide a certified copy of an agreement or articles of partnership or limited partnership and certificate;

**(4)**　　If applicant is a corporation, the application shall be accompanied by:

　　　**(a)**　A certified copy of the articles of incorporation of such corporation and, if incorporated under the laws of another state, a certificate of qualification to do business in the state of Nevada; and

　　　**(b)**　A current annual list of officers, directors and resident agent of such corporation; and

　　　**(c)**　A list of the stockholders, the last known residence address and telephone number of each, and their respective ownership interests in such corporation certified as being true and correct by the secretary of such corporation ; and

**(d)** A certified copy of all minutes or resolutions by the board of directors of such corporation authorizing such license application and designating the officer to apply on such application and authorizing his verification thereof.

**(5)** If such business is to be conducted under a name other than the legal name of the applicant, the application must be accompanied by a copy of the fictitious name certificate on file with the county clerk of Clark County, Nevada;

**(6)** All officers, directors or shareholders which own, directly or constructively, ten percent or more of the outstanding stock of the corporation, and the managing agent of the corporation must be investigated for determination of suitability as set forth in this chapter.

**(D)** The applicant shall supplement the application by submitting a written plan setting forth the method of operation of the escort bureau, which shall include, but not be limited to:

**(1)** The hours that the escort bureau will be open to the public (said hours shall include all hours any escorts are with a patron); and

**(2)** The methods of promoting the health and safety of escorts and protecting them from assault, battery and rape; and

**(3)** The methods of supervision of employees to prevent the escort from charging the patron any fee which is in addition to the fee paid to the escort bureau by the patron; and

**(4)** The methods of supervision which will prevent the escorts from soliciting acts of prostitution or offering to provide sexual stimulation or sexual gratification; and

**(5)** The Federal Employer's Identification number and Nevada Industrial Commission policy number; and

**(6)** The name and the address of the certified public accountant who will certify the gross receipts upon application for renewal license; and

**(7)** The applicant shall submit a statement disclosing the names of all persons who have invested in the proposed escort bureau, and who will share in or receive a percentage of the profit or return from the proposed escort bureau; and

**(8)** The method of compensating escorts.

**(E)** The failure to truthfully disclose any of the information required by subsections (B), (C) and (D) of this section or the failure to make a full disclosure of all facts required shall be grounds for denying the license or, if subsequent to issuance of a license it is discovered that any applicant or

person required to be investigated has not been completely truthful or has withheld any facts in answering the above questions, such failure shall be grounds for revoking the license.

**(F)**     After the filing of a completed application and payment of all fees, the applicant shall be referred to the Metropolitan Police Department for fingerprinting, investigation and reporting as required in this chapter.

**(G)**     The result of said investigation shall be given to the director within sixty days, or as soon thereafter as possible.

**(H)**     The LVMPD shall forward one set of fingerprints of each applicant to the Central Repository for Nevada Records of Criminal History. The Central Repository for Nevada Records of Criminal History is authorized to submit the fingerprints to the Federal Bureau of Investigation for its report and to exchange fingerprint data with the Federal Bureau of Investigation. The purpose for such submission of fingerprints is to allow for a state and federal criminal records investigation to determine suitability for licensure and pursuant to authority under and in conformance with Nevada Revised Statutes 239B.010(1)(a) and Federal Public Law 92-544.

The director shall place the application on the agenda for the next meeting of the licensing board which occurs subsequent to ten days from receipt of the report from the Metropolitan Police Department.

**(I)**    The licensing board shall not grant the license unless it is satisfied that the applicant is suitable in all respects. The applicant must be:

    **(1)**    A person of good character, honesty and integrity;

    **(2)**    A person whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest of the county or to the effective regulation and control of prostitution, or create or enhance the dangers of unsuitable, unfair or illegal practices, methods and activities in the conduct of an escort bureau or the carrying on of the business and financial arrangements incidental thereto; and

    **(3)**    In all other respects qualified to be licensed or found suitable consistently with the declared policy of this chapter.

**(J)**    The license board has full power to deny any application:

    **(1)**    If the applicant has not satisfied the licensing board that the proposed financing of the entire operation is from a suitable source; any lender or other source of money or credit which the licensing board

finds does not meet the standards set forth in subsection (I) of this section may be deemed unsuitable; or

**(2)**     If the license application is incomplete so as to not contain all information required by this chapter; or

**(3)**     If all license and investigation fees are not paid; or

**(4)**     If the applicant or any of its principals has been convicted of a crime listed in subsection (B)(2) of this section or has been enjoined in an adjudicated civil action from engaging in fraudulent advertising or sales or trade practices; or

**(5)**     If the applicant, based upon his activities since the enactment of these regulations, has or has an associate who has operated a sexually oriented escort bureau; or

**(6)**     If the applicant, based upon the content of his application, intends to operate an escort bureau in a sexually oriented manner; or

**(7)**     If the applicant or partner, stockholder, officer, director or associate has had an escort license previously revoked or denied for any ground contained in this section or in Section 8.32.140; or

**(8)**     If the applicant, its partners, officers or directors do not qualify for or have not obtained work identification cards as required in Section 8.32.070; or

**(9)** If the applicant's financial statement, business activities, background or associates disclose that unsuitable persons are or will be involved in the management or conduct of the day-to-day business affairs of the escort bureau; or

**(10)** If the applicant's financial statements, business activities, background or associates disclose that unlicensed or unsuitable persons have or will have an interest in the ownership of or have an equitable or beneficial right to the profit of the escort bureau; or

**(11)** For any cause deemed reasonable.

(Ord. L-241-08 § 3, 2008: Reg. G-66-83 § 1, 1983: Reg. G-59-81 § 6, 1981: Reg. G-50-79 (part), 1979)

## 8.32.090 Investigation fees.

All applicants or other persons for which an investigation is required shall pay investigation fees as required by Section 8.08.230.

(Reg. G-91-88 § 2, 1988: Reg. G-59-81 § 7, 1981)

## 8.32.095 License fees.

The initial fee shall be determined as provided in Section 6.08.090 of this code, based upon the gross receipts rate set forth in Section 6.12.835. Thereafter, all

license fees shall be paid on a semiannual period based upon the rate set forth in Section 6.12.835 of this code.

(Reg. G-66-83 § 2, 1983)

## 8.32.100 License renewal.

The escort bureau license terminates at the end of each semiannual period and must be renewed by filing an application for renewal of escort bureau license on a form to be provided by the director, which form shall be completed under oath. The application shall contain a financial statement as required in Section 8.32.080(B)(10) if not previously provided, a list of all persons receiving any portion of the net profits of the business, the names and work card numbers of all escorts and whether there have been any changes in any answers to the information supplied with the original application. The application for renewal and all required information shall be filed thirty days prior to the expiration of the semiannual licensing period and shall be referred to the police department for review.

(Reg. G-66-83 § 3, 1983: Reg. G-59-81 § 8, 1981)

## 8.32.110 Escort bureau duties.

    **(A)**    The escort service shall provide to each patron a written contract and receipt of payment for services. The contract shall clearly state the type of

services to be performed, the length of time such services shall be performed, the total amount of money such services shall cost the patron, and any special terms or conditions relating to the services to be performed.

**(B)**    The escort bureau shall maintain an open office at the licensed location during all hours escorts are working. The address of that office shall be included in all patron contracts and published advertisements. Private room or booths where the patron may meet with the escort shall not be provided at the open office or at any other location by the escort bureau. Violation of this provision shall be grounds for license revocation.

**(C)**    The escort bureau, in terms of licensing consequences, is responsible and liable for the acts of all its employees and subcontractors including, but not limited to, telephone receptionists and escorts who are referred to that bureau while the escort is with the patron.

**(D)**    The escort bureau shall commence business from an open office within thirty days after issuance of the license. In the event an escort bureau licensee shall not commence business in an open office within thirty days after issuance of a license, or shall discontinue business or close the open office for a period of thirty days without specific approval

of the licensing board, such license shall terminate and be revoked automatically, without action by the board.

(Reg. G-73-85 § 4, 1985: Reg. G-59-81 § 9, 1981)

## 8.32.120 Advertising—Implying services other than service oriented escorts.

**(A)** Any publication, dissemination or display whether by hire, contract or otherwise by any escort, escort bureau or owner, manager or employee of an escort bureau within the scope of this chapter directly or indirectly in any newspaper, magazine or other publication, by any radio, television, telephone or pictorial display, publication or other advertising media which contains any statement which is known or through the exercise of reasonable care would suggest to a reasonable, prudent person that sexual stimulation or sexual gratification is offered or provided, is prohibited.

**(B)** Any word, phrase or combination of words used in any advertisement which imply that the escort or escort bureau offers or provides sexually oriented acts or operates in a sexually oriented manner, or which give the public a basis to believe that sexual stimulation or sexual gratification, or any form of sex service is provided, is prohibited within the intent of this section.

**(C)**    It is unlawful to advertise or hold out to the public the availability of an escort or escort bureau without obtaining a license therefor as provided in this chapter, whether the actual business of escorts or escort bureau as defined in this chapter is performed or not.

**(D)**    Any photograph, picture, drawing, sketch, pictorial representation, verbal or written description, used in any escort or escort bureau advertisement, in any of the advertising media showing or depicting an escort, or representation of an escort in an unclothed state, or attired in clothing which shows the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state, is prohibited and shall be presumed to be advertising the availability of sexual stimulation or sexual gratification.

(Reg. G-66-83 § 4, 1983: Reg. G-59-81 § 10, 1981)


**8.32.130 Cease and desist orders.**

The licensing board or director may issue an order requiring a licensee to cease and desist any violation of this chapter if the licensing board or the director, upon investigation, determines that a licensee has violated any provision of this chapter.

The licensee may appeal to the licensing board any cease and desist order issued by the director. Said appeal shall be placed on the agenda of the licensing board for the licensing board meeting following fifteen days from receipt of written notice of appeal. The appeal shall state all facts and law upon which the licensee shall rely to establish the error of such order. The remedy of appeal to the licensing board shall be exhausted prior to the institution of an action for judicial review in all cases of license denial, refusal to renew, or orders of cease and desist.

(Reg. G-59-81 § 11, 1981)

## 8.32.140 Suspension or revocation of license.

A license may be suspended or revoked after notice and hearing as provided in Chapter 8.08 of licensing board regulations upon a finding that the licensee, its agent, employee, escort, partner, director, officer, stockholder, manager (key employee) or person exercising managerial authority of or on behalf of the licensee has committed one or more of the following acts:

    **(a)**    Continued to violate any of the provisions of this chapter after issuance of a cease and desist order; or

    **(b)**    Conviction in any court subsequent to the filing of the application for a license of a felony or any crime involving moral turpitude, fraud, deception, false pretenses, misrepresentation, false advertising

prostitution, solicitation of prostitution, aiding and abetting an act of prostitution as defined in Chapter 12.08 of the Clark County Code, violated NRS 201.255 or 47 USC 223, or pandering;

**(c)** Knowingly made any false, misleading or untruthful statements, intentional misrepresentations of a material fact, or concealed material facts in an application for a business license, or report or record required to be filed with the board. It is presumed any information in an application, report or record is made knowingly if signed by the applicant or authorized agent; or

**(d)** Committed any act which is included within the definition of a sexually oriented escort bureau; or

**(e)** Conducted the escort bureau in any manner which would be grounds for denial as stated in Section 8.32.080(I) and (J), (J)(1), (3), (4), (5), (9), (10), (11);or

**(f)** Violated any provision of this title, chapter, or been convicted of any crime set out in any statute, ordinance or regulation relating to the licensed activity; or

**(g)** Conducted or advertised an escort business under an unlicensed fictitious name, or at an unlicensed address; or

**(h)** Published, uttered, disseminated or conveyed, either publicly or privately, to an individual any false, deceptive or misleading statements or advertisements in connection with the operation of a business licensed hereunder; or

**(i)** Maintained the business in a structure or building which is structurally unsafe, or not provided with adequate egress, or which constitutes a fire hazard, or which is otherwise dangerous to human life or safety, or which in relation to existing use constitutes a hazard to safety or health or public welfare; or

**(j)** Conducted or maintained the business in a manner contrary to the peace, safety, general welfare or morals of the community; or

**(k)** Committed any act constituting dishonesty or fraud, or committed any unlawful, false, fraudulent, deceptive or dangerous act while conducting business;

**(l)** Otherwise violated any provisions of this chapter.

If the licensing board finds that after notice and hearing the licensee has violated any provision for which revocation could be ordered, it may suspend the license or allow continued operation upon compliance with specific conditions.

(Reg. G-73-85 § 5, 1985: Reg. G-59-81 § 12, 1981)

**8.32.150 Exemptions.**

All professions, employments and businesses which are licensed by the state of Nevada or county of Clark pursuant to a specific statute or ordinance, and all employees employed by a business so licensed, and which perform an escort or escort bureau function as a service merely incidental to the primary function of such profession, employment or business and which do not hold themselves out to the public as an escort or escort bureau, are exempt from licensing pursuant to this chapter. Any employment agency, licensed by the state, which provides escorts as defined herein, must, however, obtain a license as required by this chapter.

(Reg. G-59-81 § 13, 1981)

**XVI.    Las Vegas, Nev., Mun. Code § 6.35.**

**6.35.010 Findings.**

The Las Vegas City Council finds that:

**(A)**    Erotic dance establishments, if unregulated, will likely lead to an increase in prostitution, venereal disease, drug and alcohol offenses, fraud and other criminal activity;

**(B)**    Erotic dance establishments sometimes are fronts for or operated by persons associated with organized criminal activities, and the need to scrutinize such dance studios is thereby enhanced;

**(C)**    The law enforcement resources available for responding to problems associated with or created by erotic dance establishments are limited and are best conserved by regulating and licensing erotic dance establishments and those associated with them; and

**(D)**    The public health, safety and welfare require that erotic dance establishments and their employees be regulated and licensed in order to reduce the potential for harm.

(Ord. 3916 § 2 (part), 1995)

**6.35.020 Purpose.**

The purpose of this Chapter is to regulate erotic dance establishments to the end that the many types of criminal activities frequently engendered by such establishments will be curtailed. However, it is recognized that such regulation cannot de facto approach prohibition. Otherwise a protected form of expression would vanish. This Chapter represents a balancing of competing interests: reduced criminal activity through the regulation of erotic dance establishments versus the protected rights of erotic dancers and patrons.

(Ord. 3916 § 2 (part), 1995)

**6.35.030 Definitions.**

In this Chapter the following definitions and those in Title 6 shall apply unless the context clearly requires otherwise:

"Dancer" means a person who dances, models, personally solicits drinks or otherwise performs for an erotic dance establishment and who seeks to arouse or excite the patrons' sexual desires.

"Erotic dance establishment" means a fixed place of business which emphasizes and seeks, through one or more dancers entertainers, to arouse or

excite the patrons' sexual desires. Erotic dance establishments are deemed to be places of public accommodation.

"Security guard" means a person who acts as a doorman or bouncer or who performs a function described in NRS 648.016.

(Ord. No. 6263, § 1, 8-21-13; Ord. 3916 § 2 (part), 1995)

**6.35.060 Erotic dance establishment license—Application.**

(A)    Application for an erotic dance establishment license shall be made to the Director.

(B)    An application for an erotic dance establishment license shall be verified by the applicant and shall contain or set forth the following information:

(1)    The name, address, telephone number, principal occupation and age of the applicant;

(2)    The name, address and principal occupation of the managing agent or agents of the business;

(3)    The business name, business address and business telephone number of the establishment or proposed establishment, together with a description of the nature of the business and magnitude thereof;

(4)    Whether the business or proposed business is the undertaking of a sole proprietorship, partnership or corporation. If a sole proprietorship, the application shall set forth the name, address, telephone number and principal occupation of the sole proprietor. If a partnership, the application shall set forth the names, addresses, telephone numbers, principal occupations and respective ownership

shares of each partner, whether general, limited or silent. If a corporation, the application shall set forth the corporate name, a copy of the articles of incorporation, and the names, addresses, telephone numbers and principal occupations of every officer, director and shareholder (having more than ten percent of the outstanding shares) and the number of shares held by each;

**(5)** The names, addresses, telephone numbers and principal occupations of every person, partnership or corporation having any interest in the real or personal property utilized or to be utilized by the business or proposed business;

**(6)** A description of all other business enterprises (sales or services) which shall occur on the premises;

**(7)** Whether the applicant, anyone having a ten-percent interest in the business or proposed business, or anyone having an interest in the real property or personal property utilized or to be utilized by the business or proposed business or anyone having a right to ten percent of the proceeds of the business other than utilities has:

**(a)** Ever been convicted of or forfeited bail for any crime, excluding minor traffic offenses and, if so, the application shall

state the person involved, the charge, date, court, and disposition of the charges,

**(b)** Ever had a business license denied, revoked or charges filed therefor, and if so, the application shall state the person involved, the name of the business, date, jurisdiction, and outcome of any hearing,

**(c)** Ever owned, operated an escort service, an outcall promoter establishment, a brothel or adult nightclub theater, and if so, the name of the business, dates involved and position or interest therein.

**(C)** The applicants shall present themselves to Metro for investigation and fingerprinting and shall pay such investigation and fingerprint fee as is required by LVMC 6.86, and shall reveal to Metro such information as is required to properly identify the applicant to enable the investigation of the applicant's arrests and convictions, licensing and litigation record and verify the accuracy and completeness of the application.

**(1)** In all cases where the applicant for a license is a corporation, it shall be necessary for all of the principal officers of such corporation to present themselves for investigation and fingerprinting. All stockholders above ten percent or who exercise management of the

corporation are required to present themselves for investigation and fingerprinting.

**(D)**  Applications shall be accompanied by a nonrefundable fee of twenty-five dollars.

**(E)**  An erotic dance establishment license shall be a semiannual license renewable by payment of semiannual license fees as found in LVMC 6.35.120(A).

(Ord. 5998 § 73, 2008: Ord. 3916 § 2 (part), 1995)

## XVII.   Las Vegas, Nev., Mun. Code § 6.36 ESCORT BUREAUS AND PERSONNEL

**Article I. General Provisions**

**6.36.010 Privileged business finding—Chapter 6.06 compliance.**

The City Council finds that the business of providing escorts seriously affects the economic, social and moral well being of the City and its residents, that such business must be regulated strictly for the welfare of the public, and that such businesses must therefore comply with Chapter 6.06.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-1)

**6.36.020 Definitions.**

Unless the context otherwise requires the following words shall have the meaning ascribed to them:

**(A)**   "Escort" means any person who, for a salary, fee, commission, hire, or profit, makes himself or herself available to the public for the purpose of accompanying other persons for social engagements.

**(B)**   "Escort bureau" means any business, agency or person who, for a fee, commission, hire, or profit, furnishes or arranges for escorts to accompany other persons for social engagements.

**(C)**     "Escort patron" means any person who seeks the services of an escort bureau.

**(D)**     "Escort runner" means any person who, for a salary, fee, hire, or profit, and who is not a licensed owner of an escort bureau or is not an escort acts for an escort or escort bureau by contacting or meeting with escort patrons to make social engagements for escorts.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-2)

## Article II. Bureau Licenses
## 6.36.030 Required.

No person shall engage in the business of providing escorts or conduct an escort bureau without first obtaining and thereafter maintaining a valid unexpired license pursuant to this Chapter and this Code.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-3)

## 6.36.040 Fee.

Each escort bureau must pay in advance a semiannual license fee of one thousand dollars or one percent of the total amount of its gross sales, whichever is greater.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-16 (A))

**6.36.050 Denial or discipline grounds.**

In addition to the grounds provided in Section 6.02.330 et seq. an escort bureau license may be denied or the licensee disciplined if:

**(A)** The applicant, licensee or any principal thereof has committed a crime of prostitution or any other crime of sexual misconduct.

**(B)** An escort or escort runner employed by the escort bureau has committed a criminal act while providing services to an escort patron under circumstances where the bureau has knowledge or should have had knowledge by reasonable diligence that such criminal act might occur.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-4)

**6.36.055 Business location.**

No license for an escort bureau may be issued unless the business has a fixed location:

**(A)** From which the business will actually be conducted; and

**(B)** Which is properly zoned to allow the use.

(Ord. 5308 §§ 1, 2, 2001)

**6.36.060 Contract with patrons.**

**(A)** The escort bureau shall provide to each patron a written contract for services. The contract shall clearly state the type of services to be performed, the length of time such services shall be performed; the total amount of money such services shall cost the patron and any special terms or conditions relating to the services to be performed. The contract shall additionally include a statement in clear and concise language that prostitution is illegal in the City and is punishable by both fine and imprisonment and that no act of prostitution shall be performed in relation to the services contracted for. Further, the contracts provided for in this Subsection shall be numbered and utilized in numerical sequence by the escort bureau.

**(B)** The contract shall be signed by the patron and a copy furnished to him. The escort bureau shall also retain a copy of each contract and shall furnish said copies to the Department for their inspection upon the Department's furnishing written request therefor.

(Ord. 5998 § 79, 2008: Ord. 2262 § 2 (part), 1982: prior code § 5-23-13 (B, C))

**6.36.070 Employee permits and cards.**

It is unlawful for any escort bureau to employ an escort or an escort runner who does not have in his possession a valid unexpired identification card and permit as required by this Chapter.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-12)

**6.36.080 Referral of employees—Notice of termination.**

Every escort bureau shall refer all prospective escorts and escort runners to the Department for a permit application. Upon termination of employment of any escort or escort runner with such escort bureau, such escort bureau shall notify the Department, in writing, of such termination within five days thereof.

(Ord. 5998 § 80, 2008: Ord. 2262 § 2 (part), 1982: prior code § 5-23-13 (A))

**6.36.090 Employment records.**

Every escort bureau licensed hereunder shall maintain the following records of employment of their employee escorts and runners:

**(A)** Date employment commenced; and

**(B)** Date employment terminated.

The foregoing records shall be available to the City upon written request therefor.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-14)

**6.36.100 Age of employees.**

No escort bureau shall employ a person as an escort or escort runner who is under the age of eighteen.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-15)

**Article III. Escort and Runner Permits and Identification**
**6.36.110 Required.**

It is unlawful for any person to act as an escort or an escort runner without first obtaining and carrying in his or her possession a valid unexpired permit and a valid unexpired identification card as herein provided.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-5)

**6.36.120 Permit—Application.**

Any person who is required to have a permit must apply for the permit from the Director and pay an investigation fee of one hundred seventy-five dollars. The

application must be made upon forms provided by the Department and shall set forth the information required which includes:

 **(A)** The applicant's personal description, history, education, experience and background;

 **(B)** The applicant's criminal history and civil and administrative litigation history;

 **(C)** The applicant's relationship to the licensee;

 **(D)** In the case of an escort, the applicant shall furnish written evidence from a licensed physician that the physician has examined the applicant and that the applicant is free from any communicable disease;

 **(E)** A recent three-by-five-inch photograph showing the applicant's head and shoulders; or

 **(F)** Such other information as the Director may require that reasonably relates to the applicant's fitness for a permit or the nature of the service to be provided.

(Ord. 5998 § 81, 2008: Ord. 2262 § 2 (part), 1982: prior code § 5-23-6)

## 6.36.130 Permit—Approval, denial, revocation, suspension.

The Director shall refer the application for a permit to Metro for an investigation. Upon completion of the investigation the Director shall approve, deny or take such other action with respect to such application as he considers appropriate. The Director may deny, revoke or suspend a permit for good cause which includes but is not limited to:

    **(A)**    The application is incomplete or contains false, misleading or fraudulent statements with respect to any information required;

    **(B)**    The applicant or permittee fails to satisfy any qualification or requirement imposed by this Code, or other local, State or Federal law or regulation pertaining to such activities;

    **(C)**    Disciplinary action has been brought against the licensee or a principal of the licensee;

    **(D)**    The applicant or permittee fails to comply with any conditions of the license or permit;

    **(E)**    The applicant or permittee is or has engaged in a business, trade or profession without a valid license, permit, approval for suitability or work card when he knew that one was required or under such circumstances that he reasonably should have known one was required;

**(F)** The applicant or permittee has been subject, in any jurisdiction, to disciplinary action of any kind against a license, permit, approval for suitability or work card to the extent that such disciplinary action reflects on the qualification, acceptability or fitness to hold a permit.

**(G)** The applicant or permittee has committed acts which would constitute a crime involving moral turpitude, prostitution or other sex crimes, or involving any Federal, State or local law or regulation relating to the same or a similar business;

**(H)** When substantial information exists which tends to show that the applicant or permittee is dishonest or corrupt;

**(I)** The applicant or permittee has engaged in deceptive practices upon the public; or

**(J)** The applicant or permittee suffers from a legal disability under the laws of the State.

(Ord. 5998 § 82, 2008: Ord. 2262 § 2 (part), 1982: prior code § 5-23-7)

**6.36.140 Permit—Fee.**

Each escort and each escort runner must pay in advance a semiannual permit fee of one hundred fifty dollars. Failure to pay such fee within fifteen days of its due date shall cause the permit to automatically expire.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-16 (B))

**6.36.150 Permit—Content.**

The permit shall identify the permittee and the licensee and set forth the date of issuance.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-8)

**6.36.160 Permit—Renewal.**

Each escort prior to renewal of his permit by the payment of the semiannual permit fee shall furnish written evidence from a licensed physician that the physician has recently examined the permittee and that the permittee is free from any communicable diseases.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-10 (B))

**6.36.170 Permit—Limitation to named bureau.**

Every escort and escort runner's permit shall be issued to the applicant for one escort bureau only; it is unlawful for an escort or escort runner to undertake employment with any escort bureau other than the escort bureau identified on his permit.

(Ord.2262 § 2 (part), 1982: prior code § 5-23-11 (A))

**6.36.180 Permit—Transfer.**

Upon application and payment of a transfer fee in the amount of fifty dollars, an escort's or escort runner's permit may be transferred to a new escort bureau employer.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-11 (B))

**6.36.190 Permit—Surrender.**

Upon termination of employment as an escort or escort runner for a licensed escort bureau employer, such permittee shall surrender his or her permit to the Department within five days of such termination of employment; it is unlawful for any escort or escort runner to fail to surrender his or her permit within the time prescribed.

(Ord. 5998 § 83, 2008: Ord. 2262 § 2 (part), 1982: prior code § 5-23-11 (C))

**6.36.200 Permit—Loss reporting.**

In the event an escort or escort runner shall lose his or her permit it shall be the duty of the escort or escort runner to report said loss to the Director within five days after knowledge of the loss occurs. A fee of twenty-five dollars shall be charged by the Department to issue a new permit.

(Ord. 5998 § 84, 2008: Ord. 2262 § 2 (part), 1982: prior code § 5-23-11 (D))

**6.36.210 Identification card.**

Any individual who is required to have a work card shall make application for the card with Metro and provide the information requested including fingerprints and photographs. Such card when issued shall be valid for five years, except that a temporary card may be issued for ninety days pending the final issuance of the work card.

(Ord. 5998 § 85, 2008: Ord. 2262 § 2 (part), 1982: prior code § 5-23-9)

**6.36.220 Exhibition on request.**

Each person required to have a permit or an identification card must exhibit his permit and identification card upon the request of any person.

(Ord. 2262 § 2 (part), 1982: prior code § 5-23-10 (A))

**XVIII.    Las Vegas, Nev., Mun. Code § 6.57 OUTCALL ENTERTAINMENT REFERRAL SERVICE BUSINESSES**

**6.57.010 Intent of chapter.**

The City Council declares that this chapter is intended to:

**(A)**    Regulate outcall entertainment referral service businesses by curtailing prostitution under the guise of entertainment without de facto prohibiting or curtailing protected expression; and

**(B)**    Represent a balance between the legitimate ends of the community by:

**(1)**    Imposing an incidental, content-neutral time, place and manner regulation on outcall entertainment referral businesses without limiting alternative avenues of communication; and

**(2)**      Requiring outcall entertainment referral service businesses to carry their fair financial share of law enforcement activities related to outcall entertainment.

(Ord. 3632 §§ 1 (part), 2, 1992)

## 6.57.020 Findings—General compliance.

The City Council finds that outcall entertainment referral service businesses seriously affect the economic, social and moral well-being of the City and its residents; that such businesses must be strictly regulated for the welfare of the public; and that such businesses must therefore comply with Chapter 6.06 of this Code.

(Ord. 3632 §§ 1 (part), 3, 1992)

## 6.57.030 Definitions.

As used in this Chapter, unless the context otherwise requires, the following words shall have the meaning ascribed to them as follows:

**(A)**      "Entertainment location" means a hotel or motel guest room, or the guest room of any other public lodging accommodation including recreational vehicle parking facilities.

**(B)**  "Manager" means the person who administers, oversees or supervises the day-to-day operation of an outcall entertainment referral service and who acts as the licensee's agent.

**(C)**  "Outcall entertainer" means a natural person who is employed by and who is sent or referred to an entertainment location by an outcall entertainment referral service to entertain a patron at the entertainment location.

**(D)**  "Outcall entertainment" means a visit by an outcall entertainer at an entertainment location in response to a telephone or other request to entertain a patron at the entertainment location.

**(E)**  "Outcall entertainment referral service" means a business which for a fee sends or refers an entertainer to an entertainment location in response to a telephone or other request to entertain a patron at the entertainment location.

**(F)**  "Patron" means a person who requests an entertainer to entertain at an entertainment location and who either pays or agrees to pay the fee of the outcall entertainment referral service. "Patron" includes a person who is entertained by an outcall entertainer at an entertainment location.

**(G)**    "Police department" means the Las Vegas Metropolitan Police Department.

(Ord. 3632 §§ 1 (part), 4, 1992)

## 6.57.040 License—Required.

No person shall engage in the business of outcall entertainment referral service without first obtaining and thereafter maintaining a valid unexpired license pursuant to this Chapter and this Code.

(Ord. 3632 §§ 1 (part), 6, 1992)

## 6.57.050 License—Application—Investigation.

**(A)**    Application.

**(1)**    Any person who is required by the provisions of this Chapter to obtain a license must apply for such license at the Department and pay an investigation fee pursuant to the provisions of LVMC 6.06.

**(2)**    The application must be made upon forms provided by the Department and set forth the information required.

**(3)**    A post office box address is unacceptable as a street address on an application where a street address is required; provided, however, an

applicant may identify and designate on his application a post office box address as the address to which he prefers correspondence to be mailed.

**(B)**     Investigation. The Department shall refer the application for a license to Metro for an investigation. Upon completion of the investigation, the City Council shall approve, deny or take such other action with respect to the application as it considers appropriate. The City Council may deny a license for good cause which shall include without limitation the grounds provided in LVMC 6.02.090(A).

(Ord. 5998 § 118, 2008: Ord. 3632 §§ 1 (part), 7, 8, 1992)

## 6.57.060 License—Fee.

Each outcall entertainment referral service must pay in advance a semiannual license fee of one thousand dollars or one percent of the total amount of its gross revenues, whichever is greater.

(Ord. 3632 §§ 1 (part), 11, 1992)

## 6.57.065 License—Business location.

No license for an outcall entertainment referral service may be issued unless the business has a fixed location:

(A) From which the business will actually be conducted; and

(B) Which is properly zoned to allow the use.

(Ord. 5309 §§ 1, 2, 2001)

## 6.57.070 Licensee—Discipline.

In addition to the grounds provided in LVMC 6.02.330, an outcall entertainment referral service licensee may be disciplined if an outcall entertainer who is employed by or referred to a patron by the referral service has committed a criminal act while providing entertainment to a patron under circumstances where the referral service has knowledge or should have had knowledge by reasonable diligence that such a criminal act might occur.

(Ord. 3632 §§ 1 (part), 9, 1992)

## 6.57.080 Licensee—Hiring restrictions.

It is unlawful for any outcall entertainment referral service to employ or refer to a patron an outcall entertainer who:

**(A)**    Is less than eighteen years of age;

**(B)**    Does not have in his possession a valid unexpired work card as required by this Chapter.

(Ord. 3632 §§ 1 (part), 10, 1992)

**6.57.090 Licensee—Work cards—Application.**

    **(A)**    No person may be employed as an outcall entertainer without first obtaining and thereafter maintaining a valid unexpired work card.

    **(B)**    Any person who is required by the provisions of this Chapter to obtain a work card must apply for such work card pursuant to the provisions of Chapter 6.86 of this Code.

(Ord. 3632 §§ 1 (part), 12, 13, 1992)

**6.57.100 Licensee—Work cards—Employee discipline.**

    In addition to the grounds provided in LVMC 6.86.110, an outcall entertainment work card may be denied or an entertainer disciplined if the applicant or entertainer:

    **(A)**    Has been convicted of a crime of prostitution or any other crime of sexual misconduct;

    **(B)**    Has committed a criminal act while providing services to a patron; or

    **(C)**    Is less than eighteen years of age.

(Ord. 3632 §§ 1 (part), 14, 1992)

**6.57.110 Employees—Hiring restrictions.**

No entertainer shall:

**(A)** Provide to a patron entertainment which may contribute to the delinquency of a minor if the patron is less than eighteen years of age;

**(B)** Commit an act of prostitution; or

**(C)** Solicit any fee, gratuity or tip from any patron in addition to the basic entertainment fee.

(Ord. 3632 §§ 1 (part), 16, 1992)

**6.57.120 Employees—Record keeping.**

**(A)** Every outcall entertainment referral service and every outcall entertainer shall maintain in a ledger accurate and detailed records of all entertainment referrals and visits to entertainment locations.

**(B)** The records shall include:

**(1)** The date of the referral and visit;

**(2)** The name, if any, address and room number, if applicable, of the entertainment location where the visit was made;

**(3)** The type of entertainment performed;

**(4)** The name of the patron who was entertained; provided, however, that if there was more than one patron entertained, only the name of the patron who paid the fee to the outcall entertainer need be recorded in the ledger;

**(5)** The amount of money the entertainment cost the patron; and

**(6)** Any special terms or conditions relating to the services performed.

**(C)** Each outcall entertainment referral service shall upon request by the director make its ledger available to the Department for inspection.

**(D)** Each outcall entertainer shall upon request by the Director make his ledger available to the Department for inspection.

(Ord. 3632 §§ 1 (part), 17, 1992)

### 6.57.130 Managers—Hiring restrictions.

No person shall engage in the business of outcall entertainment referral service as a manager without first being approved for suitability pursuant to this Chapter and this Code.

(Ord. 3632 §§ 1 (part), 18, 1992)

## 6.57.140 Managers—Application—Investigation.

**(A)**     Application.

> **(1)**     Any person who is required by the provisions of this Chapter to be investigated as a manager shall file an application with the Department and pay an investigation fee pursuant to Chapter 6.06 of this Code.

> **(2)**     The application must be made upon forms provided by the Department and shall include the information required.

> **(3)**     A post office box is unacceptable as a street address where a street address is required; provided, however, an applicant may identify and designate on his application a post office box address as the address to which he prefers correspondence to be mailed.

**(B)**     Investigation. The Department shall refer the application to the Police Department for an investigation. Upon completion of the investigation, the City Council shall approve, deny or take such other action with respect to the application as it considers appropriate. The Council may deny approval for suitability for good cause which shall include without limitation the grounds provided in LVMC 6.02.090(A).

(Ord. 3632 §§ 1 (part), 19, 20, 1992)

**6.57.150 Managers—Presence on premises required.**

Other than the sole proprietor of an outcall entertainment referral service who acts as his own manager, no licensee shall maintain a referral service or refer entertainers to entertainment locations unless at least one manager remains on the premises and oversees the operation of the referral service at all times during which the operation is open.

(Ord. 3632 §§ 1 (part), 21, 1992)

**6.57.160 Managers—Termination.**

Upon termination of employment of a manager with an outcall entertainment referral service, the referral service shall notify the Department in writing of such termination within ten days thereof.

(Ord. 3632 §§ 1 (part), 22, 1992)

**6.57.170 Managers—Record keeping.**

Every outcall entertainment referral service shall maintain records of the dates on which a manager's employment commenced and on which his employment terminated.

(Ord. 3632 §§ 1 (part), 23, 1992)

**6.57.180 Advertising.**

**(A)**     No person shall advertise or cause to be advertised an outcall

entertainment referral service without first obtaining and thereafter

maintaining a valid unexpired license pursuant to this Chapter and this

Code

**(B)**     No licensee, manager or employee of an outcall entertainment referral

service and no entertainer shall, in any manner, either directly or

indirectly:

   **(1)**     Advertise, display or disseminate:

      **(a)**     In any newspaper, magazine or other publication, or

      **(b)**     By radio or television broadcasting, or

      **(c)**     By telephone, or

      **(d)**     By handbill, pictorial representation or other advertising

      any information or illustrations or pictures of any person or

      object that contain any statement which implies or suggests to

      a reasonable, prudent person or would give the public a basis to

      infer or believe that prostitution or any other illegal act,

      product or service is offered or provided by the referral service

      or the entertainer;

**(2)** Advertise in any manner set forth in paragraph (1) of this subsection any statement which implies or suggests to a reasonable, prudent person or would give to the public a basis to infer or believe that outcall entertainers have been medically examined and are free from contagious diseases.

(Ord. 3632 §§ 1 (part), 24, 25, 1992)

**6.57.190 Violation—Penalty.**

Whenever in this Chapter any act is prohibited or is made or declared to be unlawful or an offense or a misdemeanor, or whenever in this Chapter the doing of any act is required or the failure to do any act is made or declared to be unlawful or an offense or a misdemeanor, the doing of such prohibited act or the failure to do any such required act shall constitute a misdemeanor and upon conviction thereof, shall be punished by a fine of not more than one thousand dollars or by imprisonment for a term of not more than six months, or by any combination of such fine and imprisonment. Any day of any violation of this Chapter shall constitute a separate offense.

(Ord. 3632 §§ 1 (part), 27, 1992)

**XIX.** **Nev. Admin. Code § 441A.800 - Testing of sex workers; prohibition of certain persons from employment as sex worker**

**1.** A person seeking employment as a sex worker shall submit to the State Public Health Laboratory or a medical laboratory licensed pursuant to chapter 652 of NRS and certified by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services:

**(a)** A sample of blood for a test to confirm the presence or absence of human immunodeficiency virus infection (HIV) and syphilis.

**(b)** If the person is female and has a uterine cervix, a cervical specimen for a test to confirm the presence or absence of gonorrhea and *Chlamydia trachomatis* by culture or antigen detection or nucleic acid testing.

**(c)** If the person is female and does not have a uterine cervix, a high vaginal specimen for a test to confirm the presence or absence of gonorrhea and *Chlamydia trachomatis* by culture or antigen detection or nucleic acid testing.

**(d)** If the person is male or transgendered, a urethral specimen for a test to confirm the presence or absence of gonorrhea and *Chlamydia trachomatis* by culture or antigen detection or nucleic acid testing.

ADD-127

(e)     If the person is seeking employment in a licensed house of prostitution which does not have a written policy that explicitly prohibits engaging in any form of anal intercourse, a rectal specimen for a test to confirm the presence or absence of gonorrhea and *Chlamydia trachomatis* by culture or antigen detection or nucleic acid testing.

2.  A person must not be employed as a sex worker until the State Public Health Laboratory or a medical laboratory licensed pursuant to chapter 652 of NRS and certified by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services has reported that the tests required pursuant to subsection 1 do not show the presence of infectious syphilis, gonorrhea, *Chlamydia trachomatis* or infection with the human immunodeficiency virus (HIV).

3.  A person employed as a sex worker shall submit to the State Public Health Laboratory or a medical laboratory licensed pursuant to chapter 652 of NRS and certified by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services:

(a)     Once each month, a sample of blood for a test to confirm the presence or absence of:

ADD-128

**(1)** Infection with the human immunodeficiency virus (HIV); and

**(2)** Syphilis.

**(b)** Once each week if the sex worker is female and has a uterine cervix, a cervical specimen for a test to confirm the presence or absence of gonorrhea and *Chlamydia trachomatis* by culture or antigen detection or nucleic acid testing.

**(c)** Once each week if the sex worker is female and does not have a uterine cervix, a high vaginal specimen for a test to confirm the presence or absence of gonorrhea and *Chlamydia trachomatis* by culture or antigen detection or nucleic acid testing.

**(d)** Once each week if the sex worker is male or transgendered, a urethral specimen for a test to confirm the presence or absence of gonorrhea and *Chlamydia trachomatis* by culture or antigen detection or nucleic acid testing.

**(e)** Once each week if the sex worker is employed in a licensed house of prostitution which does not have a written policy that explicitly prohibits engaging in any form of anal intercourse, a rectal specimen for

ADD-129

a test to confirm the presence or absence of gonorrhea and *Chlamydia trachomatis* by culture or antigen detection or nucleic acid testing.

**4.** If a test required pursuant to this section shows the presence of infectious syphilis, gonorrhea, *Chlamydia trachomatis* or infection with the human immunodeficiency virus (HIV), the person shall immediately cease and desist from employment as a sex worker.

**5.** Each sample and specimen required pursuant to this section must be collected under the supervision of a licensed health care professional and must be identified by, as applicable:

**(a)** The name of the sex worker from whom the sample or specimen was collected, as that name appears on the local work permit card of the sex worker; or

**(b)** The name of the person from whom the sample or specimen was collected, as that name appears on the application of the person for a local work permit card.

**6.** Each laboratory test required pursuant to this section must be approved by the Food and Drug Administration of the United States Department of Health and Human Services for the purpose for which it is administered or

ADD-130

must have been validated by a laboratory certified by the Secretary of Health and Human Services pursuant to 42 U.S.C. § 263 a.

## XX.    Nye Co. Code § 9.20.020

### 9.20.010: Adoption

The adoption of this chapter provides for the licensing and regulation of prostitution; for revenue and regulation; prohibits any prostitution in Nye County, except as conducted in accordance with the provisions of this chapter; declares that prostitution conducted in accordance with the provisions of this chapter does not constitute a public offense, or nuisance and is designed to promote public trust through strict regulation which will protect the public health, safety, morals and welfare of the residents of the County. (Ord. 546, 2019: Ord. 515, 2017)

### 9.20.020: Definitions

For the purpose of this chapter, the following words and phrases have the meanings respectively ascribed to them by this section:

APPLICANT: Any person, applying to the Board for a license, finding of suitability, approval or consent

under the provisions of this chapter.

ADD-131

BOARD; LICENSING BOARD: The Board of County Commissioners and the Sheriff.

BROTHEL: Any establishment having a source of income or compensation derived from the practice of "prostitution" as defined in this section, and which has a fixed place of business where any person engages in or carries on any of the activities as defined in the definition of "house of prostitution" of this section.

CERTIFIED PUBLIC ACCOUNTANT: A person possessing a current certificate from the Nevada State Board of Accountancy to conduct business in Nevada as a certified public accountant.

CLERK OF THE BOARD: The County Clerk. COURTESAN: See PROSTITUTE.

COUNTY: The County of Nye, State of Nevada.

EMERGENCY: A sudden or unexpected or unforeseen health or safety hazard calling for immediate action or remedy to safeguard the public health, safety, morals or welfare of the inhabitants of the county.

EMPLOYEE: Any person employed for maintenance, repair, bartending, cooking, housekeeping, chauffeuring or any other purpose related to the operation of the brothel, other than courtesan, managers, or key employees, as defined in this section.

ADD-132

FEE: License fee, application/investigation fee, and work card fee.

HOUSE OF PROSTITUTION: Any house, building, trailer (with or without wheels), vehicle, tent or other structure or "premises" as defined in this section wherein or whereon acts of prostitution are committed or offered to be committed.

KEY EMPLOYEE: Any person designated by the licensee and authorized by the licensee to exercise operational control, as defined in this section, over decisions involving a brothel and approved by the Board.

LICENSE: A license issued by the Board authorizing a person to operate a brothel.

LICENSE DEPARTMENT: The License Department of Nye County, Nevada.

LICENSED OPERATION OR OPERATION: A brothel duly licensed and operated in accordance with the provisions of this chapter.

LICENSEE: The applicant to whom a license has been issued to operate a brothel as defined in this section.

MANAGER: A person, other than the licensee, having authority given him or her by the licensee to manage and conduct the regular business affairs of a brothel.

OPERATIONAL CONTROL: The control of, or the ability to control, any substantial business decision involving a brothel.

ADD-133

PERSON: Any natural person, partnership, limited partnership, firm, association of persons, joint stock company, corporation or combination of individuals of whatever form or character.

PREMISES: Each and every part or area of brothels as defined in this section, including the real property

and all improvements and structures thereon, where brothels are located.

PROSTITUTE: Any person who, engages in acts of prostitution as defined in this section. The word 'courtesan' is interchangeable with the word 'prostitute'.

PROSTITUTION: Engaging in any act, for a fee, with the purpose of arousing or gratifying the sexual desire of either person.

REGISTRANT: Those licensees, key employees, employees or courtesans required to obtain a work card through the Nye County Sheriff's Office under the provisions of this chapter.

SANCTIONS: Limiting, suspending, restricting or revoking a license and/or registration card.

SEXUAL CONDUCT: Any of the acts defined in the definition of "prostitution" of this section.

SOLICITATION: Any person who:

    **A.** Induces, persuades, encourages, inveigles or compels a person to engage in "sexual conduct" as defined in this section; or

    **B.** Offers to engage in "sexual conduct" as defined in this section.

WORK CARD: Documentation issued by the Nye County Sheriff's Office to licensees or persons who qualify to be employees or independent contractors of a brothel. (Ord. 546, 2019: Ord. 543, 2018)

### 9.20.030: License Required

Any person who works as a courtesan or operates a brothel without first having obtained a license and having paid the license fee as provided in this chapter is guilty of a misdemeanor. (Ord. 546, 2019: Ord. 515, 2017)

### 9.20.120: License Denial

The Board may refuse to grant a license to any applicant:

    **A.** Who has been convicted of a felony.

    **B.** Who is financially insolvent or who has undergone a prior bankruptcy proceeding filed by or against him that resulted in creditors receiving less than the total amount of money owed them.

    **C.** Who has a history of financial instability.

    **D.** Whose stated financial condition is inadequate or insufficient to operate a brothel.

ADD-135

**E.** Who makes any untrue statement of a material fact in any application, notice, statement or report filed with the Board in compliance with the provisions of this chapter, or willfully omits to state in any such application, notice, statement or report any material fact which is required to be stated therein, or omits to state a material fact necessary to make the fact stated in view of the circumstances under which they were stated, not misleading.

**F.** Who has any financial interest in, or connection with any business which is illegal where such business is located.

**G.** Whose licensed operation under the provisions of this chapter would be contrary to the health, safety, morals or welfare of the County or its residents.

**H.** Who is under the age of twenty-one (21) years.

**I.** Who has been convicted of a crime involving moral turpitude, unless the Board finds, upon examination of the circumstances of the crime and the applicant's criminal history, that the applicant does not present, and is not likely to present in the future, a threat to the health, safety, morals or welfare of the residents of the County, and will likely operate

ADD-136

a lawful establishment in full compliance with the letter and intent of all County ordinances, regulations, and the laws of the State.

**J.** Whose license issued under this chapter has been revoked for cause.

**K.** Who, at the time of application for renewal of any license issued under this chapter, would not be eligible for such license upon first application.

**L.** Who is a corporation, unless it is incorporated in Nevada, or unless it is a foreign corporation which is qualified under Nevada law to transact business in the State.

**M.** Whose premises are deemed by the Board to be unsuitable for the conducting of a brothel by reason of ownership of any interest whatsoever in such premises by a person who is unqualified or disqualified to hold a license, regardless of the qualifications of the person who seeks or holds a license to operate a brothel in or upon such premises. (Ord. 546, 2019: Ord. 515, 2017)

**9.20.125: Restriction On Number Of Licensed Operations Located In Amargosa Valley**

The Board shall limit the number of licensed brothels located within the legally designated boundary of the unincorporated Town of Amargosa Valley to one or less. (Ord. 546, 2019: Ord. 515, 2017)

**9.20.130: License Restrictions**

Every license issued under the provisions of this chapter shall have the following restrictions:

 **A.** Except as otherwise provided in this chapter no operation may be:

  **1.** Located within the city limits of an incorporated city, except as provided by ordinance of such incorporated city;

  **2.** Located outside an incorporated city, except as provided by this chapter;

  **3.** Located within three hundred (300) yards of any public street, road or highway, except for operations existing at the time of adoption of this chapter;

  **4.** Located within three hundred (300) yards of any private residence (other than the residence of persons associated with the licensed operation) without written consent of the owner of such residence;

ADD-138

**5.** Located within three hundred (300) yards of any other business establishment (other than another brothel), without written consent of the owner of such other business establishment;

**6.** Conducted in violation of any city, County, State or Federal ordinance, statute, or regulation;

**7.** Located within five hundred (500) yards of any schoolhouse or schoolroom used by any public or common school in the State;

**8.** Located within five hundred (500) yards of any church, edifice, building or structure erected for and used for devotional service or religious worship in the State.

**B.** All brothels shall be designated by:

**1.** One sign no larger than twenty-four (24) square feet, to be located on the entrance of the house of prostitution and to contain the following words and no others:

*BROTHEL*

*Or*

*HOUSE OF PROSTITUTION (name of the establishment)*

ADD-139

**2.** The Board may allow such other sign(s) as in the Board's determination is found to be necessary to the safety and welfare of the inhabitants of a particular area within the County;

**3.** Signs(s) approved by the Board.

**4.** Signs shall not be placed in locations prohibited by Nevada Revised Statutes 201.430.

**5.** No signs may be placed anywhere in the County advertising the brothel or associated businesses on the same property. No print advertising is allowed anywhere in the County with the same restrictions of other businesses on the same property. See subsection C.2. Notwithstanding the above, advertising within the premises on matchbooks or any kind of print advertising is allowed.

**6.** Any bar or saloon operated on the same premises must have a substantially different name than the brothel.

**C.** No license to conduct a brothel shall be issued until an inspection by the appropriate State and/or County Health Officer and the Nye County Sheriff reveal that the establishment complies with each of the following minimum requirements:

**1.** A source of water must be available to facilitate cleaning. All sources of water, including, but not limited to, wells, must be approved by the appropriate State and County agencies;

**2.** A sewage disposal system approved by the State Board of Health;

**3.** Lavatories or washbasins provided with running water shall be installed in either the toilet room or the vestibule. Lavatories or washbasins shall be provided with soap in a dispenser and with sanitary towels;

**4.** Every portion of a brothel, including appliances, apparatus and personnel, shall be kept clean and operated in a sanitary condition;

**5.** All brothels shall provide clean, laundered sheets and towels in sufficient quantity and shall be laundered after each use thereof and stored in an approved, sanitary manner. Approved receptacles shall be provided for storage of soiled linen and paper towels;

**6.** Rooms, shower compartments and toilet rooms shall be thoroughly cleaned each day the brothel is in operation. Bathtubs shall be thoroughly cleaned after each use;

**7.** The use of condoms is mandatory in Brothel and a sign that states "CONDOMS ARE MANDATORY" must be displayed in a

ADD-141

conspicuous place so that the same may be readily seen by persons entering all rooms, compartments, or areas wherein acts of prostitution are performed;

**8.** No licensee, their agents or employees, either directly or indirectly, shall place, publish, distribute or cause to be placed, published or distributed any advertisement, picture or statement which is known, or through the exercise of reasonable care should be known, to be false, deceptive, or misleading in order to induce any person to purchase or utilize the brothel services.

**D.** No person issued a brothel license, their agents or employees, shall arrange, conduct or perform any escort, outcall, outdate or similar service.

**E.** The Nye County Sheriff shall inspect the premises of each brothel at least quarterly for compliance with this chapter. Each brothel may be subject to random inspections. (Ord. 546, 2019: Ord. 543, 2018)

### 9.20.140: Requirement And Application For Work Card

**A.** Every key employee, courtesan, and employee shall be registered with the Nye County Sheriff on the forms provided by the Sheriff, and is required to have a work card. Licensees are not required to obtain a work card, unless they are required to obtain a work card pursuant to this chapter, i.e., the

ADD-142

licensee is acting as a key employee, or employee. The work card application form shall include the following information, plus such other information as the Sheriff may, from time to time, deem necessary:

**1.** The individual's name, age, address, sex, physical description, social security number, and date of birth;

**2.** Full disclosure of all assumed or fictitious names used;

**3.** Complete employment record for the preceding five (5) years;

**4.** All addresses at which the registrant has resided for the preceding five (5) years; and

**5.** A list of all prior convictions, which list shall include a statement of each offense, the place and date of its occurrence, and the date and place of convictions, if applicable.

**B.** All work card application forms shall be accompanied by the following:

**1.** A referral slip or request for work card application from a brothel for a prospective key employee, courtesan, or employee;

**2.** A copy of a current and valid health certificate provided by a physician duly licensed by the State, if the individual will be a courtesan;

**3.** A photograph and full set of fingerprints taken by the Nye County Sheriff;

**4.** A waiver to be signed by the licensee, key employee, courtesan, or employee allowing the past employment and criminal records of the licensee, key employee, courtesan or employee to be open for examination by the properly designated authorities of the County. A waiver by the courtesan shall include any physician-patient privilege with respect to medical records as may exist.

**C.** The Nye County Sheriff shall investigate, through all available means, the accuracy of all information supplied by the Licensee, key employee, courtesan, or employee on the work card application form and shall require that each licensee, key employee, courtesan, or employee furnish the Sheriff with sufficient means of identification.

**D.** No person shall be issued a work card who:

**1.** Has ever been convicted of a felony involving a crime of a sexual nature, a sexual crime involving children, or a heinous crime;

**2.** Has made any intentional false statements or omissions in the registration form;

**3.** Is under twenty-one (21) years of age.

ADD-144

**E.** If upon examining the application form and conducting his or her investigation, the Nye County Sheriff finds the registrant to be suitable for employment in a brothel, a work card shall be issued to the registrant, and shall contain:

    **1.** Names, age, and physical description;

    **2.** Photograph and signature of the cardholder;

    **3.** Name of the brothel where the registrant is employed; and

    **4.** Designated job position.

**F.** No licensee, key employee, courtesan or employee shall work in a licensed brothel until first having received a work card. The licensee shall maintain a current, accurate list of employees.

**G.** Work cards must be renewed:

    **1.** Courtesan: Brothel must be renewed quarterly, on or before the first day of the quarter (January 1, April 1, July 1, or October 1).

        **a.** A courtesan's work card shall be valid for only the courtesan's current brothel and shall not be valid at any other brothel.

ADD-145

   **b.** Upon a change from one brothel to another, a courtesan must reapply for a work card, pay the work card application fee as required.

  **2.** All other key employees, employees, and any licensees that are required to obtain a work card pursuant to this chapter must be renewed annually, on or before July 1, the start of the fiscal year, of the following year.

 **H.** A fee as required pursuant to this chapter shall accompany the work card application for each application period, or any portion thereof, and for each applicant. (Ord. 546, 2019: Ord. 515, 2017)

## 9.20.145: Display Of Registration Card

Work cards issued under section 9.20.140 of this chapter shall remain the property of Nye County. Upon commencement of employment, all registered personnel shall have their work cards in immediate access during hours when the registrant is in the brothel. The licensee or key employee shall maintain possession of the work card for employees and managers. The registrant shall ensure the return of all work cards in their possession to the Nye County Sheriff's Office within five (5) working days of the expiration of the card or separation from the brothel, whichever shall occur first. Courtesans shall maintain their work cards in their possession at all

ADD-146

times and are responsible for returning their cards to the Nye County Sheriff's Office within five (5) working days of the expiration of the card or separation from the brothel, whichever shall occur first. (Ord. 546, 2019: Ord. 515, 2017)

### 9.20.150: Health Examinations Of Courtesans And Tests

**A.** Medical examinations for all courtesans working in a brothel, must, at no cost to the County:

    **1.** Be performed at least every seven (7) calendar days;

    **2.** Be performed by a physician licensed to practice medicine in the State, or by a physician's assistant or registered nurse under the authority of a physician licensed to practice medicine in the State;

    **3.** Include tests specified by the State Board of Health (NAC 441A) for the detection and diagnosis of venereal diseases, including, but not limited to, weekly tests for lymphogranuloma venereum and/or the presence of the microorganism chlamydia trachomatis, and weekly tests for gonorrhea using an endocervical culture technique, urethra swabs, or rectal swabs. All cultures made in the completion of such tests shall be processed at licensed and approved clinical laboratories;

    **4.** Include such other medically approved tests for determining whether the courtesan is afflicted with any infectious or contagious disease, as

required by chapter 441A of the Nevada Administrative Code, as amended, and other medically approved tests deemed advisable by the examiner, and must include initial/preemployment examination and testing, and retesting monthly thereafter, to determine the presence or absence of the human immunodeficiency virus, as required by said chapter 441A;

**5.** Be performed at the location of the brothel, at the examiner's office, or at a hospital or clinic, as determined by the examiner;

**B.** After the examination, the examiner must:

**1.** Issue to a courtesan examined and found not to be afflicted with venereal disease or other contagious or infectious disease, a certificate so stating;

**2.** Refuse to issue such certificate if the courtesan is found to be, or suspected of being afflicted with venereal disease or other contagious or infectious disease, and immediately advise the licensee who shall remove the courtesan from service;

**C.** Licensees, or a designated manager or key employee, of a brothel must:

**1.** Sign the medical certificates of all courtesans working in the respective brothels. Such signature shall be considered by the Board

ADD-148

as verification by the licensee that the holder of that medical certificate is the same courtesan to whom the corresponding brothel work card was issued.

**2.** Report to the Nye County Sheriff by providing a written report within twenty-four (24) hours of the existence of any condition on the premises of the brothel which constitutes a health or safety hazard to the patrons, employees or public, together with his or her plan for correcting the condition.

**D.** Weekly medical examination results for all courtesans working at a brothel must be furnished to the Nye County Sheriff by the licensee within twenty-four (24) hours of the medical determination.

**E.** The medical examination records of each courtesan shall be open for examination at any time by the properly designated authorities of the County, and each courtesan, by accepting employment in any brothel, shall be deemed to have waived any physician-patient privilege with respect to such records as may otherwise exist.

**F.** Any licensee, manager or key employee who knowingly permits any courtesan to work in his or her brothel in violation of this section

shall, in addition to any other penalty, be subject to "sanctions" as defined in this chapter.

**G.** The health certificate of each courtesan shall be available for inspection at the licensed location.

**H.** It is unlawful for a licensee, manager, key employee, or anyone acting on behalf of any such person who has received written notice that a courtesan has tested positive for the human immunodeficiency virus, or any venereal diseases, including, but not limited to, lymphogranuloma venereum, chlamydia trachomatis, herpes, hepatitis B, human papillomavirus, trichomoniasis, cancroids, syphilis, gonorrhea in a test approved by they State Board of Health to work as a courtesan in any brothel. (Ord. 546, 2019: Ord. 543, 2018)

## 9.20.160: General Prohibitions

It is unlawful:

**A.** For any person under the age of twenty-one (21) years to enter or be a patron of any brothel;

**B.** For a licensee of any licensed brothel, or for any employee of such licensee, to compel, en encourage, permit or suffer any person under the age of twenty-one (21) years to enter or patron of any licensed brothel;

ADD-150

**C.** For any licensed operation, licensee, or for an employee of any licensee, to sell, dispense give away any alcoholic beverages to anyone under the age of twenty-one (21) years upon premises of a licensed brothel.

**D.** For any person to engage in prostitution or solicitation therefor, except in a brothel licensed u this chapter. (Ord. 546, 2019: Ord. 515, 2017)

**9.20.230: Fees**

The fees are adopted by resolution and will be periodically reviewed. The resolution will include but is not limited to:

**A.** Application/Investigative Fee: Each application for a license to operate or conduct a brothel.

**1.** Any applicant whose place of business will be conducted by a key employee, and any brothel licensee who, pursuant to section 9.20.090 of this chapter, is required to submit an amended application or is required to report the change of a key employee.

**2.** The Board may require payment of extraordinary costs, as necessary, as a condition precedent to continuing an investigation.

**3.** The Board will not take final action with respect to any application until all investigative fees have been paid in full.

ADD-151

**B.** License Fee: Every licensed operation shall pay an annual fee, or any portion thereof, as established by resolution.

**C.** Work Card Fee:

**1.** A work card fee shall be required for each calendar quarter, or any portion thereof, and for each work card application required under section 9.20.140 of this chapter. All work card fees will be deposited into the General Fund and a portion may be distributed to the veterans' service fund during each budget cycle.

**2.** An annual work card shall be issued to each person applying for a work card, pursuant to the requirements of section 9.20.140 of this chapter.

**3.** A quarterly work card shall be issued to each courtesan applying for a work card, pursuant to the requirements of section 9.20.140 of this chapter.

**4.** Each licensee shall be responsible to ensure that each employee or courtesan has a current work card. The licensee shall submit the work card to the Nye County Sheriff within two (2) business days of the termination of any employee from the licensed operation.

**D.** Fees Nontransferable: The fee paid by one licensee shall not inure to the benefit of another

licensee.

**E.** Proration: No proration of any required fee shall be allowed or granted unless provided in this

chapter.

**F.** Collection of License Fees: All license fees shall be collected and disbursed by the License Department in the manner provided in chapter 364 of Nevada Revised Statutes.

**G.** Fees Nonrefundable: Unless otherwise provided in this chapter, no fees collected pursuant to the provisions of this chapter, or portions thereof, are refundable. (Ord. 546, 2019: Ord. 543, 2018)